No. 25-7504

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

BLUE LAKE RANCHERIA, CHICKEN RANCH RANCHERIA OF
ME-WUK INDIANS, and PICAYUNE RANCHERIA OF THE
CHUKCHANSI INDIANS

Appellants/Plaintiffs,

v.

KALSHI INC., KALSHIEX LLC, ROBINHOOD MARKETS, INC.,
ROBINHOOD DERIVATIVES LLC, and DOES 1-20,

Appellees/Defendants.

On Appeal from the United States District Court
for the Northern District of California
No. 25-cv-06162-JSC
Hon. Jacqueline Scott Corley

---

APPELLANTS' OPENING BRIEF

---

LESTER J. MARSTON
California State Bar No. 081030
THE LAW OFFICES OF RAPPORT AND MARSTON
AN ASSOCIATION OF SOLE PRACTITIONERS
405 West Perkins Street
Ukiah, California 95482
Telephone: 707-462-6846
Facsimile: 707-462-4235
Email: ljmarston@rmlawoffice.net

*Attorney for Appellants*
*Blue Lake Rancheria, Chicken Ranch Rancheria Of Me-Wuk Indians, And Picayune Rancheria Of The Chukchansi Indians*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

JURISDICTION STATEMENT ...............................................................................4

ISSUES PRESENTED................................................................................................5

STATEMENT OF CASE............................................................................................6

    I.    The Parties .......................................................................................... 6

    II.    Facts Relevant to the Issues Submitted for Review ...................................... 9

    III.  The Proceedings Below ...................................................................10

SUMMARY OF ARGUMENT .................................................................................12

STANDARD OF REVIEW ......................................................................................16

ARGUMENT ............................................................................................................17

    I.    THE DISTRICT ERRED IN HOLDING THAT KALSHI'S SPORTS BETTING ACTIVITIES DID NOT VIOLATE THE TRIBES' COMPACT, PROCEDURES AND THE IGRA. ...............................................17

    II.    THE DISTRICT COURT ERRED BY INTERPRETING UIGEA TO REPEAL SUBSTANTIAL PROVISIONS OF IGRA. .......................................27

    III.  THE DISTRICT ERRED BY NOT ADDRESSING THE TRIBES' ARGUMENT THAT KALSHI'S SPORT BETTING ACTIVITIES ON THE TRIBES' LANDS VIOLATED THE CEA. ....................................................37

    IV.  THE DISTRICT COURT MISAPPLIED NINTH CIRCUIT LANHAM ACT PRECEDENT IN TREATING KALSHI'S ADVERTISEMENT AS A NON-ACTIONABLE STATEMENT OF OPINION. .......................................42

    V.    EVEN IF KALSHI'S STATEMENT WAS OPINION, THE DISTRICT COURT ERRED IN CONCLUDING THAT KALSHI HELD A GOOD-FAITH BELIEF THAT THE STATEMENT WAS TRUE..............................................46

    VI.  KALSHI'S TECHNICAL QUALIFIER DOES NOT CURE ITS LITERAL FALSE STATEMENT UNDER NINTH CIRCUIT PRECEDENT. ..................49

    VII. AT BOTTOM, DESIGNATED CONTRACT MARKETS ARE NOT AUTHORIZED VENUES FOR SPORTS BETTING. ......................................49

CONCLUSION ........................................................................................................51

CERTIFICATE OF COMPLIANCE ....................................................................53

CERTIFICATE OF SERVICE..........................................................................54

# TABLE OF AUTHORITIES

**Cases**

*All for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)......................17

*Am. Bev. Ass'n v. City & Cty. Of San Francisco*, 916 F.3d 749 (9th Cir. 2019) ....17

*Blue Lake Rancheria v. Kalshi Inc.*, No. 25-CV-06162-JSC, 2025 WL 3141202, at
     *5 (N.D. Cal. Nov. 10, 2025).................................................................passim

*Brown v. Gardner*, 513 U.S. 115 (1994) ..............................................................24

*Cayuga Nation v. New York State Gaming Comm'n*, 775 F. Supp. 3d 651 (N.D.N.Y.
     2025) ...............................................................................................26, 34

*Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024 (9th Cir.
     2022) ........................................................................................ 18, 20, 23

*Cnty. Of Yakima v. Confederated Tribes, 502 U.S. 251* (1992) ............................22

*Coastal Abstract Service, Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir.
     1999) ....................................................................................... 42, 43, 44, 45

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 69 F.4th 665 (9th Cir. 2023)
     ..................................................................................................................43, 46

*Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536 (8th Cir. 1996)..............22

*Haaland v. Brackeen*, 599 U.S. 255 (2023)...........................................................51

*I.N.S. v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183 (1991)......................29

*KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58 (D.C. Cir.
     2024) ...............................................................................................................47

*KalshiEX LLC v. Flaherty*, No. 25-CV-02152-ESK-MJS, 2025 WL 1218313, at
     *8 (D.N.J. Apr. 28, 2025)..........................................................................47, 48

*KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025) ............39, 40, 48, 50

*KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282, at *3 (D. Nev. Nov. 24, 2025)........................................................................passim

*Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019).................................................17

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).......................................38

*Marbury v. Madison*, 5 U.S. 137 (1803)................................................................37

*McGirt v. Oklahoma*, 591 U.S. 894 (2020) ...........................................................51

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982).......39

*Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (1985).............................24, 34

*Murphy v. NCAA*, 584 U.S. 453 (2018).......................................................2, 43, 44

*N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*, No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at *6 (D. Nev. Oct. 14, 2025) ..................passim

*Navajo Nation v. Dalley*, 896 F.3d 1196 (10th Cir. 2018) .....................................34

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015) .................................................................................47

*S.E.C. v. McCarthy*, 322 F.3d 650 (9th Cir. 2003) ................................................26

*Smith v. United States*, 508 U.S. 223 (1993) ........................................................33

*Stand Up for California! v. U.S. Dep't of the Interior*, 959 F.3d 1154 (9th Cir. 2020) ...............................................................................................................24

*State of California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960 (9th Cir. 2018) ...........................................................................................................passim

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609 (9th Cir. 2016) ...............................................................................................................45, 46

*United States v. Novak*, 476 F.3d 1041 (9th Cir. 2007) ..........................................31

*United States v. Schiff*, 379 F.3d 621 (9th Cir. 2004) ...............................................17

*United States v. Wells*, 156 F.4th 907 (9th Cir. 2025)...............................................31

*Whiteside v. Kimberly-Clark Corp.*, 108 F.4th 771 (9th Cir. 2024) .......................49

*Winter v. Natural Res. Ref. Council, Inc.*, 555 U.S. 7 (2008) ................................17

*Wisconsin Cent. Ltd v. United States*, 585 U.S. 274 (2018)....................................33

**Statutes**

15 U.S.C. § 1125(a)(1)(B), Lanham Act .........................................................passim

18 U.S.C. § 1964(c), Racketeer Influence and Corrupt Organization Act............... 9

21 U.S.C. § 342(f)........................................................................................................45

25 U.S.C. § 2701 et. seq., Indian Gaming Regulatory Act .............................passim

25 U.S.C. § 476, Indian Reorganization Act ......................................................... 6

28 U.S. Code § 3701 et seq., Professional and Amateur Sports Protection Act ...... 1

28 U.S.C. § 1292.......................................................................................................... 5

28 U.S.C. § 1331......................................................................................................4, 10

28 U.S.C. § 1362.......................................................................................................4, 10

31 U.S.C. § 5361 et seq., Unlawful Internet Gambling Enforcement Act.......passim

7 U.S.C. § 1 et seq., Commodity Exchange Act ..............................................passim

Cal. Penal Code § 337a ............................................................................................43

**Other Authorities**

156 Cong. Rec. S5902-01, S5906 (July 15, 2010)....................................................50

Provisions Common to Registered Entities, 76 Fed. Reg. 44,776, 44,785 (July 27, 2011) ..................................................................................................................50

S. REP. 100-446, 18, 1988 U.S.C.C.A.N. 3071, 3088....................................18, 32

*The Dynamics of Casino Slot Revenue Tax Base Calculations*, 20 J. Tax'n F. Inst. 11, 14 ...............................................................................................................33

**Regulations**

17 C.F.R. § 40.11..............................................................................................passim

17 C.F.R. § 40.2.......................................................................................................46

25 C.F.R. § 293.2(d) ..........................................................................................32, 34

25 C.F.R. § 502.4(c) .................................................................................................32

**Constitutional Provisions**

Indian Commerce Clause, Article I, § 8, cl. 3.......................................................4, 16

**INTRODUCTION**

For the majority of this Country's history, gambling on sports has been illegal for both moral reasons and to ensure that sporting events are fair and free from gambling-related corruption. Indeed, some of the most significant scandals in sports relate directly to gamblers conspiring to fix the outcome of the games. From the Black Sox Scandal, in which eight members of the Chicago White Sox were accused of intentionally losing the 1919 World Series in exchange for payment from a gambling syndicate, to the NBA's ban of Jontay Porter in 2024 for disclosing confidential information to sports bettors, limiting his own participation in one or more games for betting purposes, and betting on NBA games, gambling and sports have always had a fraught relationship.

With time, public opinion changed. Nevada entered the sports gambling market and allowed persons to wager on sporting events as a matter of state law, but in a licensed and regulated manner designed to shield the sports gambling (and the leagues themselves) from organized crime and other corrupting influences that might taint the outcomes of the games and to assure that sports gambling is conducted fairly and honestly by both the operator and players.

To prevent sports gambling's continued growth, in 1992 Congress enacted the Professional and Amateur Sports Protection Act, 28 U.S. Code § 3701 *et seq*., which purported to bar the States from authorizing sports betting. In the late 2010s, the

1

State of New Jersey, seeking to legalize sports betting within the State, fought that Act, all the way to the Supreme Court. Siding with the State of New Jersey, the Supreme Court struck down that Act, holding that "Americans have never been of one mind about gambling[,]" and that Congress could not lawfully impose such a barrier on state lawmakers. *Murphy v. NCAA*, 584 U.S. 453, 458 (2018). Since then, a majority of states have legalized sports gambling with thorough licensing and registration regimes that generate much needed tax dollars for states. Indian tribes, too, have begun to offer sports gambling on their reservations pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et. seq.* ("IGRA").

What was the point, of all of this history (and the *Murphy* litigation, itself), if Congress had already, implicitly (and while *explicitly* stating the opposite on the House floor), legalized sports betting nationwide on derivative markets through the 2010 Dodd-Frank Amendments to the Commodity Exchange Act? That is the fiction that defendants Kalshi *et al*. would have this Court accept.

Since the last presidential election, Kalshi, riding on the coat-tails of a sports-gambling-though-commodities-exchange-friendly administration, has facilitated billions of dollars of unregulated sports wagers, which account for over 90% of the transactions that occur on its platform. It does so nationwide, including on the Appellant Tribes' reservations, and its sports gambling is offered to persons as young as 18—even in locations where the legal sports gambling age is 21.

While recognizing just what Kalshi was doing,[1] the Court below erred in coming to the astounding conclusion that the Commodity Futures Trading Commission, the federal agency that regulates wheat and soybean futures and the like, is the sole arbiter of whether Congress had already legalized sports gambling, nation-wide, 18 and up, all the way back in 2010, with zero state or tribal regulatory oversight of the gambling occurring within their respective territories.

As demonstrated herein, the District Court, below, made numerous critical errors, which this Court should reverse. First, the Court erred in holding that 25 U.S.C. § 2710(d)(7)(A)(ii) did not give Indian tribes, such as the Appellant Tribes, a right of action in federal district court to enjoin illegal class III gaming conducted by third parties on their Indian Lands. Second, the Court erred in finding that Kalshi's sports betting activities did not violate the terms of the Tribes' Compact and Procedures. Instead, the Court held that the Unlawful Internet Gambling Enforcement Act impliedly repealed the Indian Gaming Regulatory Act and governs sports betting gaming activities on the Tribes' Indian lands. Third, the Court failed to address the Appellant Tribes' argument that Kalshi's sports betting activities conducted on the Tribes' lands violated the Commodity Exchange Act. Finally, the

---

[1] "…there's been enough fights in the history of this country with the Indian tribes that we probably don't need any more, and that maybe, maybe there's just a way of doing something that satisfies them and allows [Kalshi] to continue to make a lot of money, which is what it's about, right? … Gambling, we can't really argue about this is, like, for the public good or something like that.…" 2-ER-049.

District Court erred in holding that Kalshi's advertisements that its activities are "legal in all fifty states" were opinions and did not constitute false advertising in violation of the Lanham Act.

For all of these reasons, as more thoroughly shown below, the District Court's opinion must be reversed.

## JURISDICTION STATEMENT

1. The United States District Court for the Northern District of California ("District Court") had jurisdiction over the claims of Appellants, the Blue Lake Rancheria, Chicken Ranch Rancheria, and Picayune Rancheria of Chukchansi Indians (collectively "Tribes") pursuant to:

(a) 28 U.S.C. § 1331, in that this action arises under the Constitution and laws of the United States, specifically Art. I, § 8, cl. 3, 25 U.S.C. §2701–2721 and 15 U.S.C. § 1125(a)(1)(B);

(b) 28 U.S.C. § 1362, in that the Tribes are federally recognized Indian tribes asserting that Appellees, Kashi Inc., Kalshiex LLC (collectively "Kalshi"), Robinhood Markets, Inc., and Robinhood Derivatives LLC (collectively "Robinhood") actions or omissions violate the Constitution and laws of the United States; and

(c) 25 U.S.C. § 2710(d)(7)(A)(ii), in that this action has been brought by federally recognized Indian Tribes against Appellees, Kashi Inc., Kalshiex LLC,

Robinhood Markets, Inc., and Robinhood Derivatives LLC alleging that the Appellees are violating the Tribes' Tribal-State Compact/Secretarial Procedures.

2.     The Court of Appeals has jurisdiction over this appeal based upon:

(a) 28 U.S.C. § 1292, in that the Tribes are appealing a denial of the Tribes' motion for a preliminary injunction by the District Court;

(b) On November 11, 2025, the District Court issued an order ("Order") denying the Tribe's motion for a preliminary injunction. Excerpt of Record ("ER"), 1-ER-002-014; Doc. #71;

(c) The Tribes filed a notice of appeal on November 25, 2025, pursuant to Fed. R. App. P. 5. 4-ER-607-612; Doc. #73. The filing of the notice of appeal within fourteen (14) days of the entry of the District Court's Order denying the Tribe's Rule 65 motion was timely.

## ISSUES PRESENTED

1.     Did the District Court err in concluding that 25 U.S.C. § 2710(d)(7)(A)(ii) did not grant the District Court jurisdiction over the Tribes' claim seeking to enjoin Kalshi and Robinhood's class III gaming conducted on the Tribes' Indian lands, even though Kalshi and Robinhood do not meet any of the criteria set forth in 25 U.S.C. § 2710(d)(1) of IGRA that would authorize them to conduct such gaming on the Tribes' Indian lands?

2.     Did the District Court err in concluding that IGRA does not regulate

5

class III gaming conducted on a tribe's Indian lands if the gaming is conducted via the internet?

3. Did the District Court err in concluding that the UIGEA impliedly revoked portions of IGRA?

4. Did the District Court err in concluding that federal courts lack jurisdiction to interpret and apply the CEA because the Commodity Future Trading Commission ("CTFC") has exclusive jurisdiction to interpret and apply the CEA?

5. Did the District Court err in concluding that Kalshi's advertisement stating: "Sports Betting [is] Legal in all 50 States on Kalshi" is a non-actionable "statement of opinion," and, therefore, not literally false for the purpose of the Lanham Act?

## STATEMENT OF CASE

### I. The Parties

The Blue Lake Rancheria ("Blue Lake") is a federally recognized Indian tribe, organized under the provisions of the Indian Reorganization Act, 25 U.S.C. § 476, under a written Constitution, which has been approved by the Secretary of the Interior, and which designates the Blue Lake Business Council as the governing body of Blue Lake. Blue Lake is the beneficial owner of the Blue Lake Rancheria, which consists of approximately 26 acres of trust and fee lands located within the exterior boundaries of the Blue Lake Reservation in Humboldt County, California.

6

Blue Lake conducts class-III gaming on the Blue Lake Reservation pursuant to the IGRA, its Secretarial Procedures, and its Gaming Ordinance.

The Chicken Ranch Rancheria of Me-Wuk Indians ("Chicken Ranch") is a federally recognized Indian tribe, organized under a written Constitution, which designates the Chicken Ranch Tribal Council as the governing body of Chicken Ranch. Chicken Ranch is the beneficial owner of the Chicken Ranch Rancheria or reservation, which consists of approximately 40 acres of trust and fee lands located within the exterior boundaries of the Rancheria in Tuolumne County, California. Chicken Ranch conducts class-III gaming on its Chicken Ranch Rancheria pursuant to the IGRA, its Secretarial Procedures, and its Gaming Ordinance.

The Picayune Rancheria of Chukchansi Indians ("Picayune Rancheria") is a federally recognized Indian tribe, organized under a written Constitution, which designates the Picayune Rancheria Tribal Council as the governing body of the Tribe. The Tribe is the beneficial owner of the Picayune Rancheria, which is located in Madera County, California. Picayune conducts class-III gaming on its Picayune Rancheria pursuant to the IGRA, its Compact, and its Gaming Ordinance. (Blue Lake, Chicken Ranch, and Picayune Rancheria shall hereinafter be referred to collectively as the "Tribes.")

Kalshi Inc. is a Delaware corporation headquartered at 594 Broadway, Rm 407, New York City, New York 10012. The Tribes are informed and believe, and

7

on that basis alleged in the District Court Complaint, that Kalshi Inc. is the parent company of all other Kalshi entities.

KalshiEX LLC is a Delaware corporation headquartered at 594 Broadway Rm 407, New York City, New York 10012. The Tribes are informed and believe, and on that basis alleged in the District Court Complaint, that KalshiEX LLC is a wholly owned subsidiary of Kalshi Inc. that operates as a commodities exchange. (Kalshi Inc. and KalshiEX LLC shall hereinafter be referred to collectively as "Kalshi.")

Robinhood Markets, Inc. is a Delaware corporation headquartered at 85 Willow Road, Menlo Park, California 94025. The Tribes are informed and believe, and on that basis alleged in the District Court Complaint, that Robinhood Markets, Inc. is the parent company of all other Robinhood entities. Robinhood is an investment platform that permits trading on stocks, Exchanged Traded Funds and other commodities. As relevant here, Robinhood has partnered with Kalshi to open—on the Robinhood investment platform—a prediction market hub, allowing persons located both on and off the Tribes' respective Reservations/Rancherias to place illegal, unregulated sports book wagers on the outcome of sporting events, in the form of "event contracts."

Robinhood Derivatives LLC is a Delaware corporation headquartered at 85 Willow Road, Menlo Park, California 94025. The Tribes are informed and believe, and on that basis alleged in the District Court Complaint, that Robinhood Derivatives

8

LLC is a wholly owned subsidiary of Robinhood Markets, Inc. It is a futures commission merchant and provides options on futures trading. As relevant here, it is the division of Robinhood that has partnered with Kalshi to offer a prediction market hub that allows people to engage in illegal sports gambling by placing illegal, unregulated wagers on the outcome of sporting events in the form of event contracts on the Tribes' Reservations. (Robinhood Markets, Inc. and Robinhood Derivatives LLC shall hereinafter collectively as "Robinhood.")

## II. Facts Relevant to the Issues Submitted for Review

The Tribes brought this suit to stop Kalshi and Robinhood from conducting sports betting, a class III game, on their Indian lands in violation of the IGRA, the Tribes' Gaming Ordinance (which has been approved by the Chair of the National Indian Gaming Commission ("NIGC") pursuant to the IGRA), and the Tribes' class III Tribal-State Compact and Secretarial Procedures. In addition, the Tribes seek civil damages available to them pursuant to the Racketeer Influence and Corrupt Organization Act, 18 U.S.C. § 1964(c) ("RICO"), because Kalshi and Robinhood illegally conduct class III gaming on the Tribes' Indian lands through use of the internet in violation of both the IGRA and the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. § 5361(b) and § 5362(1)(E)(ii) ("UIGEA"). Finally, the Tribes filed a false advertising claim against Kalshi pursuant to the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), because Kalshi falsely advertised that its illegal sports

betting is "legal in all 50 states."

The Tribes assert that Kalshi's illegal conduct also violates the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("CEA"), because Kalshi's sporting events contracts are not "swaps" under the CEA and the listing of its future event prediction contracts on the commodity exchange violates 17 C.F.R. § 40.11.

The Tribes invoked the jurisdiction of the District Court under 25 U.S.C. § 2710(d)(7)(A)(ii) of the IGRA, which expressly provides that the "United States district courts shall have jurisdiction over – . . . (ii) any cause of action initiated by a . . . Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under" 2710(d)(3). The Tribes also invoked the jurisdiction of the District Court pursuant to 28 U.S.C. § 1331 and 1362, since the Tribes pleaded claims against Kalshi and Robinhood alleging that their conduct violated the IGRA.

### III. The Proceedings Below

The Tribes filed their Complaint for Declaratory and Injunctive Relief and Money Damages on July 22, 2025. 4-ER-617; Doc. #1. On September 2, 2025, the Tribes filed their Motion for Preliminary Injunction. 4-ER-621; Doc. #35. On September 4, 2025, the Tribes filed their Request for Judicial Notice in Support of their Motion for Preliminary Injunction. 4-ER-621; Doc. #36. On September 25, 2025, Kalshi filed its Opposition to the Tribes' Motion for Preliminary Injunction.

10

4-ER-622; Doc. #44. On September 25, 2025, Robinhood filed its Opposition to the Tribes' Motion for Preliminary Injunction. 4-ER-622; Doc. #45.

On October 16, 2025, the Tribes filed their reply to Kalshi's Opposition to the Tribes' Motion for Preliminary Injunction. 4-ER-624; Doc. #56. On October 16, 2025, the Tribes filed their Request for Judicial Notice in Support of the Tribes' Reply to Kalshi's Opposition to the Tribes' Motion for Preliminary Injunction. 4-ER-624; Doc. #57. Also on October 16, 2025, the Tribes filed their Reply to Robinhood's Opposition to the Tribes' Motion for Preliminary Injunction. 4-ER-624; Doc. #58. On October 22, 2025, Kalshi filed its Opposition to the Tribes' Request for Judicial Notice. 4-ER-624; Doc. #60.

The Tribes' Motion for Preliminary Injunction was argued on October 23, 2025 and was taken under submission. 4-ER-624; Doc. #55. On October 24, 2025, the Tribes gave notice of their filing of Supplemental Authority in Support of their Motion for a Preliminary Injunction. 4-ER-625; Doc. #65. On October 27, 2025, Kalshi and Robinhood filed their Oppositions to the Tribes' Notice of Supplemental Authority in Support of the Tribes' Motion for Preliminary Injunction. 4-ER-625; Doc. #66.

On November 11, 2025, the District Court entered an order denying the Tribes' Motion for Preliminary Injunction. 1-ER-2-14; Doc. #71. On November 25, 2025, the Tribes filed their Preliminary Injunction Appeal. 4-ER-607-612; Doc. #73.

The ruling presented for review is the District Court's November 11, 2025 Order Denying the Tribes' Motion for Preliminary Injunction.

## SUMMARY OF ARGUMENT

The Blue Lake Rancheria, Chicken Ranch Rancheria, and the Picayune Rancheria of the Chukchansi Indians, three federally recognized Indian tribes, filed suit against Kalshi Ex LLC and Robinhood Derivitives, LLC and Robinhood Markets, Inc. seeking a preliminary and permanent injunction enjoining Kalshi and Robinhood from engaging in sports betting on their Indian lands in violation of the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 *et. seq.*, their class III Gaming Compact ("Compact") and Secretarial Procedures ("Procedures") (entered into or issued pursuant to the IGRA), and their Gaming Ordinances, approved by the Chairman of the National Indian Gaming Commission pursuant to and as authorized by the IGRA. In addition, the Tribes sought a preliminary injunction to stop Kalshi's and Robinhood's false and/or deceptive advertising, over the internet, that its sports gambling was "legal in all fifty states" in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

In moving for a preliminary injunction, the Tribes invoked IGRA's grant of jurisdiction to the "United States district courts . . . over – (ii) any cause of action initiated by a . . . Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . ." 25 U.S.C. §

2710(d)(7)(A)(ii) ("Section 2710(d)(7)(A)(ii)").

In denying the Tribes' preliminary injunction motion on the grounds that the Tribes "have not shown a likelihood of success on the merits for either claims," the District Court held that the Court lacked jurisdiction over the Tribes' IGRA claims because: (1) the Tribes did not show that Kalshi's conduct of offering its "sports contracts" on the Tribes' lands violated their Compact and Procedures; (2) the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. § 5361 *et seq*. ("UIGEA") exemption for transactions regulated under the Commodity Exchange Act, 7 U.S.C. § 1 *et. seq*. ("CEA") governs Kalshi's sports contracts rather than the IGRA; and (3) Kalshi's self-certification of its sports betting contracts on the Commodity Future Trading Commission's ("CFTC") regulated exchanges, known as designated contract markets ("DCM's"), grants to the CFTC, not the Tribes—or the federal courts, for that matter—exclusive jurisdiction to determine whether Kalshi's sports gambling contracts violate federal law.

Finally, the District Court denied the Tribes' motion to enjoin Kalshi's false advertising on the grounds that its ad, "Sports Betting [is] Legal in all 50 States," was simply Kalshi's good faith opinion and not a statement of fact that was "literally or facially false."

Contrary to the plain wording of IGRA, that expressly grants tribes, and no others, the exclusive right to engage in class III gaming, such as betting on sporting

events, on their lands and the clear wording of the Tribes' Compacts and Gaming Ordinances that authorizes the Tribes and no others to engaging in any form of gambling on the Tribes' lands, the District Court held Kalshi's sports betting violated neither IGRA, the Compact/Procedures, or the Tribes' Gaming Ordinances.

Ignoring the clear wording of Section 2710(d)(7)(A)(ii) that: "The United States district courts **shall** have jurisdiction over - . . . (ii) **any cause of action** initiated by a . . . Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . ." and Section 2710(d)(1) of IGRA that: "Class III gaming activities **shall** be lawful on Indian lands **only** if such activities are – (A) **authorized** by an ordinance . . . that – (i) is adopted by the governing body of the Indian tribes having jurisdiction over such lands, . . ., and (C) conducted in conformance with a Tribal-State compact . . .," the District held it had no jurisdiction over the Tribes' claims despite the fact that Compacts and Ordinances did not authorize sports betting to be conducted on the Tribes' land and only authorized the Tribes to engage in any form of gaming on the Tribes' lands.

Mistakenly, the District Court held the UIGEA, not the IGRA, governed Kalshi's sports contracts, even though UIGEA in no uncertain terms preserved the full force and effect of IGRA and the Tribes' Compact/Procedures by providing: "No provision of this subchapter shall be construed as determining, limiting, or extending any **Federal**, or State law or **Tribal-State compact** prohibiting,

14

permitting, or regulating gambling within the United States." 31 U.S.C. § 5361(b) (emphasis added). Here, both "Federal . . . law," Section 2710(d)(1) of IGRA and the Tribes' "Tribal-State compact(s)" do not permit Kalshi from engaging in gambling on sporting events on the Tribes' lands.

The District Court also held that the CEA reserved, exclusively to the CFTC—and not the District Court—the authority to review the legality of Kalshi's sports events contracts because it had self-certified its contracts on the commodities exchange in compliance with the terms of the CEA. Kalshi's own statements made in other court proceedings and in its ads, all of which were offered to and considered by the District Court, demonstrated that Kalshi's sports contracts were, in fact, all based on the outcome of a sporting events—rather than the occurrence or non-occurrence of the event, itself. As such, the contracts were not "swaps" subject to the exclusive jurisdiction of the CFTC and Kalshi had certified them as compliant with the CEA in direct violation of 17 C.F.R. § 40.11, which prohibits Kalshi from listing any contract on the DCM exchange that involved gambling on sports. Having violated the CEA and specifically 17 C.F.R. § 40.11, Kalshi cannot now shield itself from the IGRA.

Further, Kalshi's claims that sports betting is legal in all 50 states is a blatantly false statement of fact, since it is certainly not legal on the Tribes' lands. Contrary to the District Court's holding that "multiple courts have agreed with" Kalshi, that

15

does not give Kalshi a "good faith belief" in the truth of the statements, since Kalshi began listing its ads on the internet prior to any court decisions ruling in Kalshi's favor.

Here, Congress, in the exercise of its exclusive authority over Indian affairs under the Indian Commerce Clause, Article I, § 8, cl. 3 of the United States Constitution, has enacted IGRA, and in it, granted the Tribes the exclusive, delegated authority to enact ordinances and enter into compacts to comprehensively regulate all forms of gaming conducted on their lands. The District Court's holding, if upheld, would impliedly repeal the IGRA, infringe on the Tribes' right to govern themselves on their lands in violation of IGRA, their Compacts, and their Gaming Ordinances. Congress could not have intended such a result when it enacted the amendments to the CEA governing commodities contracts or the UIGEA governing internet gambling.

The District Court's decision suffers from numerous errors of law, as more thoroughly shown below, and, respectfully, should be reserved.

## STANDARD OF REVIEW

A plaintiff seeking a preliminary injunction must establish: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Ref. Council, Inc.*, 555

16

U.S. 7, 20 (2008).

A district court's decision to deny a preliminary injunction is generally reviewed for abuse of discretion. *Am. Bev. Ass'n v. City & Cty. Of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019). A district court abuses its discretion if it rests its decision "on an erroneous legal standard or on clearly erroneous factual findings." *United States v. Schiff*, 379 F.3d 621, 625 (9th Cir. 2004). A district court's conclusion of law in support of its decision denying a preliminary injunction is reviewed *de novo*. *All for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, "[w]e review an order regarding preliminary injunctive relief for abuse of discretion, but review any underlying issues of law de novo." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019). A district court's findings of fact in support of its decision denying a preliminary injunction are reviewed for clear error. *Id*.

## ARGUMENT

**I. THE DISTRICT ERRED IN HOLDING THAT KALSHI'S SPORTS BETTING ACTIVITIES DID NOT VIOLATE THE TRIBES' COMPACT, PROCEDURES AND THE IGRA.**

The District Court's decision that there was not a strong likelihood the Tribes would prevail on their Compact/Procedures and IGRA claims flow in large part from a fundamental misreading of the text and structure of IGRA, which establishes that Compacts and Secretarial Procedures function as regulatory law that creates the conditions under which any and all forms of class III gaming activity may occur on Indian lands and that Congress intended 25 U.S.C. § 2710(d)(7)(A)(ii) to provide a

17

means for tribes "to enjoin illegal gaming on Indian lands . . . ." S. REP. 100-446, 18, 1988 U.S.C.C.A.N. 3071, 3088 ("S. REP. 100-446").

25 U.S.C. § 2710(d)(1) creates the conditions under which class III gaming may be lawful on Indian lands throughout the nation. Congress declared that class III gaming activities shall be lawful on Indian lands "**only** if such activities" are:

> (A) **authorized** by an ordinance or resolution that—
> (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands . . .
> (B) located in a State that permits such gaming for any purpose by any person, organization or entity, and
> (C) **conducted in conformance with a Tribal-State compact** entered into by the Indian Tribe and the state . . . .

25 U.S.C. § 2710(d)(1) (emphasis added). 25 U.S.C. § 2710(d)(1) thus establishes that tribal gaming ordinances and compacts are extensions of IGRA that implement the overarching structure of IGRA in specific frameworks at the tribal level (gaming ordinance) and the tribal-state level (compact). Subparts (A)–(C) of § 2710(d)(1) are elemental and exhaustive. *See Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1034–35 (9th Cir. 2022) ("*Chicken Ranch*") (holding similar provision, 25 U.S.C. § 2710(d)(3)(C), is exhaustive to the exclusion of other subjects of compact negotiation).

The critical language of 25 U.S.C. § 2710(d)(1) is the phrase "only if," which identifies the necessary conditions for the sufficient condition of *lawful* class III gaming on Indian lands. Such activity is lawful "only if . . . conducted in

18

conformance with a Tribal-State compact . . . ." 25 U.S.C. § 2710(d)(1)(C). Thus, any class III gaming on Indian lands that is *not* conducted in conformance with a tribal-state compact is necessarily conducted in violation of a tribal-state compact. The symmetry of IGRA is clear: "Class III gaming activities [are] lawful on Indian lands **only if** such activities are . . . conducted in conformance with a Tribal-State compact," 25 U.S.C. § 2710(d)(1)(C), and class III gaming activities are not lawful on Indian lands if such activities are not conducted in conformance with a Tribal-State compact, i.e., if "class III gaming activity located on Indian lands [is] conducted in violation of any Tribal-State compact . . . ." 25 U.S.C. § 2710(d)(7)(A)(ii). Congress, therefore authorized suit "to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . . ." *Id.*

Nothing in the Tribes' Compact or Procedures authorizes third-party class III gaming, nor could it, except pursuant to a management contract. *Compare* 25 U.S.C. § 2710(d)(3)(C) (enumerating proper subjects of compacts) *with id.* § 2710(d)(9) (authorizing third-party management contracts), *and id.* § 2710(d)(2)(A) (requiring tribal gaming ordinance authorizing third-party class III gaming). Nothing in 25 U.S.C. § 2710(d)(7)(A)(ii) requires the Tribes to point to a specific provision of their Compact or Procedures that Kalshi's sports betting activities on their Indian lands violates.

The District Court nevertheless held that "Picayune Rancheria has not shown a likelihood of success on its claim that Kalshi's contracts are in violation of its Tribal-State compact," because, while "Section 4.1(c) of the Tribe's 1999 Compact specifically prohibits internet gaming activities such as those being conducted by Kalshi," that section "is silent about what companies like Defendants can do on the internet, and only outlines what '[t]he Tribe' is 'authorized and permitted to operate.'" *Blue Lake Rancheria v. Kalshi Inc.*, No. 25-CV-06162-JSC, 2025 WL 3141202, at *5 (N.D. Cal. Nov. 10, 2025). Similarly, the District Court found that "Blue Lake's and Chicken Ranch's secretarial procedures have the same language and thus do not mention what companies like Kalshi can do on the internet." *Id*.

The District Court's findings are conclusory in nature and do not address how tribes and states could include provisions regulating non-tribal class III gaming on Indian lands in conformity with 25 U.S.C. § 2710(d)(3)(C), when "IGRA strictly limits the topics that states may include in tribal-state Class III compacts to those directly related to the operation of [tribal] gaming activities." *Chicken Ranch*, at 1029; *see id*. at 1037. The Compact and Procedures could explicitly provide that the Tribes have sole proprietary interest in the gaming operations on their Indian lands, *see* 25 U.S.C. § 2702(2), or that the Tribes have the exclusive right to authorize and regulate class III gaming on their Indian lands, *see* 25 U.S.C. § 2701(5) and *id*. § 2710(d)(1)(A), but that would simply be a restatement of what IGRA already

20

requires.

Because IGRA only allows tribes "recognized as possessing powers of self-government," 25 U.S.C. § 2703(5)(B), "having jurisdiction over such [Indian] lands," *id*. § 2710(d)(1)(A)(i), to lawfully engage in class III gaming activity, any other entity engaging in class III gaming activity, such as sports betting,  on the Tribes' Indian lands necessarily violates the tribal-state regulatory framework established by the Tribes' Compact and Procedures. This legal reality, considered in conjunction with the language in the Compact and Procedures "specifically prohibit[ing] internet gaming activities such as those being conducted by Kalshi," *Blue Lake*, 2025 WL 3141202, at *5, is sufficient to establish the Tribes' right of action and the court's jurisdiction to enjoin Kalshi's sports betting conduct on the Tribes' Indian lands. 25 U.S.C. § 2710(d)(7)(A)(ii).

At oral argument, Kalshi asserted that a compact "is an agreement between a state and a tribe. It governs what their respective rights and responsibilities are vis-à-vis each other." 1-ER-, 41, Doc#71. Under this theory, "the idea that a third-party can come in and violate that provision just doesn't square with elemental contract law, and the **law is clear that a compact is just another form of a contract**." *Id*. Therefore, Kalshi argued: "that is the right of action issue. I don't think they're empowered to sue at all." *Id*. at 43. To which the court responded: "So then we don't even get to the [UIGEA]?" *Id*. at 43. Because the District Court did not elaborate on

how it reached its conclusion that "Section 4.1(c) is silent about what companies like Defendants can do on the internet, and only outlines what "[t]he Tribe" is "authorized and permitted to operate," meaning "that does not mean the compact or secretarial procedures prohibit Defendants' conduct," the District Court treated the compact as a contract, and applied principles of contract law in reaching its conclusion. *Blue Lake*, 2025 WL 3141202, at *5. This represents a fundamental misreading of the text and structure of IGRA and a misunderstanding of Compacts/Procedures as mechanisms of regulatory law. [2]

Congress contemplated that separate, co-equal sovereigns would use Compacts, through a quasi-contractual relationship, to arrive at regulatory law governing class III gaming on Indian lands at the tribal-state level. 25 U.S.C. § 2702(1)–(2). Rather than dictate the specific terms of lawful class III gaming to tribes and states, Congress enacted "a statutory scheme which would incorporate and balance the interests of tribes, states, and the federal government." *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 549 (8th Cir. 1996). "After lengthy hearings, negotiations and discussions, [Congress] concluded that the use of compacts between tribes and states is the **best mechanism** to assure that the interests of both

---

[2] If the Court finds that any provisions of the IGRA are ambiguous it must adopt the Tribes interpretation of the statute. *Cnty. Of Yakima v. Confederated Tribes, 502 U.S. 251, 269* (1992)(when faced with two possible constructions of a federal statute implicating tribal interests, the statute must be "construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."

sovereign entities are met with respect to the **regulation of complex gaming enterprises** . . . ." S. REP. 100-446, at 13 (emphasis added); *Chicken Ranch*, at 1053 n.17.

Shown above, the Tribes' Compact/Procedures establish the overarching regulatory law at the tribal-state level, approved by the federal government and published in the Federal Register, to be implemented on the Tribes' lands directly through the Tribes' Gaming Ordinances. *See* 25 U.S.C. § 2701(5); 25 U.S.C. § 2710(d)(1); 25 U.S.C. 2710(d)(3)(B) (compacts are effective upon "approval by the Secretary [when] published by the Secretary in the Federal Register."). While the compacting process resembles a contract, as among the tribal and state sovereigns, Congress intended the end result to function as regulatory law, and many provisions of 25 U.S.C. § 2710(d) militate against interpreting the compact—a regulatory framework—as a mere contract.

That compacts function as regulatory law is evident from Congress's remedy where states fail to negotiate tribal-state compacts in good faith: secretarial procedures.[3] Procedures are not a contract; there are no "parties" to the Procedures. The Secretary of the Interior prescribes, similar to the promulgation of regulations,

_____

[3] Upon a showing of bad faith, states lose the right to create regulations at the tribal-state level and, instead, "the Secretary shall prescribe, in consultation with the Indian tribe, procedures—which are consistent with the proposed compact selected by the mediator. . . the provisions of [IGRA], and the relevant provisions of the laws of the State . . . ." 25 U.S.C. § 2710(d)(7)(B)(vii).

23

Procedures "which are consistent with the proposed compact selected" in the IGRA remedial process, "under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction." 25 U.S.C. § 2710(d)(7)(B)(vii).

The District Court held "the Court must presume compacts are equivalent to secretarial procedures," relying, in part, on the "presumption that a given term is used to mean the same thing throughout a statute." *Id*. at *5 (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)). *See Stand Up for California! v. U.S. Dep't of the Interior*, 959 F.3d 1154, 1160 (9th Cir. 2020).

The District Court also failed to explain how Procedures can be treated like contracts as binding only against the parties, when Procedures are not "an agreement between a state and a tribe [that] governs what their respective rights and responsibilities are vis-à-vis each other." 1-ER-41, Doc#71.

The text and structure of IGRA draws a clear distinction between "compact" and "contract." *Compare* 25 U.S.C. § 2710(d)(7)(A)(ii) ("[A]ny cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in **violation of any Tribal-State compact** . . . ." (emphasis added)), *with id*. § 2710(d)(3)(C)(v) ("Any Tribal-State compact . . . may **include** provisions relating to . . . remedies for **breach of contract** . . . ." (emphasis added)); *cf. Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 785 (1985) ("A compact typically . . . provides remedies for breach of the agreement's terms."). As

a contract between two sovereigns, IGRA provides discrete remedies for disputes arising among the parties after a compact is concluded. In establishing "remedies for breach of contract," compacts almost universally include dispute resolution mechanisms within the compact, which bind the parties.

For example, Picayune's Compact, Section 9.0, outlines mandatory dispute resolution procedures. If a dispute between Picayune and the State arises: "In recognition of the government-to-government relationship of the Tribe and the State, the parties shall make their best efforts to resolve disputes that occur under this Gaming Compact by good faith negotiations whenever possible." 2-ER-119-179, at 27. The parties "establish[ed] a threshold requirement that disputes between the Tribe and the State first be subjected to a process of meeting and conferring in good faith in order to foster a spirit of cooperation and efficiency in the administration and monitoring of performance and compliance by each other with the terms, provisions, and conditions of this Gaming Compact . . . ." *Id*. "If the dispute is not resolved to the satisfaction of the parties within 30 calendar days after the first meeting, then [the dispute] may be resolved in the United States District Court where the Tribe's Gaming Facility is located, or is to be located, and the Ninth Circuit Court of Appeals." *Id*. at 28. Thus, there is no application for 25 U.S.C. § 2710(d)(7)(A)(ii) where compact/contract formation gives rise to dispute, because § 2710(d)(7)(A)(i) applies, and almost no utility to §2710(d)(7)(A)(ii) among the parties for breach of

25

compact, because such disputes are subject to the binding terms of the compact.

Had the District Court consistently adhered to the principle of statutory interpretation, that the "presumption that a given term is used to mean the same thing throughout a statute, " *id*. at *5, and the corollary that it "is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words," *S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003), the District Court would have rejected the contention that a Compact is merely a contract that cannot bind a third party, and would have understood that Kalshi's sports betting contracts violate the Tribes' Compacts and Procedures as regulatory law governing the lawful conditions for class III gaming on the Tribes' Indian lands.

The Compact and Procedures, as creatures of federal regulatory law bind and regulate actions of any entity, state or otherwise, that conducts class III gaming on the Tribes' Indian lands that does not conform with the law of the land regulating class III gaming on the Tribes' Indian lands. *See Cayuga Nation v. New York State Gaming Comm'n*, 775 F. Supp. 3d 651, 666 (N.D.N.Y. 2025) (finding 25 U.S.C. § 2710(d)(1) "unambiguous," stating: "The text of the statute refers to '[c]lass III gaming activities' 'on Indian lands,' and does not differentiate between who is conducting the gaming. [citation omitted]. The definition of class III gaming, . . . defined as 'all forms of gaming that are not class I gaming or class II gaming,' also

does not restrict its meaning to only encompass Indian gaming.").

For these reasons, the District Court erred in ruling that the Tribes' Compact and Procedures do not prohibit Kalshi's class III sports betting activities on the Tribes lands and for this reason alone, the District Court's decision should be reversed.

## II. THE DISTRICT COURT ERRED BY INTERPRETING UIGEA TO REPEAL SUBSTANTIAL PROVISIONS OF IGRA.

The District Court did not stop at concluding that the Tribes are unlikely to establish a right of action under IGRA. The Court went on to address the application of the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. §§ 5361–5367, rejecting the Tribes' argument that UIGEA and the CEA statutes do not "control or displace IGRA . . . ." *Blue Lake*, 2025 WL 3141202, at *6. In doing so, the District Court erred in holding that UIGEA controls IGRA, effectuating an implied repeal of, *inter alia*, the federal statute mandating that all class III gaming on **Indian lands** be conducted in conformance with a compact, 25 U.S.C. § 2710(d)(1)(C), that tribes have the exclusive right to regulate gaming on Indian lands, *id.* § 2701(5), and that tribes be the primary beneficiary of any gaming operation, i.e., any gaming activity, conducted on Indian lands. *Id*. § 2702(2). The Court effectively concluded that UIGEA allows third-party entities to conduct class III gaming activity on Indian lands and evade regulation by tribes under IGRA. This conclusion is untenable.

UIGEA is inapplicable to the Tribes' IGRA-based claims because: (1) IGRA

27

provides the method for analyzing whether sports betting contracts offered on Indian lands constitute unlawful class III gaming, irrespective of the technology used to conduct the gaming; (2) UIGEA expressly does not control IGRA; and (3) UIGEA's exemption of CEA transactions are limited to application of UIGEA, not IGRA. The Court's application of UIGEA resulted in the Court failing to analyze core questions: whether the lawful scope of the CEA stops at "gaming" and whether gaming conduct that goes beyond the lawful scope of the CEA and is conducted on Indian lands brings the activity within the regulatory purview of IGRA. The District Court's treatment of UIGEA flows from an incorrect reading of IGRA.

The District Court began its analysis from the proposition that "UIGEA was passed to regulate online gambling." *Blue Lake*, 2025 WL 3141202, at *4 (quoting *State of California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 964 (9th Cir. 2018)). This is an imprecise statement of UIGEA's purpose. As the *Iipay* court more accurately stated: "Unlike IGRA or other gambling regulations, the UIGEA **does not make gambling legal or illegal directly**. Instead, the UIGEA makes it illegal for a "'person engaged in the business of betting or wagering' knowingly to accept certain financial payments from an individual who is engaged in 'unlawful Internet gambling.'" *Iipay*, 898 F.3d at 964–65 (emphasis added). Thus, UIGEA does not regulate online gambling; it regulates and prohibits a related activity: financial transactions aiding unlawful online gambling.

UIGEA is codified in Title 31 of the United States Code entitled: "Money and Finance", Subtitle IV ("Money"), Chapter 53 ("Monetary Transactions"), Subchapter IV, titled: "Prohibition on Funding of Unlawful Internet Gambling." *See I.N.S. v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 189 (1991) ("we have stated that the title of a statute or section can aid in resolving an ambiguity in the legislation's text."). UIGEA regulates payment systems. In enacting UIGEA, Congress found that unlawful online gambling "is primarily funded through personal use of payment system instruments," 31 U.S.C. § 5361(a)(1), and social problems related to online gambling, *see id*. § 5361(a)(2)–(3), required "[n]ew mechanisms for enforcing gambling laws on the Internet" 31 U.S.C. § 5361(a)(4). Congress, thus, created a mechanism for regulating and punishing financial institutions that support unlawful online gaming, *in addition to* existing federal, state, and tribal gambling laws, such as IGRA.

This is clear from Congress's rules of construction for UIGEA. UIGEA expressly preserves existing gambling laws: "No provision of this subchapter shall be construed as altering, limiting, or extending any **Federal** (IGRA) or State law or **Tribal-State compact** prohibiting, permitting, or regulating gambling within the United States." 31 U.S.C. § 5361(b) (emphasis added). UIGEA also expressly preserves IGRA and exempts tribal gaming from civil remedies: "Rule of construction.—No provision of this section shall be construed as altering,

29

superseding, or otherwise affecting the application of the Indian Gaming Regulatory Act." 31 U.S.C. § 5365(b)(3)(B). These rules of construction are not discretionary. Congress is explicitly instructing "the district courts of the United States" in interpreting the intersection of UIGEA and IGRA. 31 U.S.C. § 5365(a).

Notwithstanding the fact that UIGEA does not directly regulate gaming, *Iipay*, 898 F.3d at 964–65, the District Court interpreted UIGEA, CEA, and IGRA to allow a non-tribal entity, Kalshi, to conduct class III gaming on the Tribes' Indian lands in contravention of the strict requirements of 25 U.S.C. § 2710(d)(1). Although the Court asserted that it had harmonized UIGEA and IGRA, *Blue Lake*, 2025 WL 3141202, at *6, the District Court nevertheless reached the untenable conclusion that "the UIGEA should be interpreted to apply to cover interstate (or state-to-Indian-lands and vice versa) gaming transactions via the internet, whereas IGRA should be interpreted to cover Class III gaming activities that take place exclusively within Tribal lands." *Id*.

Nothing in IGRA supports the conclusion that IGRA only applies where an entire transaction, end-to-end, takes place on Indian lands. Rather, IGRA defines Indian lands broadly, as "all lands within the limits of any Indian reservation," 25 U.S.C. § 2703(4)(A), and 25 U.S.C. § 2710(d)(1) unequivocally states that all class III gaming on Indian lands must be conducted in conformance with a tribal-state compact. The Court arrived at its conclusion, not based on the statutory language of

IGRA, but, rather, the tribal gaming exemptions of UIGEA. 1-ER-011. Those provisions of UIGEA merely establish the kind of internet transactions that do not constitute "unlawful Internet gambling" *under UIGEA*, not IGRA.

The tribal gaming exemptions to UIGEA cannot be a basis for rewriting the plain language of IGRA, as that interpretation constitutes a repeal by implication. "Because statutory repeals by implication are disfavored, courts presume that by passing a new statute Congress ordinarily does not intend to displace laws already in effect." *United States v. Wells*, 156 F.4th 907, 913 n.4 (9th Cir. 2025) (quoting *United States v. Novak*, 476 F.3d 1041, 1052 (9th Cir. 2007)). The conclusion that "Plaintiffs have not identified any Tribal-State compact provision regulating gambling which the UIGEA, as applied here, alters, limits, or extends," 1-ER-003, directly conflicts with the requirement in IGRA that all class III gaming on Indian lands, whether in whole or in part, be conducted in conformance with a tribal-state compact. *See Iipay*, 898 F.3d at 967–68.

The District Court's application of UIGEA also turns substantially on the notion that UIGEA is "a later enacted, more specific statute," because "IGRA does not address this scenario [online gaming], which is unsurprising given 'Congress passed IGRA in 1988—a few years before the internet became publicly available . . . .'" *Blue Lake*, 2025 WL 3141202, at *6 (quoting *Iipay*, 898 F.3d at 964 n.6). This finding is both legally and historically incorrect. In enacting IGRA, Congress was

31

aware of emerging forms of electronic gaming, evident from IGRA's statutory definitions of various forms of gaming. *See* S. REP. 100-446, at 13 ("The Committee notes the strong concerns of states that . . . regulations relating to **sophisticated forms of class III gaming** be respected on Indian lands where, with few exceptions, such laws and regulations do not now apply." (emphasis added)).

"The term 'class II gaming' means— the game of chance commonly known as bingo (**whether or not electronic, computer, or other technologic aids are used in connection therewith**) . . . in which the holder of the card covers such numbers or designations when objects, similarly numbered or designated, are drawn or **electronically determined** . . . ." 25 U.S.C. § 2703(7)(A)(i). "The term 'class II gaming' does not include—**electronic or electromechanical facsimiles of any game of chance** or slot machines **of any kind**." *Id*. § 2703(7)(B). "The term 'class III gaming' means **all forms of gaming** that are not class I gaming or class II gaming." *Id*. § 2703(8).[4] This universal language is a feature of IGRA, not a flaw. IGRA's definitions anticipate advancements in electronic gaming and speaks broadly to include forthcoming electronic technology. Online gaming easily fits within the forms of gaming defined in IGRA.

---

[4] The federal regulations implementing IGRA are similarly universal. Gaming activity is defined simply as: "the conduct of class III gaming involving the three required elements of chance, consideration, and prize or reward." 25 C.F.R. § 293.2(d). While the NIGC defines class III gaming with greater specificity to include "sports betting," it does so universally, irrespective of particular format or technology. 25 C.F.R. § 502.4(c).

Historically, moreover, internet technology has been available since the 1970s in forms such as ARPANET and NSFNET, and area-wide progressive slot machines using electronic networking technology have been available through International Game Technology ("IGT") since 1986,[5] two years prior to enactment of IGRA. Even assuming Congress could not have anticipated modern online gaming, the Supreme Court has repeatedly held that statutes are written in general terms and apply to new technologies when the conduct fits the statutory category, even if the technology was unknown. *See, e.g.*, *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 284 (2018) ("While every statute's *meaning* is fixed at the time of enactment, new *applications* may arise in light of changes in the world." (original emphasis)); *Smith v. United States*, 508 U.S. 223, 229 (1993) ("Had Congress intended the narrow construction petitioner urges, it could have so indicated. It did not, and we decline to introduce that additional requirement on our own.").

No special method of analysis is necessary to determine whether online sports betting violates IGRA and the Tribes' Compacts/Procedures. Sports betting is not unique simply because it is accomplished using the internet. The universal language

---

[5] *See The Dynamics of Casino Slot Revenue Tax Base Calculations*, 20 J. Tax'n F. Inst. 11, 14 ("As state lotteries spread and as their payoffs went into the millions of dollars, the gaming industry realized that it also needed to provide larger jackpots. This came in the form of progressive jackpots. Progressive jackpots represented a series of slot machines where the major jackpot grew based on the amount of coins played. Initially, these jackpots were based on a series of linked slot machines in one casino. International Game Technology (IGT) developed a system in 1986 that allowed the slot machines to be located in a series of casinos, all linked [electronically] to a common progressive jackpot.").

of 25 U.S.C. §§ 2710(d)(1) and 2703(7)–(8) foreclose any need for a hyper-technical analysis of advanced computer networking systems: if consumers using Kalshi's app can place a wager ("consideration") on whether their chosen team will win a game ("chance") and win money ("prize or reward"), 25 C.F.R. § 293.2(d), while physically located on Indian lands, that activity constitutes class III gaming on Indian lands in violation of the applicable tribal-state Compact/Procedures, because it is not authorized by IGRA. *See* 25 U.S.C. § 2710(d)(1). As the United States Supreme Court instructs, gaming activity occurs where the bettor interacts with the gaming devices, irrespective of technology. The "act of placing a bet or wager is the 'gambling in the poker hall.'"[6] *Iipay*, 898 F.3d at 967 (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. at 792); *accord Navajo Nation v. Dalley*, 896 F.3d 1196, 1207 (10th Cir. 2018) ("Class III gaming activity relates only to activities actually involved in the *playing* of the game, and not activities occurring in proximity to, but not inextricably intertwined with, the betting of chips, the folding of a hand, or suchlike."). IGRA's definitions, therefore, apply to electronic class III gaming activity and apply to class III gaming activity even when the gaming activity is conducted by a non-tribal entity on Indian lands. *Cayuga Nation*, 775 F. Supp. 3d at 666 ("The definition of class III gaming, which, as stated above, is defined as 'all

---

[6] In enacting UIGEA, Congress recognized that a substantial portion of gambling/gaming activity occurs where the bettor initiates a bet or wager, thus requiring gaming activity to be legal both where the bet is initiated and where it is received. *Iipay*, 898 F.3d at 968; 31 U.S.C. § 5362(10).

34

forms of gaming that are not class I or class II gaming,' also does not restrict its meaning to only encompass Indian gaming.").

The operative provisions of IGRA are framed in territorial and jurisdictional terms, not by medium. *See* 25 U.S.C. § 2710(d)(1). Nothing in the text of IGRA conditions application of the statute on whether wagers are transmitted face-to-face or through networked systems. Congress later enacted UIGEA to address interstate and international internet wagering explicitly, *see* 31 U.S.C. § 5362(10), reflecting a policy judgment about cross-border transmissions. But that later specificity does not imply that IGRA categorically excludes network-mediated gaming; it reflects Congress's decision to address a distinct problem, interjurisdictional internet gambling, without narrowing the technology-neutral territorial architecture of IGRA.

Even assuming, *arguendo*, UIGEA applies to the Tribes' claims, it supports the Tribes' IGRA analysis, rather than contradicts it. In *Iipay*, interpreting UIGEA to require end-to-end transactional legality, this Court held:

> [T]he UIGEA does not prohibit otherwise legal gambling. But the UIGEA does create a system in which a "bet or wager" must be legal both where it is "initiated" and where it is "received." This requirement makes sense in light of how the internet operates. If a bet merely had to be legal where it was received, a bettor could place an illegal bet (on a game of poker, for instance) from anywhere in the United States, so long as the bet was legal in the jurisdiction hosting the servers for a game (Las Vegas or Atlantic City, for instance, in the case of online poker). In effect, the UIGEA prevents using the internet to circumvent existing state and federal gambling laws, but it does not create any additional substantive prohibitions.

*Iipay*, 898 F.3d at 965. Extending this Court's rationale in *Iipay* to the underlying

35

litigation, "it seems clear that at least some of the 'gaming activity' associated with [Kalshi] does [] occur on Indian lands and is thus [] subject to [the Tribes'] jurisdiction under IGRA." *Id*. at 968. This renders the District Court's holding, that "IGRA should be interpreted to cover Class III gaming activities that take place **exclusively** within Tribal lands" erroneous, because some of Kalshi's gaming activity occurs both on and off the Tribes' Indian lands in a single transaction, as *Iipay* demonstrates. *Blue Lake*, 2025 WL 3141202, at *6 (emphasis added).

Importantly, applying UIGEA gets the District Court no closer to evaluating whether Kalshi's sports betting activity falls within the ambit of IGRA regulation. By its own terms, UIGEA does not control IGRA. 31 U.S.C. §§ 5361(b), 5365(b)(3)(B). Yet, if UIGEA applies, it also exempts CEA transactions and Kalshi's sports betting activity, leaving the core question of whether Kalshi's sports betting activity is subject to IGRA regulation, in regulatory limbo. In contrast, analysis of the scope and limitations of the CEA and gaming contracts, and analysis of the scope and limitations of IGRA, provides a clear pathway to addressing the dispositive issue of whether Kalshi's sports betting activity on the Tribes' Indian lands violates the Tribes' Compact/Procedures and is subject to injunctive relief under IGRA. A crucial caveat is that UIGEA only exempts lawful CEA transactions and, shown below, Kalshi's sports betting contracts are not lawful under the CEA.

In sum, the District Court erred in concluding that UIGEA controls and

36

effectively repeals crucial aspects of IGRA without establishing a basis for implied repeal. Both the plain language of IGRA and the plain language of UIGEA show that UIGEA cannot be interpreted to impose additional constraints on the Tribes' right to enjoin Kalshi's class III sports betting activity on the Tribes' Indian lands. For this reason, the District Court's decision needs to be reversed.

## III. THE DISTRICT ERRED BY NOT ADDRESSING THE TRIBES' ARGUMENT THAT KALSHI'S SPORT BETTING ACTIVITIES ON THE TRIBES' LANDS VIOLATED THE CEA.

The District Court erred in finding that "Plaintiffs have not shown the Court has jurisdiction to decide whether Kalshi's event contracts violate the Commodity Exchange Act. That decision belongs to the Commodity Futures Trading Commission, which has 'exclusive jurisdiction' over its contract markets." *Blue Lake*, 2025 WL 3141202, at *7 (quoting 7 U.S.C. §§ 2(a)(1)(A), (C)(ii)). The Court's conclusion is incorrect for at least two reasons. First, the court conflates CFTC regulatory authority to determine whether swaps and event contracts are contrary to the public interest with the federal court's authority to interpret and apply federal statutory law. Second, the CFTC's exclusive jurisdiction relates to other agencies, such as the SEC, that may otherwise have overlapping jurisdiction, not to federal courts.

It is a well-settled principle of law that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803); *accord N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control*

37

*Bd.*, No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at \*6 (D. Nev. Oct. 14, 2025) ("*Crypto.com*"); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024) ("it does not follow that Congress has taken the power to authoritatively interpret [a] statute from the courts and given it to the agency. Congress expects courts to handle technical statutory questions . . . .").

Nothing in the CEA precludes federal courts from evaluating whether commodity contracts offered on a DCM comply with federal law. Rather, the plain language of the CEA confirms that federal courts have jurisdiction to determine whether Kalshi's sports betting contracts comport with the CEA. The District Court cited 7 U.S.C. § 2(a)(1)(A) in holding that the CFTC, not the District Court, had "exclusive jurisdiction," to determine whether Kalshi's sport betting contracts were illegal. While that provision of the CEA states: "The Commission shall have exclusive jurisdiction," it also provides: "Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." *Id.*; *Blue Lake*, 2025 WL 3141202, at \*7. The CEA "Special Rule," moreover, implies that interpretations of federal law by courts play a critical role in the CFTC's evaluation of contracts. 7 U.S.C. § 7a-2(c)(5)(C)(i)(I) provides: "the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—activity that is unlawful under any Federal or State law . . . ."

38

Significantly, the District Court's conclusion is out of step with other district courts that have analyzed swaps and event contracts in the context of State challenges to Kalshi and other entities offering sports betting contracts. In *Crypto.com*, 2025 WL 2916151, at *6, and *KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282, at *3 (D. Nev. Nov. 24, 2025), the United States District Court for the District of Nevada found it had jurisdiction to review Crypto's and Kalshi's sports betting contracts. There, the court held: "the CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap. [. . .] Nothing in the CEA takes statutory interpretation away from courts." *Crypto.com*, 2025 WL 2916151, at *6; *Hendrick*, WL 3286282, at *3 ("First, I have authority to construe the CEA to determine what falls within that jurisdictional provision, such as what constitutes a 'swap.'"). Similarly, the United States District Court for the District of Maryland, in *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025), explained that the CFTC's "exclusivity" only excludes competing federal agencies, such as the SEC. "Congress's clearest intent in conferring 'exclusive jurisdiction' on the CFTC with regard to commodities futures . . . was to make clear that as among *federal agencies*, the CFTC would have exclusive authority, rather than the SEC." *Martin*, 793 F. Supp. 3d 667, 678 (original emphasis); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 387 (1982) ("the exclusive-jurisdiction provision . . . was intended only to

consolidate federal regulation of commodity futures trading in the Commission . . . .”). The *Martin* court’s insight follows from the whole-text of 7 U.S.C. § 2 which frames the jurisdiction of the CFTC in contradistinction to the jurisdiction of the SEC. *See*, *e.g.*, 7 U.S.C. § 2(a)(1)(D).

The District Court erred in holding it lacked jurisdiction to evaluate Kalshi’s contracts. This is a critical misstep. A finding that Kalshi’s contracts are unlawful under the CEA undermines the Court’s analysis of and reliance on UIGEA and would have compelled the District Court to engage directly with the text and structure of CEA and IGRA to determine the proper scope and limitations of those federal statutory regimes, as the Tribes argued.

Based on its flawed conclusion that it did not have jurisdiction to address the issues raised by the Tribes relating to the CEA, the District Court did not reach the merits of the Tribes’ CEA argument in evaluating the Tribes’ likelihood of success. The District Court of Nevada, however, addressed similar arguments to those advanced by the Tribes and found that Kalshi’s contracts violate the CEA and CFTC regulations. *Crypto.com*, 2025 WL 2916151, at *6–9; *Hendrick*, WL 3286282, at *5–9. The District Court of Nevada held that Kalshi’s contracts did not meet the definition of “swaps” and were beyond the purview of the CFTC’s jurisdiction, *Hendrick*, WL 3286282, at *6–7, holding that a “DCM cannot insulate itself from state [and federal] regulation through self-certification where its conduct does not

fall within the CFTC's exclusive jurisdiction provision." *Id*. at *5.

Crucially, the Nevada court found that "Congress set forth in the CEA that if the CFTC determines that a contract is contrary to the public interest," the contract may not be listed, and held: "The CFTC made that public interest determination on a blanket basis when it promulgated 17 C.F.R. § 40.11(a), which prohibits DCMs from listing a swap based on an excluded commodity that 'involves, relates to, or references . . . gaming,' or 'an activity that is similar to' gaming." *Crypto.com*, 2025 WL 2916151, at *10; *Hendrick*, WL 3286282, at *9 ("Additionally, the CFTC has prohibited DCMs from listing contracts that involve gaming. 17 C.F.R. § 40.11(a)(1)."). This is precisely the argument advanced by the Tribes in seeking preliminary injunctive relief. The District Court of Nevada's determination Kalshi was not likely to succeed on the merits of its claims against the State of Nevada directly contradicts the District Court's determination here that the Tribes are unlikely to succeed on the merits.

Finally, although the CFTC has jurisdiction to evaluate the narrow issue of whether a commodity contract constitutes "gaming" in the context of the CEA and its regulations, the CFTC cannot determine whether the same contract constitutes "activity that is unlawful under" IGRA. That issue is left for the federal courts to

41

decide.[7]

A determination that Kalshi's sports betting contracts are unlawful under the CEA would upend every aspect of the District Court's order. If Kalshi's sports betting contracts exceed the lawful scope of the CEA, then: (1) Kalshi's conduct is **not** shielded by the CEA, and the Court need not harmonize the CEA and IGRA; (2) Kalshi's conduct is not exempt from UIGEA; and (3) Kalshi's unlawful sports betting conducted on Indian lands violates IGRA and the Tribes' Compact and Procedures. The District Court's refusal to address the Tribes' arguments concerning the CEA thus constitutes reversible error.

## IV. THE DISTRICT COURT MISAPPLIED NINTH CIRCUIT LANHAM ACT PRECEDENT IN TREATING KALSHI'S ADVERTISEMENT AS A NON-ACTIONABLE STATEMENT OF OPINION.

The District Court erred in concluding that Kalshi's advertisement stating "Sports Betting [is] Legal in all 50 States on Kalshi" was a non-actionable statement of opinion and therefore did not violate the Lanham Act. 1-ER-2-14, Doc# 71 at 3– 4. In reaching that conclusion, the Court failed to properly apply the Ninth Circuit's framework for distinguishing opinion from fact under the Lanham Act. The Court relied on *Coastal Abstract Service, Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999), reasoning that because the advertisement concerned legal compliance, it reflected an opinion rather than an actionable statement of fact. The *Coastal Abstract*

---

[7] Among federal agencies, it is the Secretary of the Interior and the National Indian Gaming Commission that have the authority to interpret the IGRA.

court, however, did not adopt a categorical rule that all assertions touching on legality are opinions. Instead, the Ninth Circuit's inquiry focused on whether the challenged statement makes a "specific and measurable claim" that is "capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Coastal Abstract*, 173 F.3d at 73; accord, *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 69 F.4th 665, 671 (9th Cir. 2023).

Under *Coastal Abstract*, Kalshi's representation that "Sports Betting [is] Legal in all 50 States on Kalshi" was not a tentative legal interpretation or generalized expression of belief. It was an unqualified claim directed to consumers nationwide that is objectively verifiable. As such, it is a false statement of fact because it is undisputed that sports betting is prohibited by criminal law in multiple jurisdictions, including California. *See* Cal. Penal Code § 337a. Thus, sports betting is indisputably not legal in all fifty states and is not legal in California. In *Murphy v. NCAA*, 584 U.S. 453 (2018), the Supreme Court confirmed that, absent federal regulation, states remain free to permit or prohibit sports gambling. Despite the fact that the Supreme Court decided *Murphy* after the enactment of the CEA, Congress's amendments to the CEA and the CFTC's promulgation of its special rule addressing event contracts, the Court did not address any federal regime, including the CEA, that might independently authorize sports wagering notwithstanding state law. That omission is significant given the Court's broad discussion of federal and state

43

authority in the gambling context, *see Murphy*, 584 U.S. at 458-60, and the existence of federal derivatives regulations at the time. Read in this context, *Murphy* reflects the Court's understanding that no background federal statute displaced state prohibitions and that states retained the authority to permit or prohibit sports gambling, a conclusion irreconcilable with the notion that sports betting was already lawful nationwide through participation in CFTC regulated derivative markets.

The District Court also relied on *Coastal Abstract* for the proposition that "absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact." 1-ER-2-14, Doc# 71 at 3–4. However, contrary to the District Court's interpretation, the analysis of whether Kalshi's statement constitutes an opinion does not require the Court to interpret the CEA or to predict how the CFTC might exercise its authority. The Tribes do not seek a determination as to whether the listing of Kalshi's sports event contracts on a designated contract market violates the Lanham Act. Rather, the Tribes only seek a determination that Kalshi's statement that "Sports Betting [is] Legal in all 50 States on Kalshi" is a false statement of fact. *Murphy* confirms that states retain authority to permit or prohibit sports gambling. Additionally, as discussed below Congress never intended the CEA to authorize gambling or betting on the outcome of sports.

For these reasons, the Tribes' Lanham Act claim parallels the claims at issue in *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609 (9th Cir. 2016). In *ThermoLife*, the Ninth Circuit held that establishing false advertising where the defendant had advertised its products as "safe" and "natural" did not require interpreting the Federal Food, Drug, and Cosmetic Act or a showing of a statutory violation. *Id*. at 612. The court reasoned that whether a statement constitutes fact or opinion turns on whether it is capable of being proved false, rather than on whether it relates to a regulatory scheme. *Id*. at 615. Just as the statutory provision on which defendants relied on in that case, 21 U.S.C. § 342(f), neither mentions a presumption of safety nor establishes whether a dietary supplement is safe, the CEA does not address whether sports betting is legal. Factual claims about legality or safety can be verified independently of the statutory framework, highlighting that *Coastal Abstract* does not bar Lanham Act claims for statements that can be determined to be true or false. Likewise, Kalshi's statement that "Sports Betting [is] Legal in all 50 States on Kalshi" is a concrete, verifiable assertion about the legality of its product. That the advertisement uses legal terminology does not transform it into opinion; it remains a factual claim that is either true or false.

Finally, the District Court's reliance on *Coastal Abstract* is further undermined by the identity of the speaker and the context in which the statement was made. Kalshi is not a layperson offering an informal view about unsettled law.

45

It is a "nationwide, federally registered, internet-based exchange," 1-ER-2-14, Doc# 71 at 1, operating as a licensed DCM under CFTC oversight. As a DCM, Kalshi is required to evaluate and attest to the legality of its products. *See* 17 C.F.R. § 40.2. The Ninth Circuit has emphasized that context matters, and that statements made by technical or industry actors using industry-specific terminology may reasonably be understood as objective representations rather than opinion. *See Enigma*, 69 F.4th at 672. In that context, a claim of nationwide legality is presented not as abstract legal commentary, but as a factual attribute of the product being marketed. Kashi's statement is a statement of fact, that is false and thus violates the Lanham Act.

## V. EVEN IF KALSHI'S STATEMENT WAS OPINION, THE DISTRICT COURT ERRED IN CONCLUDING THAT KALSHI HELD A GOOD-FAITH BELIEF THAT THE STATEMENT WAS TRUE.

Even if Kalshi's statement was properly characterized as an opinion, the District Court committed further legal error by failing to apply the Ninth Circuit's controlling exception for claims of legality. Under *ThermoLife*, 648 F. App'x at 614–15, a representation that a product is legal is actionable if the speaker lacks a good-faith belief in the truth of that claim. Rather than applying that standard, the District Court treated the existence of other federal court decisions addressing legal issues that are distinct from the issues before the Court in this case as dispositive of good faith, without regard to the timing or substance of those decisions.

The District Court stated: "Plaintiffs have not shown the opinion is literally false or that Kalshi lacks a good-faith belief in the opinion's truth," citing *Hendrick*,

2025 WL 1073495, at *8, and *KalshiEX LLC v. Flaherty*, No. 25-CV-02152-ESK-MJS, 2025 WL 1218313, at *8 (D.N.J. Apr. 28, 2025). However, Kalshi published the advertisement in question on January 23, 2025, before either of those cases was initiated or decided. As the Supreme Court explained in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175, 188–89 (2015) whether an opinion is false or misleading turns on the speaker's knowledge and belief at the time the statement is made, rather than on subsequent legal developments or later judicial determinations. *Id*. at 188–89. Thus, the relevant inquiry concerns Kalshi's belief at the time of publication of the ad. When Kalshi published the advertisement on January 23, 2025, it had less than a week earlier told the D.C. Circuit Court that "contracts that involve games are probably not the type of contracts that we want to be listed on an exchange, because they don't have any real economic value to them." 4-ER-613, District Court Doc. #1, p.31; *see KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58 (D.C. Cir. 2024).

Crucially, *Hendrick* and *Flaherty* addressed whether state officials were preempted from regulating Kalshi's event contracts in light of asserted federal authority under the CEA. They did not hold that "sports betting" is legal in all fifty states, nor did they validate use of the term "betting" within the context of the CEA. The procedural history of *Hendrick* further limits its relevance. In *Hendrick*, the court later dissolved the preliminary injunction that had restricted state enforcement

47

of its gaming laws and declined to grant Kalshi a stay pending appeal before the Ninth Circuit. *Hendrick*, 2025 U.S. Dist. LEXIS 234246, at *8; *Hendrick*, 2025 U.S. Dist. LEXIS 265127, at * 5-6 (D. Nev. Dec. 16, 2025). In *Flaherty*, the court only addressed whether Kalshi had demonstrated a reasonable likelihood of success on its claim that federal law displaced state regulation of "sports-related event contracts," not sports betting or gambling. *Flaherty*, 2025 U.S. Dist. LEXIS 79893, at 16.

Moreover, to the extent that the District Court considered *Hendrick* and *Flaherty* as relevant to Kalshi's asserted good faith belief, it did not account for contrary authority addressing the same preemption arguments. In *KalshiEX LLC v. Martin*, 2025 U.S. Dist. LEXIS 147815, the District of Maryland rejected Kalshi's contention that the CEA preempts state gambling laws, concluding that Kalshi had failed to show a likelihood of success on the merits of its preemption claim. *Id*. at 4. The Maryland court determined that Kalshi had not demonstrated either field or conflict preemption, reasoning that Kalshi had not established that Congress intended the CEA to occupy a regulatory field that includes gambling, nor that the CEA was intended to function as a gambling statute. *Id*. at 19. The court further observed that Kalshi's interpretation of the CEA would impliedly repeal portions of the Wire Act and the Indian Gaming Regulatory Act, a result that the court rejected. *Id*. The District Court was aware of both the *Crypto.com* and *Martin* decisions at the

48

time that it rendered its decisions, and the District Court should have taken these opinions into consideration in deciding whether Kalshi had a "good faith" belief that its advertisement was false. The District Court's failure to do so in and of itself is reversible error.

## VI. KALSHI'S TECHNICAL QUALIFIER DOES NOT CURE ITS LITERAL FALSE STATEMENT UNDER NINTH CIRCUIT PRECEDENT.

Finally, in reaching its decision, the District Court appeared to implicitly accept that the qualifier "on Kalshi" in the ad cures any falsity. That assumption is incompatible with Ninth Circuit law, which holds that a qualifier cannot absolve the defendant of liability stemming from a misleading primary message. *See Whiteside v. Kimberly-Clark Corp.*, 108 F.4th 771, 778 (9th Cir. 2024). Evaluated as a whole, the advertisement does not communicate a nuanced legal distinction between federally regulated event contracts and state-regulated sports betting. The advertisement communicates that sports betting is legal nationwide. As discussed above, Congress did not intend betting or gambling to take place on a DCM. As explained above, "Sports betting" cannot take place on a DCM, and it is false to say otherwise. The District Court's decision holding otherwise was incorrect.

## VII. AT BOTTOM, DESIGNATED CONTRACT MARKETS ARE NOT AUTHORIZED VENUES FOR SPORTS BETTING.

Even if this Court were to conclude an interpretation of the CEA or the regulations promulgated thereunder is required, sports betting may not occur under the CEA. As the legislative history of the CEA confirms, Congress did not intend

futures and derivatives markets to serve as venues for gambling. As the district court in *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.*, No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151 (D. Nev. Oct. 14, 2025) explained, "[t]he CFTC's decision to prohibit DCMs from listing gaming contracts is consistent with congressional intent to 'prevent gambling through futures markets.'" *Id*. at \*27 (citing 156 Cong. Rec. S5902-01, S5906 (July 15, 2010) (statement of Sen. Lincoln)). The court further noted that the CFTC itself has emphasized that its "prohibition of certain 'gaming' contracts is consistent with Congress's intent to prevent gambling through the futures markets and to protect the public interest from gaming and other events contracts." *Id*. at \*28 (citing Provisions Common to Registered Entities, 76 Fed. Reg. 44,776, 44,785 (July 27, 2011)). Other courts have reached the same conclusion. In *KalshiEX LLC v. Martin*, the court rejected Kalshi's preemption arguments, concluding that Congress did not intend the CEA to regulate gambling or to occupy a regulatory field that includes betting activities. 2025 U.S. Dist. LEXIS 147815, at \*19.

That conclusion is reinforced by 17 C.F.R. § 40.11, which makes clear that gambling-related activity is excluded from lawful trading on registered derivatives markets. Section 40.11 provides that a "registered entity shall not list for trading or accept for clearing on or through the registered entity . . . [a]n agreement, contract, transaction, or swap . . . that involves, relates to, or references . . . gaming, or an

activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a); see

*KalshiEx, LLC v. Hendrick*, 2025 U.S. Dist. LEXIS 234246, *42. Accordingly,

Kalshi's contention that sports betting may lawfully take place under the CEA, on a

DCM, or on a CFTC-regulated platform, is inconsistent with both congressional

intent, the plain wording of the statute, and the CEA's governing regulations.

## CONCLUSION

"On the far end of the Trail of Tears was a promise." *McGirt v. Oklahoma*,

591 U.S. 894, 897 (2020). Congress, and the executive agencies created by Congress

to conduct relations with the Indians, have made many such promises. To ensure that

those promises are fulfilled to the full extent guaranteed by Treaties, Congress, and

the Executive, Indian tribes have sought remedy in the federal courts. There:

> Often, Native American Tribes have come to this Court seeking justice only to leave with bowed heads and empty hands. But that is not because this Court has no justice to offer them. Our Constitution reserves for the Tribes a place—an enduring place—in the structure of American life. It promises them sovereignty for as long as they wish to keep it. And it secures that promise … by giving the federal government certain significant (but limited and enumerated) powers aimed at building a lasting peace.

*Haaland v. Brackeen*, 599 U.S. 255, 333 (2023) (J. Gorsuch, concurring).

One such promise is IGRA. In that Act, Congress worked towards building

that lasting peace by confirming that Indian tribes have a retained, exclusive, and

sovereign right to conduct and regulate class III gaming on their Indian lands for the

purpose of promoting tribal economic development, self-sufficiency, and strong

tribal governments, as well as to ensure that the Indian tribes and their members are the primary beneficiaries of the gaming that occurs within their territory. The Tribes respectfully request that the Court uphold that promise.

For all the foregoing reasons, the Tribes request that the Court reverse the decision of the District Court and hold that Kalshi and Robinhood's sports betting activities on their Indian lands violate the IGRA, UIGEA, CEA, and the Lanham Act, and remand the case to the District Court with instructions that the District Court grant the Tribes' motion for a preliminary injunction.

Dated: January 9, 2026        Respectfully Submitted,

By:   /s/ *Lester J. Marston*

LESTER J. MARSTON
California State Bar No. 081030
THE LAW OFFICES OF RAPPORT AND MARSTON
AN ASSOCIATION OF SOLE PRACTITIONERS
405 West Perkins Street
Ukiah, California 95482
Telephone: 707-462-6846
Facsimile: 707-462-4235
Email: ljmarston@rmlawoffice.net

*Attorney for Appellants*
*Blue Lake Rancheria, Chicken Ranch Rancheria Of Me-Wuk Indians, And Picayune Rancheria Of The Chukchansi Indians*

52

## CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party. This brief contains 12,810 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 32-1.

Dated: January 9, 2026      Respectfully Submitted

By:    /s/ *Lester J. Marston*

LESTER J. MARSTON
California State Bar No. 081030
THE LAW OFFICES OF RAPPORT AND MARSTON
AN ASSOCIATION OF SOLE PRACTITIONERS
405 West Perkins Street
Ukiah, California 95482
Telephone: 707-462-6846
Facsimile: 707-462-4235
Email: ljmarston@rmlawoffice.net

*Attorney for Appellants*
*Blue Lake Rancheria, Chicken Ranch Rancheria Of Me-Wuk Indians, And Picayune Rancheria Of The Chukchansi Indians*

## CERTIFICATE OF SERVICE

I am employed in the County of Mendocino, State of California. I am over the age of 18 years and not a party to the within action; my business address is that of Rapport & Marston, 405 West Perkins Street, Ukiah, California 95482.

I hereby certify that I electronically filed the foregoing document(s):

APPELLANTS' OPENING BRIEF

with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Electronic Filing system on January 9, 2026, which generated and transmitted a notice of electronic filing to Appellate Electronic Filing system registrants.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct; executed on January 9, 2026, at Ukiah, California.

*/s/ Ericka Duncan*
ERICKA DUNCAN