No. 25-7504

IN THE

# United States Court of Appeals
# for the Ninth Circuit

BLUE LAKE RANCHERIA, *et al.*,

*Plaintiffs-Appellants,*

v.

KALSHI INC., *et al.*,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:25-cv-6162 (Corley, J.)

## ANSWERING BRIEF OF DEFENDANTS-APPELLEES
## KALSHI INC. AND KALSHIEX LLC

GRANT R. MAINLAND
KAREN WONG
DAVIS CAMPBELL
MILBANK LLP
55 Hudson Yards
New York, NY 10001

CHRISTOPHER C. WHEELER
DYLAN M. SILVA
FARELLA BRAUN + MARTEL LLP
One Bush Street, Suite 900
San Francisco, CA 94104

March 9, 2026

OLIVIA S. CHOE
JOSHUA B. STERLING
WILLIAM E. HAVEMANN
MILBANK LLP
1101 New York Ave., NW
Washington, DC 20005
(202) 835-7511
ochoe@milbank.com

*Counsel for Defendants-Appellees*
*Kalshi Inc. and KalshiEX LLC*

## TABLE OF CONTENTS

INTRODUCTION ....................................................................... 1

STATEMENT OF JURISDICTION.................................................. 4

STATEMENT OF ISSUES PRESENTED........................................ 5

PERTINENT STATUTES AND REGULATIONS ........................... 6

STATEMENT OF THE CASE ....................................................... 6

    I.    LEGAL BACKGROUND........................................................ 6

        A.    Congress Subjects Derivatives Exchanges to
            Comprehensive Regulation By The CFTC ........................ 6

        B.    Congress Passes The Indian Gaming Regulatory Act
            To Govern Gaming "On Indian Lands" ........................... 10

        C.    Congress Addresses Internet Gambling By Passing
            UIGEA ........................................................................ 14

    II.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY..................... 16

SUMMARY OF ARGUMENT ....................................................... 19

ARGUMENT............................................................................... 22

    I.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THEIR
        IGRA CLAIM................................................................... 23

        A.    Plaintiffs Lack A Statutory Right Of Action To Enjoin
            Violations Of IGRA...................................................... 23

            1.    The Compact And Procedures Do Not Apply
                To Third Parties Such As Kalshi ............................ 24

            2.    Even If The Compact And Procedures
                Applied, Kalshi's Conduct Is Not "In
                Violation Of" Them.............................................. 27

            3.    Even If The Procedures Applied, Only The
                Secretary Of The Interior Can Enforce Them ........ 33

# TABLE OF CONTENTS—Continued

B. IGRA Does Not Apply To Transactions On CFTC-Designated Contract Markets........................................... 35

    1. The Text And Purpose Of IGRA Confirm That It Does Not Apply to Kalshi's Event Contracts ...... 36

    2. UIGEA Confirms That IGRA Does Not Apply To Kalshi's Event Contracts ................................... 38

    3. Plaintiffs' Reading Of IGRA Would Impliedly Repeal The CEA ...................................................... 46

C. Plaintiffs' Allegations That Kalshi's Contracts Violate The CEA And Therefore Violate IGRA Are Irrelevant And Wrong ..................................................................... 47

II. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THEIR LANHAM ACT CLAIM............................................................................ 53

A. Kalshi's Advertisement Concerning Its Contracts' Legality Is A Non-Actionable Statement of Opinion....... 53

B. Plaintiffs' Counterarguments Lack Merit........................ 54

III. IF THIS COURT DOES NOT AFFIRM, IT SHOULD REMAND TO THE DISTRICT COURT TO CONSIDER KALSHI'S ADDITIONAL ARGUMENTS IN THE FIRST INSTANCE ........................................... 61

CONCLUSION............................................................................... 63

CERTIFICATE OF COMPLIANCE

STATEMENT OF RELATED CASES

ADDENDUM A: Pertinent Statutes and Regulations

# **TABLE OF AUTHORITIES**

**CASES:**                                                                    Page(s)

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ......................................................... 23, 29

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.,*
    977 F.2d 1147 (7th Cir. 1992) ...................................... 2, 46, 47

*Big Lagoon Rancheria v. California,*
    789 F.3d 947 (9th Cir. 2015).......................................... 48, 49

*Branch v. Smith,*
    538 U.S. 254 (2003) ............................................................. 42

*Cabazon Band of Mission Indians v. Wilson,*
    124 F.3d 1050 (9th Cir. 1997) ......................................... 29, 30

*California v. Cabazon Band of Mission Indians,*
    480 U.S. 202 (1987)........................................................... 2, 10

*California v. Iipay Nation of Santa Ysabel,*
    898 F.3d 960 (9th Cir. 2018)................................3, 14, 36, 38, 44, 45, 46

*California v. Picayune Rancheria of Chukchansi Indians of
    Cal.,* No. 1:14-cv-1593, 2015 WL 9304835
    (E.D. Cal. Dec. 22, 2015)................................................. 24, 32

*California v. Trump,*
    963 F.3d 926 (9th Cir. 2020) .............................................. 42

*Cates v. Cal. Gambling Control Comm'n,*
    65 Cal. Rptr. 3d 513 (Ct. App. 2007) ..................................... 25

*Cayuga Nation v. N.Y. State Gaming Comm'n,*
    No. 5:24-cv-537, 2025 WL 2161290 (N.D.N.Y. July 30, 2025) ...............30

*Cayuga Nation v. New York State Gaming Commission,*
    775 F. Supp. 3d 651 (N.D.N.Y. 2025)................................. 25, 26

*Cheneau v. Garland,*
    997 F.3d 916 (9th Cir. 2021)................................................. 34

iv

## TABLE OF AUTHORITIES—Continued

*Chicken Ranch Rancheria of Me-Wuk Indians v. California,*
    42 F.4th 1024 (9th Cir. 2022) ................................................. 38

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,*
    173 F.3d 725 (9th Cir. 1999) .......................... 18, 53, 54, 55, 56, 57, 58, 60

*Conn. Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) ................................................................. 41

*County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation,*
    502 U.S. 251 (1992) ................................................................. 29

*Crowley Maritime Corp. v. Boston Old Colony Ins. Co.,*
    70 Cal. Rptr. 3d 605 (Ct. App. 2008) ............................... 24, 32

*EEOC v. Waffle House, Inc.,*
    534 U.S. 279 (2002) ................................................................. 24

*Enigma Software Group USA, LLC v. Malwarebytes, Inc.,*
    69 F.4th 665 (9th Cir. 2023) ................................................. 58

*Florida. v. Seminole Tribe of Fla.,*
    181 F.3d 1237 (11th Cir. 1999) ........................................ 23, 30

*Garcia v. County of Alameda,*
    150 F.4th 1224 (9th Cir. 2025) ........................................ 22, 23

*Gatewood v. North Carolina,*
    203 U.S. 531 (1906) ................................................................... 7

*Groff v. DeJoy,*
    600 U.S. 447 (2023) ................................................................. 29

*Hartman v. Kickapoo Tribe Gaming Comm'n,*
    319 F.3d 1230 (10th Cir. 2003) .............................................. 23

*Hein v. Capitan Grande Band of Diegueno Mission Indians,*
    201 F.3d 1256 (9th Cir. 2000) ........................................... 23, 31

*In re Joye,*
    578 F.3d 1070 (9th Cir. 2009) ............................................... 42

## TABLE OF AUTHORITIES—Continued

*KalshiEX LLC v. CFTC*,
No. 23-cv-3257, 2024 WL 4164694
(D.D.C. Sep. 12, 2024) ................................16, 49, 50, 51, 52, 61

*KalshiEX LLC v. Flaherty*,
No. 25-cv-2152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) ............. 49, 57

*KalshiEX, LLC v. Hendrick*,
No. 2:25-cv-575, 2025 WL 1073495 (D. Nev. Apr. 9, 2025).................. 57

*KalshiEX, LLC v. Hendrick*,
No. 2:25-cv-575, 2025 WL 3286282
(D. Nev. Nov. 24, 2025) ..............................................48, 51, 57

*KalshiEX LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) ....................................... 57

*KalshiEX LLC v. Orgel*,
No. 3:26-cv-34, 2026 WL 474869
(M.D. Tenn. Feb. 19, 2026) ...................................... 52, 57, 60

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) ............................................ 8, 57

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) ................................................ 22

*Meinecke v. City of Seattle*,
99 F.4th 514 (9th Cir. 2024) ................................................ 23

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ......................................................... 9

*Michigan v. Bay Mills Indian Cmty.*,
572 U.S. 782 (2014) ......................... 1, 10, 13, 26, 30, 36, 38, 44

*Navajo Nation v. Dalley*,
896 F.3d 1196 (10th Cir. 2018) ............................................ 45

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022)........................................................31

## TABLE OF AUTHORITIES—Continued

*Rincon Band of Luiseno Mission Indians of Rincon Reservation
v. Schwarzenegger,*
602 F.3d 1019 (9th Cir. 2010) ............................... 24

*Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.,*
902 F.2d 222 (3d Cir. 1990) ................................. 60

*SEC v. McCarthy,*
322 F.3d 650 (9th Cir. 2003) ................................ 33

*Seminole Tribe of Fla. v. Florida,*
517 U.S. 44 (1996) ........................................ 10

*Spatz v. Regents of Univ. of Cal.,*
151 F.4th 1068 (9th Cir. 2025) ............................. 42

*Stand Up for California! v. U.S. Department of Interior,*
959 F.3d 1154 (9th Cir. 2020) .............................. 34

*Starbucks Corp. v. McKinney,*
602 U.S. 339 (2024) ....................................... 22

*Taxpayers of Mich. Against Casinos v. Michigan,*
685 N.W.2d 221 (Mich. 2004) .............................. 24

*ThermoLife International, LLC v. Gaspari Nutrition Inc.,*
648 F. App'x 609 (9th Cir. 2016) ........................ 58, 59

*United States v. Wells,*
156 F.4th 907 (9th Cir. 2025) .............................. 47

*Whiteside v. Kimberly-Clark Corp.,*
108 F.4th 771 (9th Cir. 2024) .............................. 55

*Winter v. Nat. Res. Def. Council, Inc.,*
555 U.S 7 (2008) .......................................... 22

*Wisconsin v. Ho-Chunk Nation,*
478 F. Supp. 2d 1093 (W.D. Wis. 2007) .................. 25, 31, 32

## TABLE OF AUTHORITIES—Continued

**STATUTES:**

7 U.S.C. § 1a(47)(A)(ii) ............................................................. 8, 52

7 U.S.C. § 2(a)(1)(A) ...................................2, 7, 8, 46, 50, 56

7 U.S.C. § 7(d) ........................................................................... 9

7 U.S.C. § 7a-2(c)(1) ............................................................. 9, 48

7 U.S.C. § 7a-2(c)(4)(A) ............................................................. 9

7 U.S.C. § 7a-2(c)(5)(i)(ii) ......................................................... 9

7 U.S.C. § 7a-2(c)(5)(B) ........................................................... 49

7 U.S.C. § 7a-2(c)(5)(C)(i) .......................................... 9, 50, 51, 52

7 U.S.C. § 13a-2(1) .................................................................... 8

7 U.S.C. § 16(e)(1) .................................................................... 8

12 U.S.C. § 1717 ...................................................................... 32

12 U.S.C. § 1721 ...................................................................... 32

15 U.S.C. §§ 1051, *et seq.* ........................................................ 5

15 U.S.C. § 1125(a)(1) ............................................................. 53

18 U.S.C. § 1084 ..................................................................... 44

18 U.S.C. § 1084(a) ................................................................. 37

18 U.S.C. § 1166(d) .................................................................. 13

25 U.S.C. §§ 2701, *et seq.* ........................................................ 4

25 U.S.C. § 2703(6) ................................................................. 11

25 U.S.C. § 2703(7)(A) ............................................................ 11

25 U.S.C. § 2703(8) ................................................................. 11

# TABLE OF AUTHORITIES—Continued

25 U.S.C. § 2706(b)(2)................................................................ 37

25 U.S.C. § 2710(a)(1) ................................................................ 11

25 U.S.C. § 2710(b)(1) ........................................................... 11, 36

25 U.S.C. § 2710(b)(2)(E) ........................................................... 37

25 U.S.C. § 2710(d)(1) ................................................................ 11

25 U.S.C. § 2710(d)(3)(A) ........................................................... 37

25 U.S.C. § 2710(d)(3)(C) ............................................................12

25 U.S.C. § 2710(d)(6) ............................................................... 34

25 U.S.C. § 2710(d)(7)(A)(i) ........................................................13

25 U.S.C. § 2710(d)(7)(A)(ii) ......................... 3, 13, 19, 23, 29, 31, 33, 35, 47

25 U.S.C. § 2710(d)(7)(A)(iii) ..................................................13, 33

25 U.S.C. § 2710(d)(7)(B) .......................................................... 25

25 U.S.C. § 2710(d)(7)(B)(iii) ..................................................12, 34

25 U.S.C. § 2710(d)(7)(B)(iv) .......................................................12

25 U.S.C. § 2710(d)(7)(B)(vii) .......................................................12

25 U.S.C. § 5362(1)(A) .................................................................16

25 U.S.C. § 5362(10)(A) ......................................................4, 16, 37

28 U.S.C. § 1292(a)(1) ................................................................. 5

28 U.S.C. § 1331.......................................................................... 4

31 U.S.C. § 5361(a)(4) .............................................................14, 38, 39

31 U.S.C. § 5362(1) .....................................................................15

31 U.S.C. § 5362(1)(A) ...........................................................15, 41

# TABLE OF AUTHORITIES—Continued

31 U.S.C. § 5362(1)(E)(ii) ................................................. 15, 39, 41, 45, 48, 52

31 U.S.C. § 5362(1)(E)(iii) ...................................................................16

31 U.S.C. § 5362(1)(E)(iv) ...................................................................16

31 U.S.C. § 5362(10) ...................................................................15, 39

31 U.S.C. § 5363 ...................................................................14

31 U.S.C. § 5365(b)(1) ...................................................................16

31 U.S.C. § 5365(b)(2) ...................................................................16

31 U.S.C. § 5365(b)(3) ...................................................................16

47 U.S.C. § 396 ...................................................................32

National Gambling Impact Study Comission Act of 1996,
    Pub. L. No. 104-169 § 4(a)(2)(F), 110 Stat. 1482, 1484 (1996) ...............14

RULES AND REGULATIONS:

17 C.F.R. pt. 38 ...................................................................9

17 C.F.R. § 40.2(a)(1) ...................................................................9

17 C.F.R. § 40.2(a)(3) ...................................................................17

17 C.F.R. § 40.3 ...................................................................9

17 C.F.R. § 40.11(c) ...................................................................10

17 C.F.R. § 40.11(c)(2) ...................................................................10

*Event Contracts*, 89 Fed. Reg. 48968 (June 10, 2024) ...............................51

*Event Contracts; Proposed Withdrawal of Proposed
    Regulatory Action*, 91 Fed. Reg. 5386 (Feb. 6, 2026) ...........................51

Fed. R. App. P. 4(1)(A) ...................................................................5

## TABLE OF AUTHORITIES—Continued

*Provisions Common to Registered Entities*, 76 Fed. Reg. 44,776
 (July 27, 2011)........................................................................ 50

**Legislative Materials**

H.R. Rep. No. 74-421 (1935) ................................................. 6

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.)....................... 7, 46, 56

*Hearings Before the H. Comm. on Agric.*, 93d Cong.,
 1st Sess. (1973)....................................................................... 7

*Hearings Before the S. Comm. on Agric. & Forestry,*
 93d Cong., 2d Sess. (1974)...................................................... 7

S. Rep. No. 100-466 (1988)..................................... 11, 35, 43, 44

**OTHER AUTHORITIES:**

Appellant's Br., *KalshiEX LLC v. CFTC,*
 No. 24-5205 (D.C. Cir. Oct. 16, 2024) ................................. 57

*Breach*, Black's Law Dictionary (12th ed. 2024) ......................... 27

CFTC Amicus Br., *N. Am. Derivatives Exch., Inc. v.
 Nevada*, No. 25-7187
 (9th Cir. Feb. 17, 2026), Dkt. 38.2....................19, 41, 49, 52, 57

James Royal, *Options vs. stocks: Which one is better for you?*,
 Yahoo! Finance (Aug. 25, 2025),
 https://finance.yahoo.com/news/options-vs-stocks-one-
 better-210539982.html ........................................................ 54

Kevin T. Van Wart, *Preemption and the Commodity Exchange
 Act*, 58 Chi.-Kent L. Rev. 657, 700 (1982) ............................. 8

Nat'l Indian Gaming Comm'n, *NIGC FY 2024 Gross Gaming
 Revenue Report* (2024), https://perma.cc/X6AG-A6RM .......................1

## INTRODUCTION

In 1988, Congress passed the Indian Gaming Regulatory Act ("IGRA") to create a framework for the regulation of gaming on tribal lands. The statute applies to gaming conducted "on Indian lands, *and nowhere else.*" *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 795 (2014) (emphasis added). Plaintiffs now try to use IGRA to regulate a nationwide derivatives exchange even though, years before IGRA was passed, Congress gave the Commodity Futures Trading Commission ("CFTC") exclusive jurisdiction over the nation's derivatives markets. Plaintiffs effectively argue that the CFTC's jurisdiction is not exclusive after all, but rather concurrent with the jurisdiction of more than 240 Indian tribes who offer gaming in this country.[1] The district court correctly rejected this contention and denied Plaintiffs a preliminary injunction. This Court should affirm.

KalshiEX LLC ("Kalshi") is a CFTC-licensed derivatives exchange, known as a designated contract market ("DCM"), that enables its users to take a position on the likelihood of future events by buying and selling derivatives called "event contracts." Based in New York, it offers these event contracts in areas such as economics, weather, popular culture, political

---

[1] Nat'l Indian Gaming Comm'n, *NIGC FY 2024 Gross Gaming Revenue Report* (2024), https://perma.cc/X6AG-A6RM.

1

elections, and sports. Because Kalshi is a DCM, the Commodity Exchange Act ("CEA") preempts any other regulation of trading on Kalshi's exchange. 7 U.S.C. § 2(a)(1)(A) ("supersed[ing]" and "limit[ing]" the jurisdiction of "regulatory authorities under the laws of the United States or of any State" as applied to transactions on DCMs). Congress preempted the field of derivatives trading to reform what was then a patchwork of concurrent state and federal regulations by imposing "a uniform set of regulations" administered by a single federal regulator. *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992).

When Congress passed IGRA fourteen years later, it made no mention of upending this uniform regime. That is because it addressed another matter entirely: the Supreme Court's holding in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), that states lacked authority to regulate gaming on tribal lands. Congress responded by constructing a framework for balancing federal, state, and tribal interests in regulating gaming activity—but solely, in the words of the statute, "on Indian lands."

Plaintiffs are three Indian tribes based in California. They allege that Kalshi is engaged in unlawful gaming "on Indian lands" because persons located there can access Kalshi's exchange and trade sports-related event contracts on their computer or phone. In essence, Plaintiffs seek in IGRA a

2

foothold to regulate trading on a national derivatives exchange operated from thousands of miles away. The district court was correct to deny them this foothold, for two principal reasons.

First, Plaintiffs lack a statutory right of action to enjoin violations of IGRA. The provision they rely on to sue requires a "violation of [a] Tribal-State compact." 25 U.S.C. § 2710(d)(7)(A)(ii). But a compact is an agreement between a state and tribe; it does not bind strangers to the agreement such as Kalshi. So there is no way for Kalshi to act "in violation" of one. And even if it could apply to non-parties, the compact in question lacks any language that even arguably governs Kalshi's conduct. The district court's ruling on the IGRA claim can be affirmed on this basis alone.

Second, even if Plaintiffs had an available right of action, IGRA does not apply to Kalshi's exchange. Assuming *arguendo* that Kalshi's event contracts qualify as "gaming," "IGRA is silent" on the topic of "gaming on Indian lands facilitated by the internet." *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 968 (9th Cir. 2018). But a statute passed many years later— the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA")—is not. UIGEA was enacted to prevent using the internet to "circumvent" the patchwork of gambling laws across the country. It did so by rendering a "bet or wager" actionable if it is unlawful where "initiated"—exactly the claim

pressed by Plaintiffs here. 31 U.S.C. § 5362(10)(A). There is just one problem for Plaintiffs: UIGEA exempted transactions on DCMs from this regulatory framework so as to preserve the CEA's preemptive effect. It cannot be that Congress preserved CEA preemption in UIGEA (the statute addressing internet gaming) while creating a 240-tribe exception to preemption in IGRA (which predated the internet). The district court rightly rejected this implausible interpretation.

Plaintiffs' Lanham Act claim is equally unlikely to succeed. They contend that a Kalshi advertisement stating that "Sports Betting [is] Legal in all 50 States on Kalshi" constitutes false advertising. But as the district court observed, the ad merely states Kalshi's view that its contracts are legal, and under this Court's precedents, statements concerning a product's legality are statements of opinion, not fact—and thus inactionable under the Lanham Act. Plaintiffs insist that Kalshi's contracts are clearly illegal, but Kalshi's federal regulator has determined otherwise, and courts have long accepted the preemptive effect of the CEA. For that reason, Plaintiffs cannot show that Kalshi's statements lacked good faith.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims under the Indian Gaming Regulatory Act (25

U.S.C. §§ 2701, *et seq*.) and the Lanham Act (15 U.S.C. §§ 1051, *et seq*.). This Court has jurisdiction to review the district court's denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1). The district court denied Plaintiffs' motion for a preliminary injunction on November 10, 2025, 1-ER-014, and Plaintiffs timely appealed on November 25, 2025, 4-ER-607-608; *see* Fed. R. App. P. 4(1)(A).

## STATEMENT OF ISSUES PRESENTED

1. Whether IGRA gives Plaintiffs a right of action to enjoin Kalshi—a nationwide CFTC-regulated DCM—from offering sports-event contracts accessible via the internet by persons located on Indian lands.

2. Whether Plaintiffs are likely to succeed on their claim that IGRA prohibits the offering of sports-event contracts accessible via the internet by persons located on Indian lands, even though the CEA preempts the application of other federal laws to trading on DCMs, and UIGEA—which Congress passed specifically to target internet gambling—expressly excludes trading on DCMs from its reach.

3. Whether Plaintiffs are likely to succeed on their claim that Kalshi's statements concerning the legality of its sports-event contracts constitute false advertising under the Lanham Act.

## PERTINENT STATUTES AND REGULATIONS

The pertinent statutes and regulations are set forth in Addendum A to this brief.

## STATEMENT OF THE CASE

### I.  LEGAL BACKGROUND

#### A.  Congress Subjects Derivatives Exchanges to Comprehensive Regulation By The CFTC.

This appeal involves derivatives: financial instruments whose value depends on one or more underlying commodities.  Futures contracts, one type of derivative, developed in the United States in the 19th century as a tool to hedge against fluctuation in commodity prices.  Congress first subjected futures contracts to federal regulation in the Grain Futures Act of 1922, which created a regulatory framework for trading in grain futures.  In 1936, Congress revised that framework and extended it to other kinds of futures trading, involving other kinds of commodities, by passing the Commodity Exchange Act.

In passing these laws, Congress stopped short of comprehensive federal regulation.  It did not seek "to occupy the field."  H.R. Rep. No. 74-421, at 5 (1935).  That decision left derivatives exchanges subject to a patchwork of different regulations, including state laws that sought to regulate as gambling so-called "bucket shops," where parties speculated on the "rise or fall of the

prices of stocks, grain, oil, etc." *Gatewood v. North Carolina*, 203 U.S. 531, 536 (1906). That proved unworkable, eventually leading exchanges to recommend that "federal policy … be uniform throughout the United States" and not "subject to the vagaries" of different obligations in "different jurisdictions." *Hearings Before the H. Comm. on Agric.*, 93d Cong., 1st Sess. 121 (1973) [hereinafter "*House Hearings*"].

Congress responded in 1974 with seminal legislation designed to "[b]ring[ ] all futures trading under federal regulation." *Hearings Before the S. Comm. on Agric. & Forestry,* 93d Cong., 2d Sess. 848 (1974). Most relevant here, Congress created the CFTC to oversee trading on CFTC-designated contract markets, *i.e.*, DCMs. Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction." *House Hearings* at 128. Congress in Section 2(a) of the amended statute therefore explicitly vested the CFTC with "exclusive jurisdiction" to regulate trading on DCMs. 7 U.S.C. § 2(a)(1)(A). Its express intent was to "preempt the field insofar as futures regulation is concerned." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).

Courts immediately understood the preemptive effect of those amendments. Writing for the Second Circuit, Judge Friendly explained that the CEA "preempts the application of state law" regarding trading on federal

exchanges. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980). The CFTC likewise understood that the amendments preempted state laws deeming futures contracts to be "illegal gambling contracts." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 700 (1982) (citation modified).

The CFTC's exclusive jurisdiction over trading on DCMs has been a central pillar of the federal framework for regulating derivatives for over 50 years. Although Congress has amended the CEA numerous times, it has consistently reaffirmed that exclusive jurisdiction. In 1978, Congress granted states limited jurisdiction to enforce the CEA against some derivatives market participants, but *not* against DCMs. 7 U.S.C. § 13a-2(1). In 1982, Congress amended the CEA to invite state regulation of *off-DCM* fraudulent activity involving derivatives, while preserving the CFTC's exclusive jurisdiction over *on-DCM* trading. 7 U.S.C. § 16(e)(1). Most recently, in 2010, Congress brought another kind of derivative—swaps— under the CFTC's exclusive jurisdiction. 7 U.S.C. § 2(a)(1)(A).

Swaps include event contracts like the ones at issue here. *See* 7 U.S.C. § 1a(47)(A)(ii). Congress recognized that certain event contracts could be structured to resemble wagers on sporting events. To address that concern, Congress passed a "Special Rule" giving the CFTC the discretion—not the

obligation—to prevent event contracts that "involve" "gaming" from trading on DCMs if they are "contrary to the public interest." 7 U.S.C. §§ 7a-2(c)(5)(C)(i), (ii). The Special Rule does not withdraw the CFTC's exclusive jurisdiction over "gaming"-related event contracts, but instead empowers the CFTC to decide whether such contracts may trade on DCMs under its exclusive jurisdiction. Contracts that involve "unlawful" "activity" and certain other specified subjects are also subject to the Special Rule. *Id.*

The CEA today sets out a "comprehensive regulatory structure" for entities seeking to offer trading in derivatives. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (quotation marks omitted). Such entities must become "designated" as contract markets—*i.e.*, DCMs. Receiving such a designation requires exchanges to prove they can comply with 23 "Core Principles" identified in the CEA and CFTC regulations. *See* 7 U.S.C. § 7(d); 17 C.F.R. pt. 38. DCMs may list derivative contracts by self-certifying compliance with applicable requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(1). Alternatively, the CEA continues to allow exchanges to submit contracts to the CFTC voluntarily for approval before listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. § 40.3. Regardless of method, if the CFTC concludes that an event contract may fall within an enumerated category in the Special Rule, it may subject the contract to a 90-day public-interest

review. *See* 17 C.F.R. § 40.11(c). Following any such review, the CFTC "shall issue an order approving or disapproving" the contract. *Id.* § 40.11(c)(2).

### B. Congress Passes The Indian Gaming Regulatory Act To Govern Gaming "On Indian Lands."

In 1988, Congress passed the Indian Gaming Regulatory Act ("IGRA") to address a very different problem. In a 1987 decision, the Supreme Court "held that States lacked any regulatory authority over gaming on Indian lands." *Bay Mills*, 572 U.S. at 794 (citing *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987)). While states had substantial "regulatory power over tribal gaming outside Indian territory," the Supreme Court's decision in *Cabazon* meant states could not regulate gaming on Indian lands located within their boundaries. *Id.* To address that problem, IGRA "grants the States a power that they would not otherwise have, viz., some measure of authority over gaming on Indian lands." *Id.* at 795 (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996)).

Under IGRA, gaming on Indian lands is subject to a unique blend of federal, state, and tribal oversight. At the federal level, the National Indian Gaming Commission ("NIGC") oversees Indian gaming activities under the aegis of the Secretary of the Interior. The allocation of regulatory authority between the federal government, the states, and tribes varies depending on which of three "classes" of gaming is involved. Class I gaming consists of

10

"social games solely for prizes of minimal value" or "traditional" Indian games. 25 U.S.C. § 2703(6). "Class I gaming on Indian lands is within the exclusive jurisdiction of the Indian tribes." *Id.* § 2710(a)(1). Class II gaming refers to "bingo" and certain "card games" when played for prizes. *Id.* § 2703(7)(A). An Indian tribe can conduct class II gaming on its lands if it is legal under state law and authorized by a tribal ordinance that has been approved by the NIGC. *Id.* § 2710(b)(1). Class III gaming refers to "all forms of gaming that are not class I gaming or class II gaming." *Id.* § 2703(8).

Class III gaming is the type of gaming relevant to this appeal. Under IGRA, an Indian tribe may conduct class III gaming on its lands if it is legal under state law, authorized by a tribal ordinance approved by the NIGC Chairman, *and* if it is permitted by a "compact" the tribe enters with the state. *Id.* § 2710(d)(1). In passing IGRA, Congress wished to respect tribal sovereignty and thus did not "unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities." S. Rep. No. 100-466, at 5-6 (1988). Instead, Congress provided for tribal-state compacts as a "mechanism" by which tribes would "affirmatively elect[] to have State laws and State jurisdiction extend to tribal lands." *Id.*

Such compacts may address various issues pertaining to the state's regulation of class III gaming activity on Indian lands, including whether the

11

state's or the tribe's laws will apply to the activity, whether the state or the tribe will have jurisdiction to enforce those laws, taxes the state and the tribe may collect, remedies for breach of the compact, and other subjects related to the gaming activities. 25 U.S.C. § 2710(d)(3)(C). If a tribe is unable to negotiate a compact with the state after attempting to do so, it can still conduct class III gaming activity pursuant to "procedures" adopted by the Secretary of the Interior. *Id.* § 2710(d)(7)(B)(vii). Any class III gaming offered by the tribe must conform to the tribal-state compact or the secretarial procedures, as applicable.

Though secretarial procedures are adopted by the Secretary, they function as a substitute for a tribal-state compact. When a court finds that a state refused to negotiate a compact in good faith, IGRA instructs the court to order the parties to agree on a compact within 60 days. *Id.* § 2710(d)(7)(B)(iii). If that fails, the court is to appoint a mediator to whom the state and tribe are to submit their own competing compact proposals so that the mediator can "select" whichever one "best comports with" IGRA "and any other applicable Federal law." *Id.* § 2710(d)(7)(B)(iv). If the state rejects the mediator's selection, only then does the Secretary prescribe secretarial procedures, which are to be "consistent with the proposed compact selected by the mediator." *Id.* § 2710(d)(7)(B)(vii). But because

12

"the Secretary cannot unilaterally obligate the State," the procedures may not be "identical to[ ] the class III gaming compact selected by the mediator[,]," which would have bound the state if accepted. 2-ER-182, 3-ER-247.

In connection with this regulatory scheme, IGRA creates three civil causes of action.[2] First, it permits an Indian tribe to initiate an action against a state for failing to negotiate a tribal-state compact in good faith. 25 U.S.C. § 2710(d)(7)(A)(i). Second, it permits a state or tribe to sue "to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact." *Id.* § 2710(d)(7)(A)(ii). Third, it permits the Secretary of the Interior to sue to enforce applicable secretarial procedures. *Id.* § 2710(d)(7)(A)(iii). Separately, 18 U.S.C. § 1166(d)—also part of IGRA— provides for exclusive federal jurisdiction to prosecute "violations of State gambling laws" in "Indian country," unless a tribal-state compact provides for a state to exercise criminal jurisdiction. *Bay Mills*, 572 U.S. at 795 n.6 (noting that "only the Federal Government can enforce the law" against a tribe that "opens a casino on Indian lands before negotiating a compact").

---

[2] Section 2710(d)(7)(A) speaks in terms of "jurisdiction," and the district court understandably discussed it in such terms as well. 1-ER-009. The Supreme Court has suggested, however, that it views the provision as determining whether "a party has" a "statutory right of action." *Bay Mills*, 572 U.S. at 787 & n.2.

## C. Congress Addresses Internet Gambling By Passing UIGEA.

When Congress passed IGRA in 1988, "the internet" still would not become "publicly available" for "a few years." *Iipay Nation*, 898 F.3d at 964 & n.6. But by the mid-1990s, the internet had become widely available—and so had internet gambling. In 1996, Congress passed a law commissioning a study concerning, among other things, "the interstate and international effects of gambling by electronic means, including the use of interactive technologies and the Internet." Pub. L. No. 104-169 § 4(a)(2)(F), 110 Stat. 1482, 1484 (1996). Informed by that study, Congress concluded that "traditional law enforcement mechanisms [were] often inadequate for enforcing gambling prohibitions or regulations on the Internet." 31 U.S.C. § 5361(a)(4). In 2006, Congress passed the Unlawful Internet Gambling Enforcement Act ("UIGEA") to "prevent[] using the internet to circumvent existing state and federal gambling laws." *Iipay Nation*, 898 F.3d at 965.

"UIGEA does not prohibit otherwise legal gambling." *Id.* Instead, it reinforces existing prohibitions by barring certain financial transactions entered into in connection with unlawful internet gambling. *See* 31 U.S.C. § 5363. Specifically, a "person engaged in the business of betting or wagering" may not accept payments "in connection with the participation of another person in unlawful Internet gambling." *Id.* "[U]nlawful Internet

14

gambling" is a defined term meaning "to place, receive, or otherwise knowingly transmit a bet or wager" using "the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." *Id.* § 5362(10). That is, UIGEA requires consideration of the law of the location both where the bet is initiated and where it is received. If the law of either location does not permit the bet, then the bet is unlawful for UIGEA purposes, and UIGEA's prohibition on accepting payment applies.

UIGEA includes a detailed definition of the term "bet or wager." *Id.* § 5362(1). Under UIGEA, a "bet or wager" is "the staking or risking by any person of something of value upon the outcome of a contest of others, a sporting event, or a game subject to chance, upon an agreement or under-standing that the person or another person will receive something of value in the event of a certain outcome." *Id.* § 5362(1)(A). Congress—informed by decades of state efforts to regulate derivatives trading as gambling—recognized that certain kinds of derivatives might be captured by that definition. So Congress excluded from its scope "any transaction conducted on or subject to the rules of a registered entity [*i.e.*, a DCM] ... under the Commodity Exchange Act." *Id.* § 5362(1)(E)(ii). It similarly excluded other

transactions covered by the federal commodities laws. *Id.* §§ 5362(1)(E)(iii)-(iv).

Thus, even if a transaction on a DCM involves "staking or risking ... something of value upon the outcome of ... a sporting event," it is not a "bet or wager" and thus cannot constitute "unlawful Internet gambling" under UIGEA. *Id.* §§ 5362(1)(A), (10)(A). That exemption ensured that UIGEA—which empowers federal, state, and tribal authorities to enforce its prohibitions on internet gambling in violation of their laws, *id.* §§ 5365(b)(1)-(3)—would not interfere with the CFTC's exclusive jurisdiction over DCMs.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Defendant Kalshi was designated as a contract market by the CFTC in 2020. *See KalshiEX LLC v. CFTC*, No. 23-cv-3257, 2024 WL 4164694, at *4 (D.D.C. Sep. 12, 2024). Defendant Kalshi Inc. is Kalshi's parent company; it is not a DCM and does not offer derivatives for trading. Since Kalshi became a DCM, it has been fully regulated under federal law alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange. Kalshi offers many kinds of event contracts related to climate, technology, health, popular culture, and economics. It also offers contracts related to sports. Under the CFTC's rules, Kalshi self-certified those contracts in 2025, submitting to the CFTC, among other information, written analyses

concerning the contracts' compliance with the CEA and CFTC regulations. 3-ER-298; 17 C.F.R. § 40.2(a)(3). The CFTC has not subjected Kalshi's sports-event contracts to public-interest review under the Special Rule or otherwise taken action to prevent Kalshi's contracts from trading.

Plaintiffs—Picayune, Blue Lake, and Chicken Ranch Rancherias—are Indian tribes that operate casinos on their tribal lands. KalshiSER-15 ¶ 42. They assert that Kalshi's contracts constitute "class III gaming on [their] Indian lands" because they pay out based on the outcomes of sporting events and can be accessed from Plaintiffs' reservations. KalshiSER-40 ¶¶ 154-157. They further argue that Kalshi's contracts violate their tribal-state compact (Picayune) or secretarial procedures (Blue Lake and Chicken Ranch) (the "Compact" and "Procedures," respectively). On that basis, Plaintiffs sought an injunction under 25 U.S.C. § 2710(d)(7)(A)(ii) preventing Kalshi from offering its contracts to anyone located on their lands. Compliance with such an injunction would require Kalshi to implement geofencing technology it currently lacks. 3-ER-301-302. Plaintiffs also sought an injunction against certain of Kalshi's marketing statements on the ground that they constitute false advertising under the Lanham Act. As relevant to this appeal, Plaintiffs challenged an advertisement stating that "Sports Betting [is] Legal in all 50 States on Kalshi." 1-ER-004.

The district court denied an injunction. It held that Plaintiffs were not empowered to enjoin Kalshi under 25 U.S.C. § 2710(d)(7)(A)(ii) because they were unlikely to succeed in showing that Kalshi had violated the Compact or Procedures. 1-ER-009-010. The court further held that, even if Plaintiffs had a right of action, IGRA did not govern nationally available internet gaming, but only "cover[s] Class III gaming activities that take place exclusively within Tribal lands." 1-ER-011. Finally, as to Plaintiffs' Lanham Act claim, the court held that Kalshi's marketing was "merely stating an opinion" that Kalshi's contracts are "legal," and "[s]tatements of opinion are generally not actionable under the Lanham Act." 1-ER-005 (quoting *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999)).

Plaintiffs timely appealed.

In the meantime, related litigation between CFTC-regulated entities and state regulators concerning whether the CEA preempts state gambling laws as applied to trading on DCMs has proceeded in parallel with this case. That litigation includes three appeals pending before this Court, which have been consolidated for oral argument. *See N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir.) (lead appeal). The CFTC has filed an amicus brief in those appeals supporting Kalshi's position that the CFTC's "exclusive

jurisdiction ... preempts application of state gambling laws to event contracts trading on DCMs." CFTC Amicus Br. 21, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. 38.2 ("CFTC Br."). It also explained that sports-event contracts like Kalshi's fall "comfortably" within the CFTC's exclusive jurisdiction, *id.* at 19, and that "[s]tates cannot invade the CFTC's exclusive jurisdiction" merely "by re-characterizing swaps trading on DCMs as illegal gambling," *id* at 2.

## SUMMARY OF ARGUMENT

The district court correctly denied a preliminary injunction, because neither Plaintiffs' IGRA claim nor their Lanham Act claim has a likelihood of success on the merits.

**I.A.** The IGRA claim fails at the threshold because Plaintiffs lack a statutory right of action to bring it. The right of action Plaintiffs invoke requires a "violation" of a "Tribal-State compact"; it does not authorize suit to enjoin violations of IGRA more generally. 25 U.S.C. § 2710(d)(7)(A)(ii). Non-parties such as Kalshi cannot violate a compact, which is an agreement between states and tribes only. Nor can they violate secretarial procedures, which regulate only the tribes' gaming activities. As the district court correctly held, even if a non-party could violate these instruments, Plaintiffs point to no language in the Compact or Procedures

that prohibits Kalshi's conduct—because there is none. And with regard to the Procedures in particular, even if they arguably applied (they do not), IGRA is clear that only the Secretary of the Interior can enforce them.

**B.** Plaintiffs' IGRA claim fails for the additional, independent reason that IGRA does not apply to transactions on an online derivatives exchange such as Kalshi. As the Ninth Circuit has observed, IGRA is silent on alleged gaming over the internet. This is unsurprising, because IGRA was passed before the internet became publicly available, and was intended to address a Supreme Court case holding that states lacked regulatory authority over gaming activity on tribal lands. Years later, when Congress enacted UIGEA to address internet gaming, it adopted the construct Plaintiffs urge here— that such gaming would be unlawful under federal law if not permitted where a "bet or wager" is initiated. But in doing so, Congress exempted trading on CFTC-designated contract markets such as Kalshi. The obvious purpose of the exemption was to respect the preemptive effect of the CEA regarding transactions on DCMs. It is inconceivable that Congress created that exemption in UIGEA while intending the same conduct to be actionable— and subject to regulation by more than 240 Indian tribes—under IGRA.

**C.** The IGRA claim is not rescued by Plaintiffs' argument that Kalshi's contracts violate the CEA and CFTC regulations. Whether those contracts

comply with the CEA and CFTC regulations says nothing about whether IGRA applies. Regardless, an IGRA lawsuit is not an appropriate vehicle to challenge the CFTC's regulatory activities, as the agency has made clear in asserting its exclusive jurisdiction over DCMs in other appeals pending in this Court. Nor do Plaintiffs' allegations of non-compliance have any substantive merit, as evidenced by the CFTC's decision to let Kalshi's contracts trade.

**II.A-B.** As to Plaintiffs' Lanham Act claim, the district court correctly held the advertisement Plaintiffs raise on appeal is not actionable. The ad merely stated that Kalshi's sports event contracts are legal—a statement of opinion, not fact. Plaintiffs did not introduce evidence showing Kalshi disbelieved its statement. Nor could the statement be false given that Kalshi's federal regulator has permitted sports-event contracts to trade, and multiple courts have recognized the preemptive effect of the CEA. Plaintiffs' counterarguments mischaracterize the ad as proclaiming that all sports betting of all kinds is legal everywhere; rely on inapposite cases that do not address statements of legal opinion; and advance irrelevant and meritless arguments about Congress's intent in passing the CEA.

**III.** The district court did not reach all of Kalshi's likelihood-of-success arguments as to Plaintiffs' Lanham Act claim and did not address any of its

arguments on the other preliminary-injunction factors. Therefore, even if this Court does not affirm, it should remand to the district court to consider these additional arguments rather than instructing the district court to grant a preliminary injunction outright, as Plaintiffs request.

## ARGUMENT

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S 7, 24 (2008)). A "mandatory injunction"—one which, like the one Plaintiffs seek here, "orders a responsible party to 'take action'"—is "particularly disfavored" and is "not issued in doubtful cases." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citations omitted). This Court "'review[s] the denial of a preliminary injunction for abuse of discretion, but … review[s] *de novo* the underlying issues of law.'" *Garcia v. County of Alameda*, 150 F.4th 1224, 1229 (9th Cir. 2025) (citations omitted). Here, the district court correctly denied a preliminary injunction based on its determination that Plaintiffs "have not shown a likelihood of success on the merits" of their IGRA or Lanham Act claims, 1-ER-003—"'the most important factor' in determining whether a preliminary injunction is

warranted," *Garcia*, 150 F.4th at 1230 (quoting *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024)). This Court should affirm.

## I.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THEIR IGRA CLAIM.

To succeed on their IGRA claim, Plaintiffs must show it falls within the statutory right of action they invoke, and that IGRA applies to transactions on a CFTC-regulated DCM. They are not likely to succeed on either point.

### A.   Plaintiffs Lack A Statutory Right Of Action To Enjoin Violations Of IGRA.

To sue to enforce a federal statute, a plaintiff requires an express or implied right of action. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Plaintiffs have not alleged that IGRA affords an implied right of action, and courts—including this one—have unanimously declined to find such a right.[3] Rather, Plaintiffs invoke IGRA's provision authorizing suits by states or tribes to enjoin "class III gaming activity located on Indian lands … in violation of any Tribal-State compact." 25 U.S.C. § 2710(d)(7)(A)(ii). Plaintiffs' IGRA claim falls outside that provision.

---

[3] *See, e.g.*, *Hein v. Capitan Grande Band of Diegueno Mission Indians*, 201 F.3d 1256, 1260 (9th Cir. 2000); *Florida. v. Seminole Tribe of Fla.*, 181 F.3d 1237, 1245 (11th Cir. 1999); *Hartman v. Kickapoo Tribe Gaming Comm'n*, 319 F.3d 1230, 1232–33 (10th Cir. 2003).

### 1. The Compact And Procedures Do Not Apply To Third Parties Such As Kalshi.

Plaintiffs cannot show a "violation" by Kalshi of either the Compact or the Procedures, because none of them binds third parties such as Kalshi. A compact "is a contract between the Tribe and the State" that is "governed by general federal law principles." *California v. Picayune Rancheria of Chukchansi Indians of Cal.*, No. 1:14-cv-1593, 2015 WL 9304835, at *7 (E.D. Cal. Dec. 22, 2015), *aff'd*, 725 F. App'x 591 (9th Cir. 2018); *see also Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger*, 602 F.3d 1019, 1039 (9th Cir. 2010) ("general contract principles" apply to tribal-state compacts, and IGRA "anticipates a very specific exchange of rights and obligations" between tribes and states). It "goes without saying that a contract cannot bind a nonparty." *Crowley Maritime Corp. v. Boston Old Colony Ins. Co.*, 70 Cal. Rptr. 3d 605, 611 (Ct. App. 2008) (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)). It is therefore impossible for Kalshi to violate the Compact.

Plaintiffs argue (at 17) that a tribal-state compact "function[s] as regulatory law" that binds third parties, rather than as a contract. There is no support for this assertion, and the case law overwhelmingly refutes it. *See, e.g.*, *Taxpayers of Mich. Against Casinos v. Michigan*, 685 N.W.2d 221, 230 (Mich. 2004) (non-parties to a tribal-state compact "cannot be bound

by [its] terms"); *Wisconsin v. Ho-Chunk Nation*, 478 F. Supp. 2d 1093, 1098 (W.D. Wis. 2007), *aff'd in part, vacated in part*, 512 F.3d 921 (7th Cir. 2008) ("A compact is a contract, subject to the ordinary rules of contract construction."); *Cates v. Cal. Gambling Control Comm'n*, 65 Cal. Rptr. 3d 513, 522 (Ct. App. 2007) ("The Compact is an agreement between the State and the individual tribes and is interpreted as a contract.").

The Procedures cannot bind Kalshi either. Though secretarial procedures are not compacts, they are meant to substitute for a compact when a state refuses to negotiate one in good faith. *See* 25 U.S.C. § 2710(d)(7)(B). Plaintiffs acknowledge (at 24) that secretarial procedures must be "consistent *with the proposed compact* selected" during the remedial process prescribed by IGRA (emphasis added). Thus, like a tribal-state compact, secretarial procedures generally are meant to govern the conduct of the tribe, not that of third parties who would have been total strangers to a compact had it been successfully negotiated.

Because the Compact and Procedures do not govern third-party conduct, Section 2710(d)(7)(A)(ii) does not apply here. Indeed, Plaintiffs fail to cite any authority construing Section 2710(d)(7)(A)(ii) to reach third-party conduct, and Kalshi has found none. Plaintiffs (at 26) cite *Cayuga Nation v. New York State Gaming Commission*, 775 F. Supp. 3d 651, 666 (N.D.N.Y.

2025), for the proposition that compacts and secretarial procedures bind "any entity … that conducts class III gaming on the Tribes' Indian lands." But they misrepresent the case. *Cayuga Nation* merely held that "IGRA's regulatory regime was meant to apply to *state gaming* on Indian lands." *Id.* at 665 (emphasis added). Section 2710(d)(7)(A)(ii) therefore provides a reciprocal cause of action for both states and tribes, such that a tribe could seek to enjoin a state gaming operation (such as lottery machines, *see id.* at 657) on Indian lands if it is in violation of a compact. *Cayuga Nation* says nothing about compacts or secretarial procedures binding third parties.

Plaintiffs' textual counterarguments also fail. IGRA does not "draw[] a clear distinction between 'compact' and 'contract,'" as Plaintiffs assert (at 24). Plaintiffs point to Section 2710(d)(3)(C)'s use of the term "breach of contract," but this provision refers to breaches of *the compact* itself. Indeed, Plaintiffs acknowledge (at 24) that "[a] compact typically … provides remedies for breach of the agreement's"—*i.e.*, the compact's—"terms" (quoting *Bay Mills*, 572 U.S. at 785). They also agree (at 25) that a compact's "dispute resolution mechanisms" are "remedies for breach of contract" under Section 2710(d)(3)(C). All of this simply confirms that a compact is a contract. Plaintiffs' suggestion that a "violation" is different from a "breach"

26

is wrong too. A "breach" is a "violation," including a violation of an "agreement." *Breach*, Black's Law Dictionary (12th ed. 2024).

Nor does a compact's provision for "remedies for breach of contract" render Section 2710(d)(7)(A)(ii)'s cause of action superfluous, as Plaintiffs suggest (at 25). A compact is not required to provide remedies for its own breach, and a compact that does not do so can still be enforced via Section 2710(d)(7)(A)(ii). And even if a compact sets forth dispute resolution procedures, those procedures may fail to resolve a dispute, in which case the availability of a cause of action under Section 2710(d)(7)(A)(ii) to enforce the compact would still have utility. Plaintiffs fail to contend with any of this.

### 2. Even If The Compact And Procedures Applied, Kalshi's Conduct Is Not "In Violation Of" Them.

Even if the Compact and Procedures could in theory apply to Kalshi, they do not in actuality. As the district court correctly determined, the Compact "is silent about what companies like Defendants can do on the internet, and only outlines what '[t]he Tribe' is 'authorized and permitted to operate.'" 1-ER-009 (citation omitted). And the Procedures "have the same language, and thus do not mention what companies like Kalshi can do on the internet." 1-ER-009 (citation omitted).

The district court had it exactly right. In the proceedings below, Plaintiffs asserted that Section 4.1(c) of the Compact "specifically prohibits

internet gaming activities such as those being conducted by Kalshi." 4-ER-568. But Section 4.1 generally provides what activities "[t]he Tribe" is "authorized and permitted to operate[.]" 2-ER-127. Section 4.1(c) specifically provides that "the Tribe will not offer" certain kinds of games. ER-128. It says nothing about what strangers to the Compact like Kalshi may and may not do. The Procedures are similar. *See* 2-ER-197 ("The Tribe shall not engage in class III gaming that is not expressly authorized in these Secretarial Procedures[.]"); 3-ER-262 (same). Kalshi's conduct does not violate any of these instruments, which by their terms apply only to State of California (or Secretary of the Interior, as applicable); the tribes; and the tribes' licensees, if any—not to Kalshi.

On appeal, Plaintiffs do not meaningfully contest the district court's interpretation of the Compact and Procedures. Instead, they argue (at 19) that, despite the clear language of the statute, they need not identify "a specific provision of their Compact or Procedures that Kalshi's sports betting activities on their Indian lands violates." Put differently, Plaintiffs contend (at 14) they need only show Kalshi is not expressly "*authorize[d]*" to conduct class III gaming activities on Indian lands. They argue (at 19) that gaming not "in conformance" with a compact "is necessarily conducted in violation" of the compact. To accept that argument would be to rewrite the statute.

28

"[P]rivate rights of action to enforce federal law must be created by Congress." *Sandoval*, 532 U.S. at 286. "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.* And "statutory interpretation must begin with, and ultimately heed, what a statute actually says." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (citation modified). Here, the text is clear: it only gives Plaintiffs a cause of action to enjoin activity that is "in violation of" a "Tribal-State compact." 25 U.S.C. § 2710(d)(7)(A)(ii). It does not allow tribes (or states) to sue to enjoin activity that is merely "unauthorized" by a compact—or even that violates IGRA. Plaintiffs invoke in a footnote (at 22) a canon that statutes should be liberally construed in favor of Indian tribes, but they concede the canon only applies if "any provisions of the IGRA are ambiguous" (citing *County of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation*, 502 U.S. 251, 269 (1992) ("ambiguous provisions" are to be "interpreted to [tribes'] benefit")). Section 2710(d)(7)(A)(ii) is clear, not ambiguous.

In fact, this Court has already rejected this precise argument. In *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050 (9th Cir. 1997), California invoked Section 2710(d)(7)(A)(ii) to enjoin a tribe's operation of "slot machines," which were "not authorized" by the tribe's compacts. *Id.* at 1059.

Though the compacts did not expressly forbid slot machines, the state—like Plaintiffs here—argued that, "[b]ecause the Compacts authorized only simulcast horse racing," any other "games [were] being conducted in violation of the Compacts." *Id.* This Court disagreed: "Because the slot machines … are not mentioned in the Compacts, the Bands have not breached the Compacts," and the state had no cause of action. *Id.* at 1060. So too here. Just as the compact in *Wilson* was silent as to slot machines, the Compact and Procedures here are silent as to Kalshi's event contracts. So just as in *Wilson*, no cause of action lies under Section 2710(d)(7)(A)(ii). *Id.*

*Wilson* is no outlier. Courts have roundly rejected attempts to use Section 2710(d)(7)(A)(ii) to bring suits to enjoin allegedly unauthorized conduct untethered to a compact violation. For example, the Supreme Court has noted that, where "a tribe opens a casino on Indian lands before negotiating a compact, the surrounding State cannot sue" under Section 2710(d)(7)(A)(ii), even though such conduct would violate Section 2710(d)(1) of IGRA. *Bay Mills*, 572 U.S. at 795 n.6; *see also Seminole Tribe*, 181 F.3d at 1246 n.13 (absent tribal-state compact, cause of action under Section 2710(d)(7)(A)(ii) was "plainly not available to the State"); *Cayuga Nation v. N.Y. State Gaming Comm'n*, No. 5:24-cv-537, 2025 WL 2161290, at *2-3 (N.D.N.Y. July 30, 2025) (absent tribal-state compact, tribe lacked

cause of action under Section 2710(d)(7)(A)(ii)). The Seventh Circuit has held that Section 2710(d)(7)(A)(ii) does not even apply to *all* tribal-state compact violations, but only to an "alleged violation relate[d] to a compact provision agreed upon pursuant to the IGRA negotiation process." *Ho-Chunk Nation*, 512 F.3d at 933. And this Court has noted more generally that a plaintiff cannot "sue for every violation of IGRA by direct action under the statute." *Hein*, 201 F.3d at 1260.

Plaintiffs have no answer to the statutory text. They cite (at 17-18) language from a Committee Report to support their contention that Congress generally meant to let tribes enjoin "illegal gaming." But "the text of a law controls over purported legislative intentions unmoored from any statutory text." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). And the statutory text at issue refers not to "illegal" or "unauthorized" gaming but to gaming "in violation of any Tribal-State Compact." 7 U.S.C. § 2710(d)(7)(A)(ii). Plaintiffs' arguments (at 18-19) as to why Kalshi's contracts are not "lawful" thus miss the point. Section 2710(d)(7)(A)(ii) does not create a cause of action to enjoin alleged violations of Section 2710(d)(1).

Plaintiffs' argument (at 22) that a tribal-state compact is "regulatory law" and not a contract is irrelevant. Even if a tribal-state compact *could* bind third parties (it cannot, *see supra* § I.A.1), the Compact and Procedures

do not purport to do so.  The district court correctly held as much based on their plain text, without addressing whether they are akin to contracts. Indeed, regulatory law often applies to particular entities rather than being generally applicable.  *See, e.g.*, 12 U.S.C. § 1717 (Federal National Mortgage Association); *id.* § 1721 (Government National Mortgage Association); 47 U.S.C. § 396 (Corporation for Public Broadcasting).  Even if the Compact and Procedures are "regulatory" devices, they do not—by their plain text—govern Kalshi's conduct.

Plaintiffs all but admit the Compact and Procedures do not bind third parties.  They even argue (at 20) that their instruments *cannot* include provisions regulating third parties in light of IGRA's "strict[ ]" limitations on what "topics" a tribal-state compact can address (citation omitted).  *See Ho-Chunk Nation*, 512 F.3d at 933-934 (holding that Section 2710(d)(7)(A)(ii) applies only to an "alleged violation relat[ing] to a compact provision agreed upon pursuant to the IGRA negotiation process").  Those limitations make perfect sense given that a compact "is a contract," *Picayune Rancheria*, 2015 WL 9304835, at *7, and "a contract cannot bind a nonparty," *Crowley Maritime Corp.*, 70 Cal. Rptr. at 611.

### 3. Even If The Procedures Applied, Only The Secretary Of The Interior Can Enforce Them.

Blue Lake's and Chicken Ranch's IGRA claim suffers from yet another fatal flaw: Those tribes conduct class III gaming pursuant to the Procedures, not a tribal-state compact. The text of Section 2710(d)(7)(A) accordingly makes clear that Blue Lake and Chicken Ranch lack a right of action. Subsection (ii) of that section—under which Plaintiffs seek relief—applies to a "cause of action initiated by a State or Indian tribe" to enjoin gaming activity that violates a "Tribal-State compact." 25 U.S.C. § 2710(d)(7)(A)(ii). Subsection (iii) applies to a "cause of action initiated by the Secretary [of the Interior]" to "enforce" secretarial "procedures." *Id.* § 2710(d)(7)(A)(iii). Neither affords Plaintiffs a cause of action to enforce the Procedures.[4]

The district court held to the contrary based on its conclusion that all references in IGRA to a "Tribal-State compact" necessarily also refer to secretarial procedures. 1-ER-009. That conclusion is mistaken. "Tribal-State compact" is a materially different term from "secretarial procedures," and the two terms should accordingly be "presumed to have different meanings." *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) (citation

---

[4] The Court need not reach this issue because the Procedures do not prohibit Kalshi's conduct (*see supra* § I.A.2; 1-ER-009), but it provides yet another basis for affirmance with respect to Blue Lake and Chicken Ranch.

omitted). "This presumption applies with even greater force ... where Congress used particular language in one provision and not in another provision of the same subsection of the same statute." *Cheneau v. Garland*, 997 F.3d 916, 920 (9th Cir. 2021).

To support its conclusion, the district court relied heavily on *Stand Up for California! v. U.S. Department of Interior*, 959 F.3d 1154 (9th Cir. 2020). But *Stand Up* is distinguishable. That case held that a different IGRA provision allowing Indian tribes to use "gambling devices" to the extent a "Tribal-State compact ... is in effect" also applied where a tribe conducted Class III gaming pursuant to secretarial procedures. *Id.* at 1159; 25 U.S.C. § 2710(d)(6). That provision is markedly different from Section 2710(d)(7)(A) because its text does not separately address procedures at all. Congress's silence on procedures in one provision of IGRA should not control when it comes to Congress's intentional decision, in two adjacent "provision[s] of the same subsection of the same statute," to provide specific parties with separate causes of action. *Cheneau*, 997 F.3d at 920.

Construing Section 2710(d)(7)(A)(ii) to apply to the Procedures would also give California the right to enforce them, even though the Procedures only exist because California "failed to negotiate" a compact "in good faith." 25 U.S.C. § 2710(d)(7)(B)(iii). Moreover, the Procedures make clear the state

is "not a party to the procedures" and has no "regulatory responsibilities" under them, and only "the Tribe," "the United States[,] and the National Indian Gaming Commission" have "jurisdiction ... to regulate the class III gaming conducted under these Secretarial Procedures on" the Tribe's "Indian lands." 2-ER-191, 3-ER-256. The district court's interpretation would improperly "extend" "State Jurisdiction" to "tribal lands" without the tribe's consent—something Congress "[i]n no instance" intended to happen. S. Rep. No. 100-466, at 5-6.

## B. IGRA Does Not Apply To Transactions On CFTC-Designated Contract Markets.

Even if Plaintiffs had a statutory right of action to enjoin alleged violations of IGRA, Plaintiffs are not likely to succeed on their claim that Kalshi's event contracts violate IGRA. The question presented is whether a DCM like Kalshi can be held liable under IGRA for conducting "class III gaming activity located on Indian lands" merely because persons located on Plaintiffs' tribal lands can access Kalshi's platform there. 25 U.S.C. § 2710(d)(7)(A)(ii). The district court correctly held that the answer is no, because IGRA does not "govern[ ] Kalshi's contracts." 1-ER-010. That is so for multiple reasons.

### 1. The Text And Purpose Of IGRA Confirm That It Does Not Apply to Kalshi's Event Contracts.

As this Court recognized in *Iipay Nation*, "IGRA is silent" on the topic of "gaming on Indian lands facilitated by the internet." 898 F.3d at 968. That is because "Congress passed IGRA in 1988—a few years before the internet became publicly available." *Id.* at 964 n.6. Although the statute envisioned electronic bingo, it "nowhere referenced the internet, or other networking capabilities that reach beyond Indian lands." *Id.* IGRA in no way addresses the fact pattern presented by Plaintiffs' suit—a New York-based company's operation of an alleged "gaming" platform that can be accessed by persons located around the country, including on tribal lands in California. As the district court recognized, such conduct is beyond the scope of IGRA because it does not "take place exclusively within Tribal lands." 1-ER-011; *accord Bay Mills*, 572 U.S. at 795 ("IGRA affords tools … to regulate gaming on Indian lands, and nowhere else.").

That Congress did not intend to regulate this kind of cross-border activity through IGRA is apparent from the statute's text, which repeatedly references gaming conducted within brick-and-mortar facilities on Indian lands, not cross-border transmission of wagers. As to class II gaming, for example, IGRA requires a "separate license … for each *place, facility, or location on Indian lands* at which class II gaming is conducted." 25 U.S.C.

36

§ 2710(b)(1) (emphasis added). IGRA gives the NIGC power to "inspect and examine *all premises located on Indian lands* on which class II gaming is conducted." *Id.* § 2706(b)(2) (emphasis added). It regulates "the construction and maintenance of *the gaming facility*." *Id.* § 2710(b)(2)(E) (emphasis added). As to class III gaming, IGRA applies to activity "conducted" "upon" "Indian lands," *id.* § 2710(d)(3)(A)—language that again contemplates an activity physically located on Indian lands, not one merely accessible from Indian lands using networking technology. Plaintiffs themselves (at 35) describe IGRA's "operative provisions" as "territorial" in focus, conceding that UIGEA "address[es] a distinct problem, interjurisdictional internet gambling."

Indeed, when Congress has passed laws to govern the transmission of wagers from one place to another, it has used very different language. For example, the Wire Act—enacted decades before IGRA—refers to "the *transmission* in interstate or foreign commerce of bets or wagers" using "a wire." 18 U.S.C. § 1084(a) (emphasis added). Likewise, UIGEA refers to "*plac[ing], receiv[ing]*, or otherwise knowingly *transmit[ting]* a bet or wager" using "the Internet." 31 U.S.C. § 5362(10)(A) (emphasis added). IGRA contains no analogous language, reflecting its focus on activities that take place wholly on tribal lands.

37

The district court's interpretation is also supported by the statute's purpose, which was to remedy the Supreme Court's holding in *Cabazon* that "States lacked any regulatory authority over gaming on Indian lands." *Bay Mills*, 572 U.S. at 794. In response to *Cabazon*, IGRA "create[d] a limited exception to" that "lack of power." *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1035 (9th Cir. 2022); *see also Bay Mills*, 572 U.S. at 795 n.6 (IGRA created a "compact-based solution" to the "vacuum of state authority over gaming in Indian country"). But the "problem Congress set out to address" by passing IGRA "arose *in Indian lands alone*." *Bay Mills*, 572 U.S. at 794 (emphasis added).

### 2. UIGEA Confirms That IGRA Does Not Apply To Kalshi's Event Contracts.

If there were any doubt, it is laid to rest by UIGEA, a statute that *does* address internet gambling. UIGEA's purpose is to "prevent[] using the internet to circumvent existing state and federal gambling laws." *Iipay Nation*, 898 F.3d at 965. Before UIGEA was enacted, states had little recourse if internet gambling operations located in jurisdictions where gambling is legal (such as New York) sought to offer bets to users in jurisdictions where gambling is illegal (such as Utah). *See* 31 U.S.C. § 5361(a)(4). UIGEA accordingly created a framework in which a "bet or wager" must be legal *both* where "initiated" *and* where "received," otherwise

it constitutes "unlawful internet gambling." 31 U.S.C. § 5362(10). But in imposing that framework for assessing the legality of internet wagering, UIGEA expressly excluded DCM transactions from the definition of "bet or wager." *Id.* § 5362(1)(E)(ii).

Plaintiffs do not dispute that they cannot enjoin Kalshi from offering its sports-event contracts nationally under UIGEA. Nor could they, as Plaintiffs' own complaint alleges that Kalshi's contracts are "transaction[s] conducted on" a DCM, and thus do not qualify as "unlawful Internet gambling" under UIGEA. 31 U.S.C. §§ 5362(1)(E)(ii), (10); KalshiSER-29-30 ¶ 108 (alleging that "Kalshi, as [a] [DCM], operates as a federally regulated exchange where users can trade event contracts based on the outcome of future events"). Instead, Plaintiffs argue (at 36) that, although they cannot enjoin Kalshi under UIGEA—the very statute in which Congress enacted a "new mechanism[] for enforcing gambling laws on the Internet," 31 U.S.C. § 5361(a)(4)—they may enjoin Kalshi under IGRA from engaging in the same conduct.

Plaintiffs' argument is utterly implausible. It asks the Court to accept the following narrative:

- In 1974, Congress amended the CEA to create the CFTC, giving it "exclusive jurisdiction" over transactions on DCMs in order to impose a uniform federal regulatory framework.

- Then, in 1988, Congress passed IGRA, and silently walked back the grant of exclusive jurisdiction to the CFTC, instead empowering more than 240 Indian tribes to enjoin transactions on DCMs by calling them "gaming."

- Later, in 2006, Congress passed UIGEA to deal with the advent of internet gambling; expressly provided that transactions on DCMs are not "bets or wagers"; and yet nonetheless intended that more than 240 Indian tribes could enjoin them as "gaming" under IGRA.

The end result of Plaintiffs' narrative is that Kalshi's contracts are affirmatively exempted from liability under UIGEA (the federal statute that Congress enacted for the express purpose of regulating cross-border internet gaming), but are "unlawful" and subject to tribal regulation under IGRA (a statute that is "silent" regarding the internet and applies, by its terms, to conduct "on Indian lands").

A far more plausible interpretation is the one adopted by the district court, which gives effect to the exclusive jurisdiction of the CFTC to regulate

transactions on DCMs by interpreting IGRA to apply only to intra-tribal or inter-tribal transactions, and leaving it to UIGEA to regulate the kind of cross-border, internet-based activity at issue in this lawsuit. 1-ER-010-011. In so doing, the court correctly harmonized the three federal statutes that bear upon the subject matter—the CEA, IGRA, and UIGEA—rather than creating (as Plaintiffs do) a "positive repugnancy" among them. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992).

UIGEA also clarifies why transactions on DCMs cannot be deemed to constitute "class III gaming" under IGRA. Plaintiffs argue (at 34) that Kalshi's sports-event contracts *must* be "gaming" on the theory that they resemble sports betting. *See* KalshiSER-19 ¶ 63 (arguing that Kalshi's contracts have "no hedging or other economic purpose" and thus are "simply gambling on sports"). But the question is not what Kalshi's contracts *look like*, but how federal law *treats them*. UIGEA is crystal clear on this: transactions on DCMs are *not* "bets or wagers," 31 U.S.C. § 5362(1)(E)(ii), even if they involve "staking or risking ... something of value upon the outcome of ... a sporting event," *id.* § 5362(1)(A). Why does UIGEA so provide? Because decades earlier, Congress had determined that the nation's derivatives markets should not be subject to a "patchwork" of state regulation, including state "gambling laws." CFTC Br. 27.

Under settled principles of statutory interpretation, IGRA must be interpreted "in the context of the *corpus juris* of which [it is] a part, *including later-enacted statutes*" such as UIGEA. *Branch v. Smith*, 538 U.S. 254, 281 (2003) (Scalia, J., plurality opinion) (emphasis added). "[S]tatutes addressing the same subject matter" "should 'be construed as if they were one law.'" *Spatz v. Regents of Univ. of Cal.*, 151 F.4th 1068, 1074 (9th Cir. 2025) (citations omitted). Applying that principle, in construing undefined statutory terms such as "gaming" in IGRA, this Court has looked to defined terms in other statutes, like the definition of "bet or wager" in UIGEA. *See California v. Trump*, 963 F.3d 926, 947-948 & n.15 (9th Cir. 2020) (construing the term "military function[ ]" as used in Section 8005 of the Department of Defense Appropriations Act of 2019 consistent with 10 U.S.C. § 2801(a)'s definition of "military construction"). Construing IGRA to apply to DCM transactions notwithstanding the CFTC's exclusive jurisdiction over such transactions and UIGEA's express exclusion of them from the definition of "bet or wager" would be contrary to this principle, and by failing to "harmonize" these three statutes would contravene another "well-established canon of statutory interpretation." *In re Joye*, 578 F.3d 1070, 1076 n.1 (9th Cir. 2009).

Plaintiffs (at 30) protest that, under this reading, UIGEA would "repeal" IGRA "by implication." The district court correctly rejected this argument. 1-ER-011. It is the CEA's grant of exclusive jurisdiction to the CFTC that shows why IGRA does not empower Indian tribes to regulate DCM transactions. UIGEA simply further confirms that this is so. Congress in 2006 was careful to ensure that in passing a new law to regulate internet gambling, it did not inadvertently subject derivatives markets to a patchwork of state-by-state and tribe-by-tribe regulation. That makes it all the more unlikely that, in 1988, Congress silently gave tribes the authority Plaintiffs claim, without so much as mentioning the CEA, the CFTC, or derivatives. Acknowledging this commonsense conclusion does not construe UIGEA to "alter[ ], limit[ ], or extend[ ]" IGRA, as Plaintiffs argue (at 29-30). It simply confirms what would be the most natural reading of IGRA even absent UIGEA.

Plaintiffs attempt to stretch IGRA to cover internet gaming in general and Kalshi's contracts specifically, but their arguments all fail. They cite (at 32) a committee report referring to "sophisticated forms of class III gaming" (quoting S. Rep. No. 100-466, at 13). But a game's "sophistication" has nothing to do with whether it is accessed remotely from off the reservation. Plaintiffs likewise (at 32) point to statutory references to "electronic,

computer, or other technologic aids" and similar terms (citations omitted). But these are references to technology as a general matter, not to "the internet[] or other networking capabilities that reach beyond Indian lands." *Iipay Nation*, 898 F.3d at 964 n.6.[5] Plaintiffs' argument (at 33) that statutes can "apply to new technologies" also misses the mark. The Wire Act, a statute much older than IGRA, governs interstate "transmission" of wagers. 18 U.S.C. § 1084. Congress could have included similar language in IGRA, but it instead targeted only gaming "on Indian lands." IGRA simply does not contemplate application to partially off-reservation gaming, let alone nationwide derivatives exchanges.

Plaintiffs' authorities (at 34) are not to the contrary. None of them addresses a scenario where an off-reservation gaming operator made an alleged gaming application available to users located on tribal lands remotely. In *Bay Mills*, the Supreme Court held that Section 2710(d)(7)(A)(ii) did not allow a state to enjoin gaming activity at a physical casino located "outside Indian lands." 572 U.S. at 792. And in *Iipay Nation*, where a tribe hosted an internet bingo game on servers located on tribal lands and offered it to off-

---

[5] The Senate Report suggested tribes could use "telephone, cable, television or satellite" technology to "link[] participant players *at various reservations*" so they can play bingo together. S. Rep. No. 100-466, at 9 (emphasis added). Such gaming activity would take place solely on tribal lands.

reservation users, this Court held the "gaming activity" was not wholly "on Indian lands" and thus was not covered by IGRA. 898 F.3d at 967. *Navajo Nation v. Dalley*, 896 F.3d 1196 (10th Cir. 2018), is even further afield, as it addressed the permissible scope of a tribal-state compact under IGRA, not the lawfulness of any particular gaming activity. *Id*. at 1209.

Lacking any on-point authority, Plaintiffs point to, of all things, UIGEA itself. They argue (at 34) that in passing UIGEA, Congress "recognized that a substantial portion of gambling/gaming activity occurs where the bettor initiates a bet or wager." Plaintiffs are correct that this is UIGEA's default construct. What Plaintiffs miss is the profound import of UIGEA's *exclusion* of DCM transactions from that construct. 31 U.S.C. § 5362(1)(E)(ii). To get around this, Plaintiffs (at 36) assert UIGEA's carveout applies only to "*lawful* CEA transactions." But once again they ignore the statutory text. Setting aside the fact that the CFTC has defended Kalshi's right to offer its contracts without state interference, *see generally* CFTC Br., the exemption applies to "*any* transaction conducted on" a DCM, 31 U.S.C. § 5362(1)(E)(ii) (emphasis added).

Though Plaintiffs again (at 35) look to *Iipay Nation*, that case does not support their approach. The IGRA question in *Iipay Nation* was whether a tribe's Class II gaming activity took place *wholly* on Indian lands. 898 F.3d

at 967. "[A]t least some of" it did not, so it was "not subject to Iipay's jurisdiction under IGRA." *Id.* That comports with the district court's conclusion below that IGRA applies only to "gaming activities that take place exclusively within Tribal lands." 1-ER-010. *Iipay Nation* separately considered, as part of its UIGEA analysis, whether the wagers at issue—computerized bingo over the internet—were legal both where they were initiated and where they were received. 898 F.3d at 967. They were not, so they violated *UIGEA*, and IGRA could not "shield" the tribe "from the application of the UIGEA." *Id.* Plaintiffs inappropriately conflate these separate analyses.

### 3. Plaintiffs' Reading Of IGRA Would Impliedly Repeal The CEA.

Accepting Plaintiffs' interpretation of IGRA would also result in an implied repeal of the CEA. Congress in 1974 granted the CFTC "exclusive jurisdiction" to regulate DCMs and the transactions on them. 7 U.S.C. § 2(a)(1)(A). Its intent was to "preempt the field" of regulating nationwide derivatives exchanges, and it did not "contemplate that there will be a need for any supplementary regulation." H.R. Rep. No. 93-1383, at 35-36. Congress believed subjecting DCMs to overlapping and duplicative legal regimes would "lead to total chaos." *Am. Agric.*, 977 F.2d at 1156 (citation omitted). It therefore sought "to bring the markets under a uniform set of

46

regulations." *Id.* Congress has revisited the CEA numerous times since 1974, but in each instance it has preserved the CFTC's exclusive jurisdiction over DCM transactions.

Plaintiffs' position would vitiate that exclusive jurisdiction. They assert that IGRA gives them the right to ban Kalshi's contracts—and any other derivative that might be characterized as gaming—if they can be accessed from tribal lands. If they were correct, IGRA would give every Indian tribe in the United States that conducts class III gaming on its lands that same right. That would subject derivatives markets to the "total chaos" Congress sought to prevent when it vested exclusive jurisdiction over DCMs in the CFTC. *Id.* at 1156 (citation omitted). As Plaintiffs themselves note (at 31), "repeals by implication are disfavored" (quoting *United States v. Wells*, 156 F.4th 907, 913 n.4 (9th Cir. 2025)). Nothing in IGRA comes close to overcoming that presumption.

### C. Plaintiffs' Allegations That Kalshi's Contracts Violate The CEA And Therefore Violate IGRA Are Irrelevant And Wrong.

As explained in Section I.A, to prevail under Section 2710(d)(7)(A)(ii), Plaintiffs must show Kalshi's contracts violate a tribal-state compact, not merely that they violate IGRA. Plaintiffs cannot support their IGRA claim by pointing to purported violations of entirely different laws. For that reason,

Plaintiffs' argument (at 40) that Kalshi's contracts "violate the CEA and CFTC regulations" is irrelevant to this appeal. Plaintiffs contend (at 42) that if Kalshi's contracts "exceed the lawful scope of the CEA," then "Kalshi's conduct is **not** shielded by the CEA" and "Kalshi's conduct is not exempt from UIGEA." But an alleged CEA violation does not convert a derivative subject to exclusive CFTC jurisdiction into gaming subject to tribal jurisdiction. And again, UIGEA excludes from the definition of "bet or wager" *all* DCM transactions, not just those that comply with the CEA. 31 U.S.C. § 5362(1)(E)(ii). Plaintiffs' reliance on *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-575, 2025 WL 3286282 (D. Nev. Nov. 24, 2025), is also misplaced, as that decision, which Kalshi has appealed, concerned a *state's* purported exercise of its police powers to regulate Kalshi, not an Indian *tribe's* invocation of IGRA to do so. *See id.* at *1.

Regardless, the district court correctly declined to consider Plaintiffs' arguments, which constitute an impermissible "collateral attack[ ]" on an agency action. *Big Lagoon Rancheria v. California*, 789 F.3d 947, 952 (9th Cir. 2015). Under the CEA's comprehensive regime for regulating derivatives trading, DCMs are permitted to list new contracts by self-certifying to the CFTC that they comply with applicable law. 7 U.S.C. § 7a-2(c)(1). The CFTC then has the power to review self-certified contracts and determine whether

48

they would "violate" the CEA or CFTC "regulations." *Id.* § 7a-2(c)(5)(B). Kalshi has lawfully self-certified its sports-event contracts to the CFTC, and the CFTC has not taken any action to prevent trading in Kalshi's contracts, reflecting its "implicit decision to permit them." *KalshiEX LLC v. Flaherty*, No. 25-cv-2152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025), *appeal docketed*, No. 25-1922 (3d Cir. May 15, 2025). The CFTC has also explicitly stated that "sports event contracts" like Kalshi's "fall comfortably within the [CEA's] reach." CFTC Br. 19.

In pressing their CEA arguments, Plaintiffs "necessarily argue[ ] that the [CFTC] exceeded its authority" by permitting Kalshi's contracts to trade. *Big Lagoon Rancheria*, 789 F.3d at 953. If Plaintiffs have any ability to challenge the CFTC's regulation of Kalshi—which is highly doubtful—"[t]he proper vehicle to make such a challenge" would be via an Administrative Procedure Act (APA) action against the CFTC, not an IGRA lawsuit against Kalshi. *Id.*; *see KalshiEX LLC*, 2024 WL 4164694, at *1 (sustaining APA challenge to CFTC order prohibiting Kalshi from offering election-related event contracts under the Special Rule).

Plaintiffs (at 38) identify two provisions that they contend permit this Court to overrule the CFTC's regulatory decisions in this posture: a savings clause and the CEA's Special Rule. But the savings clause Plaintiffs invoke

49

merely establishes that the CFTC's "exclusive jurisdiction" to regulate DCMs does not divest federal and state courts of their subject matter jurisdiction over cases and controversies. 7 U.S.C. § 2(a)(1)(A). It certainly does not make an IGRA action an appropriate vehicle to challenge the CFTC's regulatory decisions. Nor does the Special Rule. That provision gives the CFTC discretion to prohibit contracts that "involve" certain enumerated categories, including "unlawful" activity or "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i). While a federal court may review the CFTC's actions under the Special Rule in an APA case, *see KalshiEX*, 2024 WL 4164694, at *1, the district court correctly held that the propriety of the CFTC's exercise of its regulatory discretion was not before it by virtue of Plaintiffs' IGRA claim. 1-ER-013.

Even if it were appropriate to consider Plaintiffs' CEA arguments, those arguments are wrong. Plaintiffs argue (at 41) that Kalshi's contracts violate 17 C.F.R. § 40.11, subsection (a) of which generally bars DCMs from offering contracts involving "gaming." But they ignore subsection (c), which confirms the CFTC's discretion to permit such contracts on a case-by-case basis. The CFTC has stated that DCMs "may always" self-certify contracts notwithstanding Section 40.11, and recognized that "case-by-case" review is available despite subsection (a)'s apparent "prohibition." *Provisions*

*Common to Registered Entities*, 76 Fed. Reg. 44,776, 44,785-86 (July 27, 2011). Even when the CFTC bars a contract under the Special Rule, it does so based on a two-step determination that the contract *both* "involve[s] enumerated activities *and* [is] contrary to the public interest." *See KalshiEX*, 2024 WL 4164694, at *6 (emphasis added).

Reading Section 40.11 as a blanket prohibition would also run afoul of the CEA and APA, because Section 40.11 contains no rationale for finding every conceivable gaming-related contract to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). Nor would that construction make sense in light of the CFTC's later actions. In 2024, the CFTC issued a new notice of proposed rulemaking—since withdrawn—that *would have* prohibited sports-related event contracts. *Event Contracts*, 89 Fed. Reg. 48968 (June 10, 2024); *Event Contracts; Proposed Withdrawal of Proposed Regulatory Action*, 91 Fed. Reg. 5386 (Feb. 6, 2026). Had Section 40.11 already done so, the proposed rule would have been unnecessary.

Plaintiffs also cite a case (at 40) holding that Kalshi's contracts are not "swaps" subject to the CFTC's "exclusive jurisdiction" (citing *Hendrick*, 2025 WL 3286282, at *6-7).[6] Plaintiffs did not make that argument below, and

---

[6] *Hendrick* is currently on appeal before this Court. *KalshiEX, LLC v. Assad*, No. 25-7516 (9th Cir.).

they barely develop it on appeal. Nor does it matter, because UIGEA's carveout applies to "transactions" on DCMs, not just swaps. 31 U.S.C. § 5362(1)(E)(ii). Regardless, Plaintiffs are wrong. Under the CEA, a "swap" includes any agreement that "provides for ... payment" based on "the occurrence ... of an event or contingency associated with a *potential* financial ... consequence." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). As the CFTC has explained to this Court, "sports event contracts fall comfortably within the statute's reach." CFTC Br. 19; *accord KalshiEX LLC v. Orgel*, No. 3:26-cv-34, 2026 WL 474869, at \*7-8 (M.D. Tenn. Feb. 19, 2026) (similar).

Plaintiffs finally argue (at 41) that the CFTC cannot unilaterally determine whether a contract "constitutes 'activity that is unlawful under'" IGRA, apparently referencing the Special Rule. 7 U.S.C. § 7a-2(c)(5)(C)(i) (CFTC may prohibit contracts that "involve" "unlawful" activity). That argument misunderstands the Special Rule, which applies not where a contract itself "constitutes" unlawful activity, but where the contract's underlying event "involves"—*i.e.*, "relates to"—unlawful activity. *KalshiEX*, 2024 WL 4164694, at \*13. Kalshi's contracts "involve" underlying sports events, which obviously do not violate IGRA. Even if they did, under the Special Rule, prohibiting the contracts would be within the CFTC's

discretion.  In any case, for the reasons explained in Section I.B, IGRA does not apply to Kalshi's contracts, anyway.

## II.  PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THEIR LANHAM ACT CLAIM.

### A.  Kalshi's Advertisement Concerning Its Contracts' Legality Is A Non-Actionable Statement of Opinion.

Plaintiffs (at 42) challenge an advertisement stating that "Sports Betting [is] Legal in all 50 States on Kalshi" as false advertising under the Lanham Act.  The district court held that Plaintiffs are not likely to succeed on that claim because the challenged statement is "not 'literally or facially false.' " 1-ER-005.  The district court was right.

To prevail on their Lanham Act claim, Plaintiffs must prove that Kalshi made a "false or misleading *representation of fact*."  *Coastal Abstract*, 173 F.3d at 730 (quoting 15 U.S.C. § 1125(a)(1)) (emphasis in original).  As the district court observed, "[s]tatements of opinion are generally not actionable under the Lanham Act."  1-ER-005 (*Coastal Abstract*, 173 F.3d at 731).  And statements concerning a product's legality are generally non-actionable statements of opinion.  As this Court has held: "Absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute

or regulation are opinion statements, and not statements of fact." *Coastal Abstract*, 173 F.3d at 731.

The advertisement Plaintiffs challenge "merely stat[es] an opinion" that Kalshi's "product is legal" and thus is not actionable. 1-ER-005. Plaintiffs did not identify any "clear and unambiguous ruling" contradicting the ad below, nor do they do so now. *Coastal Abstract*, 173 F.3d at 731. To the contrary, as the district court noted, "multiple courts have agreed" with Kalshi. 1-ER-005. Plaintiffs accordingly "have not shown the opinion is literally false or that Kalshi lacks a good-faith belief in the opinion's truth." 1-ER-005.

## B. Plaintiffs' Counterarguments Lack Merit.

*Plaintiffs misread the advertisement.* Plaintiffs principally contend (at 43-44) that the challenged ad was an actionable "false statement of fact" because some states "indisputably" prohibit sports betting. But Plaintiffs' argument hinges on an implausible reading of the ad. In their telling (at 49), it communicates that all sports betting of every kind is legal in every state, and the reference to activity "*on* Kalshi" is a mere "technical qualifier" that the court should have ignored.[7]

---

[7] "Betting" is a general term commonly used in investments contexts in a colloquial sense. *See, e.g.*, James Royal, *Options vs. stocks: Which one is better*

Plaintiffs are wrong. "On Kalshi" is not a "qualifier"; it is an essential component of the ad. No reasonable consumer would read Kalshi's ad the way Plaintiffs do. As Plaintiffs themselves recognize (at 46) "context matters," as this Court made clear in the very case Plaintiffs cite. *See Whiteside v. Kimberly-Clark Corp.*, 108 F.4th 771, 784-785 (9th Cir. 2024) ("an asterisk" and "qualifying statement" on label cured allegedly misleading statement). If "on Kalshi" is a "qualifier," *Whiteside* instructs this Court to consider it, not ignore it.

*The district court applied the correct legal standard.* Plaintiffs (at 42) accuse the district court of erroneously adopting "a categorical rule that all assertions touching on legality are opinions." But the district court did not apply a categorical rule. It acknowledged that a statement concerning a product's legality could be falsified by "a clear and unambiguous ruling from a court or agency of competent jurisdiction." 1-ER-005 (quoting *Coastal Abstract*, 173 F.3d at 731). This Court's precedents make clear that absent such a ruling, "statements by laypersons that purport to interpret the

_____

*for you?*, Yahoo! Finance (Aug. 25, 2025), https://finance.ya-hoo.com/news/options-vs-stocks-one-better-210539982.html (describing a stock option as a "side bet among traders over what the price of a stock will be at a certain time").

meaning of a statute or regulation are opinion statements, and not statements of fact." *Coastal Abstract*, 173 F.3d at 731.

Despite that clear precedent, Plaintiffs contend (at 42) the district court should instead have assessed whether the ad makes a "specific and measurable claim" "capable of being proved false or of being reasonably interpreted as a statement of objective fact" (quoting *Coastal Abstract*, 173 F.3d at 731). But that is the test *Coastal Abstract* applied in assessing whether a statement—in that case, that a business was "too small" to handle a competitor's business—qualifies as non-actionable "puffery." *Coastal Abstract,* 173 F.3d at 731. *Coastal Abstract* separately assessed a statement concerning legality—that a competitor's business was "not licensed in California" and was required to be. *Id.* at 731-732. The Court held that the statement was not actionable because "the correct application of" California law on that issue "was not knowable to the parties at the time" the statement was made. *Id.* at 732.

So too here. Even before any courts addressed the issue, there was ample basis for Kalshi's good-faith belief in the legality of its offerings. 7 U.S.C. § 2(a)(1)(A) (granting the CFTC "exclusive jurisdiction" over trading on CFTC-registered exchanges like Kalshi); H.R. Rep. No. 93-1383, at 35 (1974) (noting Congress's intent to "preempt the field" with respect to

regulating such trading); *Leist*, 638 F.2d at 322 (recognizing the CEA "preempts the application of state law"). Kalshi's federal regulator agrees that the CEA "preempts application of state gambling laws as to event contracts trading on DCMs." CFTC Br. 21, *see also* Appellant's Br. 27, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Oct. 16, 2024) ("due to federal preemption, event contracts never violate state law when they are traded on a DCM"). And while the courts are split, some have agreed with the CFTC's and Kalshi's view. *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-575, 2025 WL 1073495, at *6 (D. Nev. Apr. 9, 2025); *Flaherty*, 2025 WL 1218313, at *5; *Orgel*, 2026 WL 474869, at *9-10 (M.D. Tenn. Feb. 19, 2026).[8] Even if the courts of appeals or the Supreme Court ultimately determine otherwise, that result would not have been "knowable" to Kalshi "at the time" the statement was made. *Coastal Abstract*, 173 F.3d at 732.

Plaintiffs seek to distinguish *Coastal Abstract*, arguing (at 45-46) that Kalshi is a "technical or industry actor[ ]" making an "objective

---

[8] The District of Nevada later dissolved the preliminary injunction it issued in April. *Hendrick*, 2025 WL 3286282. In doing so, it did not reverse its prior ruling that the CEA preempts state law as applied to "swaps" transactions on DCMs, but instead concluded that sports-event contracts are not swaps. *Id.* at *3. It also underscored that, even in ruling against Kalshi, there were "serious questions on the merits." *Id.*; *see also KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 687 (D. Md. 2025) (denying preliminary injunction).

representation[ ]," not a "layperson offering an informal view about unsettled law." Specifically, they argue (at 46) that the ad is actionable because Kalshi must "evaluate and attest to the legality of its products." But every business has an obligation to do that; Plaintiffs' argument would effectively nullify the rule announced in *Coastal Abstract* that advertising statements concerning legality are "opinion statements, and not statements of fact." 173 F.3d at 731. Plaintiffs identify no support for this sweeping theory.

Plaintiffs compare Kalshi to the defendant in *Enigma Software Group USA, LLC v. Malwarebytes, Inc.*, 69 F.4th 665 (9th Cir. 2023), but that case is inapposite. *Enigma* involved a cybersecurity company's description of software as "malicious" and a "threat." *Id.* at 672. That description was actionable because whether software is "malware" is "largely a question of objective fact." *Id.* Legality generally is not. To the extent *Enigma* stands for the proposition (at 46) that "statements made by technical or industry actors using industry-specific terminology may reasonably be understood as objective representations rather than opinion," that does not help Plaintiffs, either. Stating that a product is legal is not "industry-specific terminology."

Plaintiffs similarly argue (at 45) that their claim parallels those at issue in *ThermoLife International, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609 (9th Cir. 2016). But like *Coastal Abstract*, *Gaspari* involved different

kinds of statements: some saying that "products were 'legal,'" some saying that they were "'safe,'" and some saying that they were "'natural.'" *Id.* at 614-615. Like the district court below, *Gaspari* noted that statements concerning legality "are generally inactionable opinion," unless the "speaker … lack[ed] a good faith belief in the truth of the statement." *Id.* (citation modified). Plaintiffs (at 45) ignore that holding, relying on *Gaspari*'s analysis of factual assertions that the product at issue was "safe" and "natural." Those were not statements of opinion, precisely because they *did not* "purport to interpret the meaning of a statute or regulation." *Id.* at 614. Nothing in *Gaspari* undermines the district court's application of *Coastal Abstract*.

*Plaintiffs' CEA arguments are unavailing.* Instead of pointing to any "clear and ambiguous ruling," Plaintiffs ask this Court (at 44) to determine what Congress "intended the CEA" to accomplish, arguing that Congress "never intended the CEA to authorize gambling or betting on the outcome of sports." This request is puzzling in light of Plaintiffs' argument in the same paragraph (*id.*) that the Court is not "require[d] … to interpret the CEA or to predict how the CFTC might exercise its authority." In any event, Plaintiffs supply no reason for this Court to undertake such an exercise in evaluating Plaintiffs' Lanham Act claim under the rule enunciated in *Coastal Abstract*.

Even if this Court were to reach the CEA issues Plaintiffs have put forward and adopt Plaintiffs' interpretations (which are meritless, *see supra* pp. 50-51), that result still would not have been "knowable to the parties at the time" of the ad and thus would not mean that the ad was false. *Coastal Abstract*, 173 F.3d at 732. Regardless, it is not "appropriate for a court in a Lanham Act case to determine preemptively how a federal administrative agency will interpret and enforce its own regulations." *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231 (3d Cir. 1990).

*Plaintiffs cannot show bad faith.* The district court also found that Plaintiffs failed to carry their burden of showing that "Kalshi lacks a good-faith belief in" the ad's "truth." 1-ER-005. Plaintiffs fail to identify any clear error in that finding. As the district court noted, Kalshi has advanced its view in court that it is lawfully operating a nationwide DCM, prevailing on multiple occasions. 1-ER-005. Another court has reached the same conclusion since. *See KalshiEX LLC v. Orgel*, No. 3:25-cv-34, 2026 WL 474869, at *12 (M.D. Tenn. Feb. 19, 2026). Plaintiffs complain (at 46) that these decisions post-date the ad, but they cannot dispute that Kalshi's vigorous defense of the legality of its contracts is probative of its good-faith belief in its earlier statements. On the other hand, the contrary decisions

60

Plaintiffs cite (at 48) do not show bad faith—Kalshi disagrees with them and accordingly has sought their reversal on appeal.

Besides district court decisions that Kalshi has openly disagreed with and appealed, Plaintiffs' sole evidence of bad faith (at 47) consists of a statement Kalshi made in prior litigation concerning its election contracts. But nothing about that statement shows bad faith. That litigation concerned whether the CFTC could prohibit Kalshi's election-based contracts under the CEA's Special Rule. The CFTC had asserted the authority to prohibit Kalshi's election contracts on the purported ground that they involved "gaming." *KalshiEX*, 2024 WL 4164694, at *4-5. Kalshi argued in court that its election contracts did not involve "gaming," which must be "defined by reference to 'games.'" *Id.* at *7 (citation omitted). The D.C. District Court agreed. *Id.* Kalshi never argued that the CEA prohibits actual "gaming"-related contracts, but merely acknowledged that such contracts are subject to the Special Rule, meaning that the CFTC has *discretion* to prohibit them. All of that is consistent with Kalshi's statements that its sports-event contracts are legal nationwide.

## III. IF THIS COURT DOES NOT AFFIRM, IT SHOULD REMAND TO THE DISTRICT COURT TO CONSIDER KALSHI'S ADDITIONAL ARGUMENTS IN THE FIRST INSTANCE.

Plaintiffs request (at 52) that this Court reverse and instruct the district

court to grant a preliminary injunction outright. But Kalshi made additional arguments below that the district court did not reach. Because the district court ruled solely based on Plaintiffs' lack of likelihood of success on the merits, it did not reach the other preliminary injunction factors. Nor did the district court reach additional merits arguments Kalshi made concerning Plaintiffs' Lanham Act claim, including that Plaintiffs lack standing to bring a Lanham Act claim and that Plaintiffs have not shown a likelihood of deception or injury. Because resolving these arguments may require the district court to make factual findings, if this Court does not affirm, it should allow the district court to address Kalshi's other arguments in the first instance.

## CONCLUSION

This Court should affirm the district court's denial of a preliminary injunction.

Date: March 9, 2026                          /s/ Olivia S. Choe

GRANT R. MAINLAND                     OLIVIA S. CHOE
KAREN WONG                            JOSHUA B. STERLING
DAVIS CAMPBELL                        WILLIAM E. HAVEMANN
MILBANK LLP                           MILBANK LLP
55 Hudson Yards                       1101 New York Ave., NW
New York, NY 10001                    Washington, DC 20005
                                      (202) 835-7511
CHRISTOPHER C. WHEELER                ochoe@milbank.com
DYLAN M. SILVA
FARELLA BRAUN + MARTEL LLP            *Counsel for Defendants-Appellees*
One Bush Street, Suite 900            *Kalshi Inc. and KalshiEX LLC*
San Francisco, CA 94104

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-7504

I am the attorney or self-represented party.

**This brief contains** | 13,395 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Olivia S. Choe | **Date** | Mar 9, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* [http://www.ca9.uscourts.gov/forms/form17instructions.pdf](http://www.ca9.uscourts.gov/forms/form17instructions.pdf)

**9th Cir. Case Number(s)** | 25-7504

The undersigned attorney or self-represented party states the following:

○  I am unaware of any related cases currently pending in this court.

○  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

◉  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

> North Am. Derivatives Exch. Inc. v. Nevada, No. 25-7187; KalshiEX, LLC v. Assad, No. 25-7516; Robinhood Derivatives, LLC v. Dreitzer, No. 25-7831:  These appeals involve attempts by Nevada gaming regulators to prohibit Defendants (including Kalshi) from offering DCM-traded event contracts.  Defendants in these appeals assert that the CEA preempts state gambling laws as applied to DCM-traded event contracts.
>
> State of Nevada v. KalshiEX, LLC, No. 26-1304; State of Nevada v. Blockratize, Inc., No. 26-1343:  These appeals involve attempts by Nevada gaming regulators to enforce state law against DCM-traded event contracts. At issue is whether the actions were properly removed from state court.

**Signature** | s/Olivia S. Choe        **Date** | Mar 9, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at [forms@ca9.uscourts.gov](mailto:forms@ca9.uscourts.gov)*

**Form 17**                                                                 *New 12/01/2018*

**ADDENDUM A:**

**PERTINENT STATUTES AND REGULATIONS**

# TABLE OF CONTENTS

Provisions from the Commodity Exchange Act
(as codified at 7 U.S.C.) ....................................................... A1

  7 U.S.C. § 1a(47)(A)(ii) ..................................................... A1

  7 U.S.C. § 2(a)(1)(A) ......................................................... A1

  7 U.S.C. §§ 7a-2(c)(5)(C)(i), (ii) ....................................... A2

Provisions from the Lanham Act (as codified at 15 U.S.C.) ...................... A2

  15 U.S.C. § 1125(a)(1) ....................................................... A2

Provisions from the Indian Gaming Regulatory Act
(as codified at 18 U.S.C. & 25 U.S.C.) .......................................... A3

  18 U.S.C. § 1166(d) ......................................................... A3

  25 U.S.C. §§ 2710(d)(1), (3), (7) ...................................... A3

Provisions from the Unlawful Internet Gambling Enforcement Act
(as codified at 31 U.S.C.) ...................................................... A7

  31 U.S.C. § 5361 ............................................................ A7

  31 U.S.C. §§ 5362(1)(A), (E)(ii)-(iv) ................................ A7

  31 U.S.C. § 5362(10)(A) .................................................. A8

Provisions from Title 17 of the Code of Federal Regulations .................... A8

  17 C.F.R. § 40.11 .......................................................... A8

**Provisions from the Commodity Exchange Act (as codified at 7 U.S.C.):**

### 7 U.S.C. § 1a(47)(A)(ii)

Except as provided in subparagraph (B), the term "swap" means any agreement, contract, or transaction—

...

(ii) that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence[.]

### 7 U.S.C. § 2(a)(1)(A)

The Commission shall have exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 (including an amendment made by that Act) and subparagraphs (C), (D), and (I) of this paragraph and subsections (c) and (f), with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title. Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

## 7 U.S.C. §§ 7a-2(c)(5)(C)(i), (ii)

(C) Special rule for review and approval of event contracts and swaps contracts

(i) Event contracts

In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or levels of a commodity described in section 1a(2)(i)2 of this title), by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve--

    (I) activity that is unlawful under any Federal or State law;

    (II) terrorism;

    (III) assassination;

    (IV) war;

    (V) gaming; or

    (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

(ii) Prohibition

No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

## **Provisions from the Lanham Act (as codified at 15 U.S.C.):**

## 15 U.S.C. § 1125(a)(1)

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

## Provisions from the Indian Gaming Regulatory Act (as codified at 18 U.S.C. & 25 U.S.C.):

### 18 U.S.C. § 1166(d)

The United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country, unless an Indian tribe pursuant to a Tribal-State compact approved by the Secretary of the Interior under section 11(d)(8) of the Indian Gaming Regulatory Act, or under any other provision of Federal law, has consented to the transfer to the State of criminal jurisdiction with respect to gambling on the lands of the Indian tribe.

### 25 U.S.C. §§ 2710(d)(1), (3), (7)

(d) Class III gaming activities; authorization; revocation; Tribal-State compact

(1) Class III gaming activities shall be lawful on Indian lands only if such activities are--

(A) authorized by an ordinance or resolution that--

(i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,

(ii) meets the requirements of subsection (b), and

(iii) is approved by the Chairman,

(B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and

(C) conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

...

(3)(A) Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact.

(B) Any State and any Indian tribe may enter into a Tribal-State compact governing gaming activities on the Indian lands of the Indian tribe, but such compact shall take effect only when notice of approval by the Secretary of such compact has been published by the Secretary in the Federal Register.

(C) Any Tribal-State compact negotiated under subparagraph (A) may include provisions relating to--

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations;

(iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity;

(iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities;

(v) remedies for breach of contract;

(vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and

(vii) any other subjects that are directly related to the operation of gaming activities.

...

(7)(A) The United States district courts shall have jurisdiction over--

(i) any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact under paragraph (3) or to conduct such negotiations in good faith,

(ii) any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under paragraph (3) that is in effect, and

(iii) any cause of action initiated by the Secretary to enforce the procedures prescribed under subparagraph (B)(vii).

(B)(i) An Indian tribe may initiate a cause of action described in subparagraph (A)(i) only after the close of the 180-day period beginning on the date on which the Indian tribe requested the State to enter into negotiations under paragraph (3)(A).

(ii) In any action described in subparagraph (A)(i), upon the introduction of evidence by an Indian tribe that--

(I) a Tribal-State compact has not been entered into under paragraph (3), and

(II) the State did not respond to the request of the Indian tribe to negotiate such a compact or did not respond to such request in good faith,

the burden of proof shall be upon the State to prove that the State has negotiated with the Indian tribe in good faith to conclude a Tribal-State compact governing the conduct of gaming activities.

(iii) If, in any action described in subparagraph (A)(i), the court finds that the State has failed to negotiate in good faith with the Indian tribe to conclude a Tribal-State compact governing the conduct of gaming activities, the court shall order the State and the Indian Tribe2 to conclude such a compact within a 60-day period. In determining in such an action whether a State has negotiated in good faith, the court--

(I) may take into account the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities, and

(II) shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith.

(iv) If a State and an Indian tribe fail to conclude a Tribal-State compact governing the conduct of gaming activities on the Indian lands subject to the jurisdiction of such Indian tribe within the 60-day period provided in the order of a court issued under clause (iii), the Indian tribe and the State shall each submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact. The mediator shall select from the two proposed compacts the one which best comports with the terms of this chapter and any other applicable Federal law and with the findings and order of the court.

(v) The mediator appointed by the court under clause (iv) shall submit to the State and the Indian tribe the compact selected by the mediator under clause (iv).

(vi) If a State consents to a proposed compact during the 60-day period beginning on the date on which the proposed compact is submitted by the mediator to the State under clause (v), the proposed compact shall be treated as a Tribal-State compact entered into under paragraph (3).

(vii) If the State does not consent during the 60-day period described in clause (vi) to a proposed compact submitted by a mediator under clause (v), the mediator shall notify the Secretary and the Secretary shall prescribe, in consultation with the Indian tribe, procedures--

(I) which are consistent with the proposed compact selected by the mediator under clause (iv), the provisions of this chapter, and the relevant provisions of the laws of the State, and

(II) under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction.

## Provisions from the Unlawful Internet Gambling Enforcement Act (as codified at 31 U.S.C.):

### 31 U.S.C. § 5361

(a) **Findings.**--Congress finds the following:

(1) Internet gambling is primarily funded through personal use of payment system instruments, credit cards, and wire transfers.

(2) The National Gambling Impact Study Commission in 1999 recommended the passage of legislation to prohibit wire transfers to Internet gambling sites or the banks which represent such sites.

(3) Internet gambling is a growing cause of debt collection problems for insured depository institutions and the consumer credit industry.

(4) New mechanisms for enforcing gambling laws on the Internet are necessary because traditional law enforcement mechanisms are often inadequate for enforcing gambling prohibitions or regulations on the Internet, especially where such gambling crosses State or national borders.

(b) **Rule of construction.**--No provision of this subchapter shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States.

### 31 U.S.C. §§ 5362(1)(A), (E)(ii)-(iv)

Bet or wager.--The term "bet or wager"--

(A) means the staking or risking by any person of something of value upon the outcome of a contest of others, a sporting event, or a game subject to chance, upon an agreement or understanding that the person or another person will receive something of value in the event of a certain outcome;

...

(E) does not include--

...

(ii) any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the Commodity Exchange Act;

(iii) any over-the-counter derivative instrument;

(iv) any other transaction that--

(I) is excluded or exempt from regulation under the Commodity Exchange Act; or

(II) is exempt from State gaming or bucket shop laws under section 12(e) of the Commodity Exchange Act or section 28(a) of the Securities Exchange Act of 1934;

## 31 U.S.C. § 5362(10)(A)

Unlawful internet gambling.--

(A) **In general.**--The term "unlawful Internet gambling" means to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made.

## Provisions from Title 17 of the Code of Federal Regulations:

## 17 C.F.R. § 40.11

(a) Prohibition. A registered entity shall not list for trading or accept for clearing on or through the registered entity any of the following:

(1) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law; or

(2) An agreement, contract, transaction, or swap based upon an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which involves, relates to, or references an activity that is similar to an activity enumerated in § 40.11(a)(1) of this part, and that the Commission determines, by rule or regulation, to be contrary to the public interest.

(b) [Reserved]

(c) 90−day review and approval of certain event contracts. The Commission may determine, based upon a review of the terms or conditions of a submission under § 40.2 or § 40.3, that an agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), be subject to a 90−day review. The 90−day review shall commence from the date the Commission notifies the registered entity of a potential violation of § 40.11(a).

(1) The Commission shall request that a registered entity suspend the listing or trading of any agreement, contract, transaction, or swap based on an excluded commodity, as defined in Section 1a(19)(iv) of the Act, which may involve, relate to, or reference an activity enumerated in § 40.11(a)(1) or § 40.11(a)(2), during the Commission's 90−day review period. The Commission shall post on the Web site a notification of the intent to carry out a 90−day review.

(2) Final determination. The Commission shall issue an order approving or disapproving an agreement, contract, transaction, or swap that is subject to a 90−day review under § 40.11(c) not later than 90 days subsequent to the date that the Commission commences review, or if applicable, at the conclusion of such extended period agreed to or requested by the registered entity.