No. 25-7504

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

BLUE LAKE RANCHERIA, CHICKEN RANCH RANCHERIA OF
ME-WUK INDIANS, and PICAYUNE RANCHERIA OF THE
CHUKCHANSI INDIANS

Appellants/Plaintiffs,

v.

KALSHI INC., KALSHIEX LLC, ROBINHOOD MARKETS, INC.,
ROBINHOOD DERIVATIVES LLC, and DOES 1-20,

Appellees/Defendants.

On Appeal from the United States District Court
for the Northern District of California
No. 25-cv-06162-JSC
Hon. Jacqueline Scott Corley

---

APPELLANTS' REPLY BRIEF

---

LESTER J. MARSTON
California State Bar No. 081030
THE LAW OFFICES OF RAPPORT AND MARSTON
AN ASSOCIATION OF SOLE PRACTITIONERS
405 West Perkins Street
Ukiah, California 95482
Telephone: 707-462-6846
Facsimile: 707-462-4235
Email: ljmarston@rmlawoffice.net

*Attorney for Appellants*
*Blue Lake Rancheria, Chicken Ranch*
*Rancheria Of Me-Wuk Indians, And Picayune*
*Rancheria Of The Chukchansi Indians*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

I. THE TRIBES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR IGRA CLAIMS. .................................................................................................3

    A. Kalshi's interpretation of § 2710(d)(7)(A)(ii) conflicts with the text, structure, and purpose of IGRA. .........................................................3

        1. Tribal-state compacts implement IGRA and have the force of federal law.............................................................................................5

        2. § 2710(d)(7)(A)(ii) must be understood in the context of § 2710(d)(1) and the whole text of IGRA. ......................................8

    B. Neither UIGEA nor *Iipay* are dispositive of the Tribes' IGRA claims............................................................................................................11

        1. There is no legal basis for applying UIGEA and Kalshi does not dispute this reality. ...................................................................12

        2. Neither UIGEA nor *Iipay* support implied repeal of IGRA. .........14

    C. The CEA does not authorize sports betting on the Tribes' Indian lands..............................................................................................................16

II. THE TRIBES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR LANHAM ACT CLAIM................................................................................21

    A. Kalshi's Opposition relies on a characterization of its product not reflected in the advertisements. .......................................................21

    B. The statement that "Sports Betting [Is] Legal in All 50 States On Kalshi" is a statement of fact, not opinion. ........................................24

    C. Kalshi's reliance on "On Kalshi" does not save the advertisements. .26

III. THE DISTRICT COURT DID NOT ADDRESS THE REMAINING *WINTER* FACTORS..........................................................................................27

CONCLUSION ....................................................................................................27

CERTIFICATE OF COMPLIANCE....................................................................29

CERTIFICATE OF SERVICE ............................................................................30

i

# TABLE OF AUTHORITIES

## Cases

*Bd. of Trade of City of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236 (1905)................................................................................................16

*Big Sandy Rancheria Enters. v. Bonta*, 1 F.4th 710 (9th Cir. 2021) ........................11

*Blue Lake Rancheria v. KalshiEX LLC*, No. 25-7504 (9th Cir. Jan. 9, 2026)...........5

*Board of Trade of the City of Chicago v. SEC*, 677 F.2d 1137 (7th Cir. 1982)......16

*California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987)....................4

*California v.Iipay Nation of Santa Ysabel*, 2016 WL 10650810 (S.D. Cal 2016) ...............................................................................................12

*Cayuga Nation v. New York State Gaming Comm'n*, 775 F. Supp. 3d 651 (N.D.N.Y. 2025) ................................................................................................10

*Chicken Ranch Rancheria v. Newsom,* 42 F.4th 1024 (9th Cir. 2022)................8, 19

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999) ..................................................................... 24, 25, 26

*Crowley Maritime Corp. v. Boston Old Colony Ins.*Co., 158 Cal. App. 4th 1061 (Ct. App. 2008) ..............................................................................................8

*Cuyler v. Adams*, 449 U.S. 433 (1981) ....................................................................5

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 69 F.4th 665 (9th Cir. 2023) ...............................................................................................25

*Entergy Arkansas, Inc. v. Nebraska*, 358 F.3d 528 (8th Cir. 2004) ..........................6

*Gatewood v. State of N. Carolina*, 203 U.S. 531 (1906).........................................16

*Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30 (1994).................................6

*Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92 (1938)....6, 7

*InSinkErator, LLC v. Joneca Co., Ltd. LLC*, 163 F.4th 608 (9th Cir. 2025)...........25

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124 (2001)...........14

*KalshiEX LLC v. CFTC*, No. 23-cv-3257, 2024 WL 4164694 (D.D.C. Sep. 12, 2024) ...................................................................................23

*KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024)....................................................24

*KalshiEX LLC v. Flaherty*, No. 25-cv-2152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025)...................................................................................23

*KalshiEX LLC v. Orgel*, No.3:25-cv-34, 2026WL 474869 (M.D. Tenn. Feb. 19, 2026)...................................................................................23

*KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282 (D. Nev. Nov. 24, 2025) ............................................................... passim

*Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)...................................................................................25

*Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996) ...............................14

*Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782 (2014) ............................ 12, 15

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453 (2018)................. 4, 22, 26

*N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151 (D. Nev. Oct. 14, 2025) ............................................................... 16, 18, 26

*Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832 (1982)...................................................................................11

*Stand Up for California! v. U.S. Dep't of the Interior*, 959 F.3d 1154 (9th Cir. 2020) ................................................................................3

*State of California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960 (9th Cir. 2018) ........................................................ 12, 13, 14, 15

*Taxpayers of Mich. Against Casinos v. Michigan,*685 N.W.2d 221 (Mich. 2004) ................................................................................8

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609 (9th Cir. 2016) ..............................................................................25

*United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188 (1876)....................6

*Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7 (2008)* ......................................27

*Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921 (7th Cir. 2008) ................................5

**Statutes**

18 U.S.C. § 1162................................................................................4

18 U.S.C. § 1166........................................................................ passim

18 U.S.C. § 1166(d) ............................................................................4

18 U.S.C. §1166(b) ........................................................................ 10, 11

25 U.S.C. § 2701(3) ............................................................................5

25 U.S.C. § 2702(2) ........................................................................ 4, 5, 7, 10

25 U.S.C. § 2703(8) ............................................................................15

25 U.S.C. § 2710................................................................................10

25 U.S.C. § 2710(d)(1)................................................................ passim

25 U.S.C. § 2710(d)(1)(C) ................................................................7, 10

iv

25 U.S.C. § 2710(d)(2)(C) .................................................................7

25 U.S.C. § 2710(d)(3)(B) .................................................................7

25 U.S.C. § 2710(d)(3)(C) .................................................................5

25 U.S.C. § 2710(d)(3)(C)(v) .............................................................5

25 U.S.C. § 2710(d)(7)(A) .................................................................9

25 U.S.C. § 2710(d)(7)(A)(ii) ..................................................... passim

25 U.S.C. § 2710(d)(7)(A)(iii) ......................................................9, 10

25 U.S.C. § 2710(d)(7)(B)(vii) ...........................................................3

25 U.S.C. § 2710(d)(8)(A) .................................................................7

25 U.S.C. § 2711 .............................................................................10

25 U.S.C. §§ 2701–2721 .................................................................26

28 U.S.C. § 1360 ..............................................................................4

28 U.S.C. §§ 3701–3704 .................................................................17

28 U.S.C. §§ 3702–3703 ...................................................................4

31 U.S.C. § 5361(4) .........................................................................13

31 U.S.C. § 5361(b) .................................................................... 13, 14

31 U.S.C. § 5362(10)(C) ..................................................................13

5365(b)(3)(B) ............................................................................ 13, 14

7 U.S.C. § 1a(47)(A) .......................................................................19

7 U.S.C. § 1a(47)(A)(ii) ...................................................................19

7 U.S.C. § 7a-2(c)(5)(C) ....................................................... 17, 18, 19

v

Cal. Penal Code § 337a ................................................................ 11, 22

**Other Authorities**

156 Cong. Rec. S5902-01, S5906 (July 15, 2010) .................................... 16, 19, 26

77 Fed. Reg. 48,208, 48,217, 48,247 (Aug. 13, 2012) ............................................22

American Gaming Association, *New Study Finds Sports Bettors Abandoning Bookies for Legal Market*, https://www.americangaming.org/new-study-finds-sports-bettors-abandoning-bookies-for-legal-market/.........................................25

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 68 (2012)............................................................................. 5, 8, 14

Brandon Mastromartino et al., Perceived Legality and Online Sports Betting Behavior, 41 J. Gambling Stud. 1703, 1717 (2025)..............................................25

Buenger et al., *The Evolving Law and Use of Interstate Compacts*, § 2.1 (2016) ....8

Christopher L. Culp, *Risk Transfer: Derivatives in Theory and Practice* (2004)...17

Christopher L. Culp, *Risk Transfer: Derivatives in Theory and Practice* 26 (2004) ...........................................................................................16

Gary E. Kalbaugh, *Derivatives Law and Regulation* 8 (3d ed. 2019).....................17

Kalbaugh, *Derivatives Law and Regulation*, Ch.2.E.2–3 (3d ed. 2019) .................17

Lynn A. Stout, *Uncertainty, Dangerous Optimism, and Speculation: An Inquiry into Some Limits of Democratic Governance*, 97 Cornell L. Rev. 1177, 1199 (2012) ...........................................................................................16

Robert L. McDonald, *Derivatives Markets* (3d ed. 2013).............................. 16, 17

S. REP. 100-446, 1988 U.S.C.C.A.N. 3071 ............................................. 4, 5, 7, 10

## Regulations

17 C.F.R. § 40.2 ...............................................................................................18

17 C.F.R. § 40.3 ...............................................................................................18

17 C.F.R. 40.11(a)................................................................................ 17, 18, 19

17 C.F.R. 40.11(c)..................................................................................... 18, 19

25 C.F.R. § 502.14 ...........................................................................................10

25 C.F.R. § 502.15 ...........................................................................................10

25 C.F.R. § 502.4(c)..........................................................................................15

25 C.F.R. § 502.5 .............................................................................................10

25 C.F.R. §§ 502.17–502.19 ............................................................................10

## Constitutional Provisions

U.S. Const. art. I, § 10, cl. 3.............................................................................6

**INTRODUCTION**

If the District Court and Appellees' statutory interpretation is accepted, in enacting the Indian Gaming Regulatory Act, Congress produced a result that is diametrically opposed to its stated intent. Rather than codifying Indian tribes' authority to regulate gaming on their Indian lands and to ensure that the tribes are the primary beneficiaries of the gaming, Congress actually sought to strip tribes of the authority to determine who can conduct gaming on their Indian lands and prevent outsiders from conducting such gaming on Indian lands without benefit to the tribes. Rather than ensuring that the tribal and state interests in safeguarding the fairness of the gaming and preventing the gaming from being influenced by organized crime, Congress, under Appellees' theory, withheld any method for tribes and states to regulate the gaming conducted on Indian lands by persons or entities who have no relationship with the tribes and who have not been authorized to conduct gaming on their lands. Rather than assign the primary responsibility for regulating the gaming to the tribes and states, Congress in fact decided that only the federal government has the authority to stop illegal gambling on Indian lands through criminal prosecution.

If the District Court and Appellees' statutory interpretation is accepted, Congress, in legislating to prevent unregulated derivatives trading from causing a repeat of the 2008 mortgage crisis, actually allowed derivatives trading to *expand* to

include sports betting in all its permutations, nationwide, the legality of which is determined by the sports betting entity itself through self-certification.

If the District Court and Appellees' statutory interpretation is accepted, Congress, in attempting to stop financial institutions from facilitating betting initiated by entities located outside of the criminal jurisdiction of federal and state governments through the Unlawful Internet Gambling Enforcement Act, apparently repealed portions of IGRA and restricted tribal authority to regulate gaming.

If the District Court and Appellees' statutory interpretation is accepted, Congress, in seeking to protect the public from false advertising, provided no remedy when highly sophisticated, well-funded entrepreneurs (represented by some of the country's most respected law firms) assert the facially false position that sports betting is legal nationwide on their platform, because that assertion is merely a statement of opinion of a non-expert.

Finally, if the District Court and Appellees' legal analysis is accepted, Appellees, who are reporting taking billions of dollars of sports bets over the last year, will suffer irreparable harm if they are not permitted to continue to take billions of dollars more in sports bets without interference from federal courts.

Demonstrated below, the District Court's and Appellees' implausible interpretations must be rejected and the District Court's ruling reversed.

2

## I. THE TRIBES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR IGRA CLAIMS.

Kalshi argues that the Tribes lack standing because: (1) 25 U.S.C. § 2710(d)(7)(A)(ii) is merely a compact enforcement mechanism; (2) compacts—and derivatively, Secretarial procedures—are merely private contracts between sovereigns, not federal law; and (3) Kalshi's conduct on Indian lands cannot be bound by the Tribes Compact or Procedures due to a lack of privity or, alternatively, because compacts and procedures only address what tribes may do, not what non-tribal, third-parties may do on Indian lands.

Kalshi's legal theories fail at every level. Tribal-state compacts, like interstate compacts, are territorial law, published in the Federal Register, implementing IGRA, governing class III gaming on specific Indian lands, binding on any entity operating within the territorial jurisdiction and within the ambit of the compact. Procedures are obviously regulatory law prescribed by the Secretary of the Interior and published in the Federal Register and perform the same regulatory function as compacts. 25 U.S.C. § 2710(d)(7)(B)(vii); *see Stand Up for California! v. U.S. Dep't of the Interior*, 959 F.3d 1154, 1159–60 (9th Cir. 2020).

### A. Kalshi's interpretation of § 2710(d)(7)(A)(ii) conflicts with the text, structure, and purpose of IGRA.

IGRA was enacted to fill a perceived regulatory void, where tribes and high-stakes tribal gaming would be subject to organized crime and corruption absent state

regulation, arising from jurisdictional barriers to state regulation under 28 U.S.C. § 1360, 18 U.S.C. § 1162 and *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). To resolve the issue, Congress granted states limited civil jurisdiction over class III gaming on Indian lands, through compacts, and federalized state criminal gambling laws on Indian lands. 18 U.S.C. § 1166(d).[1] To protect tribes, Congress granted the federal government "exclusive jurisdiction over criminal prosecutions of violations of State gambling laws," *id.*, but established a civil cause of action, § 2710(d)(7)(A)(ii), for states and tribes to, *inter alia*, "enjoin illegal gaming on Indian lands . . . ." S. REP. 100-446, 18, 1988 U.S.C.C.A.N. 3071, 3088.[2]

Yet, if the District Court and Kalshi are correct in their interpretations of IGRA, if § 2710(d)(7)(A)(ii) can only be used for compact enforcement, the implication is that Congress created the very regulatory void it sought to close and shifted the burden of enforcement to the federal government, leaving tribes and states with no direct, efficient remedy to stop illegal gaming or "shield it from organized crime and other corrupting influences . . . ." 25 U.S.C. § 2702(2). This is

---

[1] §1166 also authorized tribes and states, through the adoption of a compact, to transfer the United States criminal jurisdiction to enforce §1166 to states. In Section 8.2 of its compact, Picayune transferred §1166 jurisdiction to the State of California.

[2] Analogous to the civil cause of action in IGRA, in enacting PAPSA, 28 U.S.C. §§ 3702–3703, Congress similarly created a civil cause of action to enjoin unlawful sports gambling by interested parties. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 453 (2018) ("PASPA does not make sports gambling itself a federal crime. Instead, it allows the Attorney General, as well as professional and amateur sports organizations, to bring civil actions to enjoin violations. § 3703.").

4

antithetical to the purpose of IGRA[3] and an atextual interpretation of IGRA statutes.[4]

The Tribes' have provided a textual analysis of IGRA in Pls.' Opening Br. at 17–27, *Blue Lake Rancheria v. KalshiEX LLC*, No. 25-7504 (9th Cir. Jan. 9, 2026) (Dkt. No. 31.1). The Tribes' interpretation of IGRA validates rather than obstructs the purpose of IGRA. IGRA delineates between a "violation of [a] Tribal-State compact," § 2710(d)(7)(A)(ii), meaning conduct not in "conformance with a Tribal-State compact," § 2710(d)(1), and a "breach of contract."[5] 25 U.S.C. § 2710(d)(3)(C)(v); Dkt. 31.1, at 24–25; *see Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 933 (7th Cir. 2008) (holding only compact breaches material to § 2710(d)(3)(C) are subject to § 2710(d)(7)(A)(ii)). This is because Congress intended for compacts and procedures to have the force of federal law, like interstate compacts. 25 U.S.C. § 2702(2) (Congress intended "to provide a statutory basis for the **regulation** of gaming by an Indian tribe . . ." (emphasis added)).

### 1. Tribal-state compacts implement IGRA and have the force of federal law.

Properly understood, tribal-state compacts, like interstate compacts that are "law of the Union," *see Cuyler v. Adams*, 449 U.S. 433, 439 (1981), have the force

---

[3] *See* 25 U.S.C. § 2701(3); S. REP. 100-446 at 5.
[4] *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 68 (2012) ("*Reading Law*") ("A textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored.); *id*. at 70 (An interpretation that validates outweighs one that invalidates . . . .").
[5] *See Reading Law* at 145 ("A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning."); *id*. at 148 ("If possible, every word and every provision is to be given effect . . .").

of federal law upon publication in the Federal Register. U.S. Const. art. I, § 10, cl. 3 provides: "No State shall . . . enter into any Agreement or Compact with another State, or with a foreign Power . . . without the Consent of Congress." Interstate compacts represent a political compromise between "constituent elements of the Union," as opposed to a "commercial transaction." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 40 (1994); *Entergy Arkansas, Inc. v. Nebraska*, 358 F.3d 528, 542 (8th Cir. 2004).

Compacts are made to "address interests and problems that do not coincide nicely either with the national boundaries or with State lines—interests that may be badly served or not served at all by the ordinary channels of National or State political action." *Hess*, 513 U.S. at 40. "The compact . . . adapts to our Union of sovereign States the age-old treaty making power of independent sovereign nations." *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 104 (1938); *see also United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 197 (1876) (finding power to make treaties with Indian tribes coextensive with power to make treaties with foreign nations). "While a common law contract directly affects only the rights and obligations of the individual parties to it, an interstate compact may directly impact the population, the economy, and the physical environment in the whole of the compact area." *Entergy*, 358 F.3d at 542. Crucially, compacts are binding on third-parties operating within the combined territorial jurisdiction of

6

party-states, within the ambit of the conduct regulated by the compact. *See*, *e.g.*, *Hinderlider*, 304 U.S. at 106 (holding a compact "is binding upon the citizens of each State and all water claimants, even where the State had granted the water rights before it entered into the compact.").

IGRA and tribal-state compacts must be understood in the context of interstate compacts. Whereas interstate compacts are only federalized through the consent of Congress, in enacting IGRA, Congress expressly chose tribal-state compacts as the "mechanism for facilitating the unusual relationship in which a tribe might affirmatively seek the extension of State jurisdiction and the application of state laws to activities conducted on Indian land . . . ." S. REP. 100-446, 6. Tribal-state compacts are federalized (1) through IGRA itself, §§ 2702(2), 2710(d)(1)(C), and (2) through the ratifying act of approval by the Secretary of the Interior, § 2710(d)(8)(A), with the effect of federal law upon publication in the Federal Register. 25 U.S.C. § 2710(d)(3)(B). Once effective, tribal-state compacts become the law of the land, binding on any entity within the designated territorial jurisdiction and scope of activity regulated by the compact. Thus, just as interstate compacts are agreements between a state and another sovereign entity (state or foreign sovereign) with the force of federal law, tribal-state compacts are agreements between a state and another sovereign entity (tribe) with the force of federal law. The similarities between interstate and tribal-state compacts are undeniable, eclipsing the

7

differences, and there is no comparable legal device for achieving "cooperative federalism" among tribes and states. *See Chicken Ranch Rancheria v. Newsom,* 42 F.4th 1024, 1032 (9th Cir. 2022).

None of the decisions Kalshi relies on refute the proposition that tribal-state compacts are federal law binding third-parties. Those decisions either apply principles of contract law to interpret compacts when a dispute arises between sovereign parties, apply principles of contract law in negotiation disputes between sovereign parties,[6] or are wholly inapposite.[7] *See* KalshiEX LLC's Answering Brief at 24–27, *Blue Lake Rancheria v. KalshiEX LLC*, No. 25-7504 (9th Cir. Mar. 9, 2026) (Dkt. No. 43.1). In fact, Kalshi's reliance on *Picayune* and *Ho-Chunk*, Dkt. 43.1, at 24–25, show that § 2710(d)(7)(A)(ii) only applies where compact dispute resolution procedures are incapable of resolving disputes between sovereign parties.

### 2. § 2710(d)(7)(A)(ii) must be understood in the context of § 2710(d)(1) and the whole text of IGRA.

Understood as legal devices implementing IGRA[8] at the tribal-state level with

---

[6] *See generally* Buenger et al., *The Evolving Law and Use of Interstate Compacts*, § 2.1 (2016) (explaining that compacts are hybrid contracts between sovereigns and cross-jurisdictional law governing specific activity); § 2.1.2.5 (explaining that courts apply "principles of contract law, conflicts of law, or statutory interpretation to establish the binding nature of compacts.").

[7] *Crowley Maritime Corp. v. Boston Old Colony Ins.*Co., 158 Cal. App. 4th 1061, 1069 (Ct. App. 2008), has nothing to do with IGRA or compacts. *Taxpayers of Mich. Against Casinos v. Michigan,*685 N.W.2d 221, 230 (Mich. 2004) evaluates whether compacts are *state* "legislation" under Michigan's constitution that are binding on political subdivisions of the State *under state law*.

[8] *See Reading Law* at 64 ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."); *id*. at 143 ("The text must be construed as a whole.").

8

the force of federal law, compacts and procedures are violated like any other law, namely, when class III conduct on Indian lands does not conform with the enumerated lawful conditions in compacts/procedures implementing IGRA. Nothing in § 2710(d)(7)(A)(ii) restricts civil actions to enjoin unlawful class III gaming to suits against parties to a compact. Rather, the language of § 2710(d)(7)(A)(ii) reflects the language of § 2710(d)(1), because that provision enumerates the only conditions under which class III gaming is lawful on Indian lands.

Kalshi asserts "Section 2710(d)(7)(A)(ii) is clear, not ambiguous," Dkt. 43.1, at 29, but Kalshi also asserts it "provides a reciprocal cause of action for both states and tribes," Dkt. 43.1, at 26, implying that § 2710(d)(7)(A)(ii) *only applies reciprocally*. Nothing in § 2710(d)(7)(A)(ii) limits potential defendants to states and tribes. Quite the opposite, the provision authorizes "**any cause of action** initiated by a State or Indian tribe," (emphasis added), without limiting language concerning potential defendants. "To accept [Kalshi's] argument would be to rewrite the statute." Dkt. 43.1, at 28.

Kalshi appears to conflate § 2710(d)(7)(A)(ii) and (d)(7)(A)(iii), while simultaneously delineating the two to exclude procedures. Dkt. 43.1, at 26, 33. The three causes of action in § 2710(d)(7)(A) have different purposes. The first deals with failure to *engage* in good faith negotiations; the second deals with *enjoining*

9

class III conduct not in conformance with a compact/procedures under § 2710(d)(1); the third deals with *enforcement* of procedures by the Secretary, since states lack jurisdiction to enforce procedures, having forgone the compacting process. Kalshi interprets § 2710(d)(7)(A)(ii) to be a compact *enforcement* provision, but if that were the case Congress could have said "any cause of action initiated by a tribe or state to enforce the compact," similar to § 2710(d)(7)(A)(iii). Instead, Congress established a cause of action to enjoin illegal gaming, not in conformance with a compact, by any entity, tribal, state, or non-tribal, consistent with § 2702(2), §2710(d)(1), and 18 U.S.C. §1166(b). *See Cayuga Nation v. New York State Gaming Comm'n*, 775 F. Supp. 3d 651, 666 (N.D.N.Y. 2025); Dkt. 31.1, at 26–27; S. REP. 100-446, 18.

The District Court and Kalshi contend that a compact must explicitly address third-party conduct to create a cognizable violation. *See* ER-009; Dkt. 43.1, at 27–31. Both are mistaken. Nothing in § 2710(d)(7)(A)(ii) requires an express prohibition of non-tribal, third-party conduct; rather, it expressly reflects the elements of lawful class III gaming in § 2710(d)(1), specifically § 2710(d)(1)(C). Compacts/procedures are primarily enabling law that implement IGRA. IGRA addresses non-tribal entities, such as managers, key employees, and vendors or entities with a financial interest in a management contract. 25 U.S.C. §§ 2710, 2711; 25 C.F.R. §§ 502.15, 502.14, 502.5, 502.17–502.19. By negative implication, any entity not permitted by IGRA is prohibited from conducting class III gaming on

Indian lands. 18 U.S.C. § 1166. The District Court and Kalshi demand that the compact/procedures expressly prohibit conduct, but the purpose of compacts/procedures is to enumerate the conduct that is permitted. Compacts/procedures do not need to define and prohibit what is otherwise not authorized by IGRA.[9]

Finally, considering that resolution of the purpose of § 2710(d)(7)(A)(ii) involves competing interpretations of the same provisions of IGRA, if the intent of Congress cannot be ascertained through general principles of statutory construction, the Court must apply the Indian canons of construction and construe IGRA in favor of the Tribes. *See*, *e.g.*, *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue of New Mexico*, 458 U.S. 832, 846 (1982); *Big Sandy Rancheria Enters. v. Bonta*, 1 F.4th 710, 721 (9th Cir. 2021) (finding statutes passed for the benefit of Indian tribes are liberally construed, doubtful expressions being resolved in Indians' favor).

**B.     Neither UIGEA nor *Iipay* are dispositive of the Tribes' IGRA claims.**

The District Court erred in finding that UIGEA either supersedes IGRA or repeals IGRA by implication and Kalshi's analysis in defense of the District Court's conclusions is not legally coherent. In their opening brief, the Tribes

---

[9] 18 U.S.C. § 1166 makes Kalshi's sports gaming activities a federal crime and prohibits the Appellees conduct within Indian country since it violates California's law prohibiting sports betting. Cal. Penal Code § 337a. Since §1166 prohibits the conduct, Picayune's compact must authorize, not prohibit the conduct, for it to be legal in Indian Country. 18 U.S.C. §1166(b).

comprehensively demonstrated that: (1) Congress was aware of the existence of the internet in 1988 when IGRA was enacted; (2) IGRA's definition of class III gaming regulates all forms of gaming that are not class I or class II, irrespective of medium or technological format; (3) that UIGEA expressly does not supersede or repeal IGRA; and (4) *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 792 (2014) supplies the analytical framework for evaluating the situs of gaming activity in this litigation. Dkt. 31.1, at 30–36.

### 1. There is no legal basis for applying UIGEA and Kalshi does not dispute this reality.

Citing to UIGEA, both the District Court and Kalshi arrive at the factually and legally incorrect conclusion that IGRA does not regulate class III internet gaming conducted on Indian lands. ER-010. Their application of UIGEA arises from the District Court's misunderstanding of *State of California v. Ipay Nation of Santa Ysabel*, 898 F.3d 960, 964 n.6 (9th Cir. 2018), where this Court analyzed IGRA's definition of *class II* gaming and found it silent on whether IGRA regulates internet gambling. Unlike *Ipay*, there is no basis for the application of UIGEA in this litigation.

The Tribes have not pleaded a UIGEA claim, unlike the State in *Ipay*. *California v. Ipay Nation of Santa Ysabel*, No. 314CV02724AJBNLS, 2016 WL 10650810, at *3 (S.D. Cal. Dec. 12, 2016), *aff'd sub nom. State of California v. Ipay Nation of Santa Ysabel*, 898 F.3d 960 (9th Cir. 2018) ("The State initiated this action

on November 18, 2014, filing a complaint against Tribal Defendants for: (1) breach of the Compact entered into with the State; and (2) unlawful Internet gambling under UIGEA."). Kalshi does not argue that UIGEA applies to their conduct. On the contrary, they argue that they are exempt from UIGEA. Dkt. 43.1, at 39. Since the Tribes have not invoked UIGEA and Kalshi argues it is exempt from UIGEA, the only possible application of UIGEA is if it supersedes IGRA or repeals IGRA by implication. Neither UIGEA nor *Iipay* support this contention.

The Tribes have already established that UIGEA does not supersede IGRA. Dkt. 31.1, at 29–30; 31 U.S.C. §§ 5361(b), 5365(b)(3)(B). UIGEA acknowledges that, at the time of enactment, some existing gambling laws were adequate to regulate internet gambling. *See* 31 U.S.C. § 5361(4) ("New mechanisms for enforcing gambling laws on the Internet are necessary because traditional law enforcement mechanisms **are often** inadequate for enforcing gambling prohibitions or regulations on the Internet . . . ." (emphasis added)). UIGEA acknowledges that IGRA is capable of regulating internet gambling on Indian lands, thus intra-tribal and inter-tribal internet gambling is not unlawful. *See* 31 U.S.C. § 5362(10)(C). The operative gaming activity in this litigation occurs on the Tribes' Indian lands. UIGEA does not apply to the claims in this case, nor does it supersede IGRA.[10] 31

---

[10] Although UIGEA does not apply, Congress understood, consistent with the Tribes' arguments, that a portion of the gambling activity occurs where the bettor initiates the bet.

U.S.C. §§ 5361(b), 5365(b)(3)(B). Here, both the federal criminal law, 18 U.S.C. § 1166, and federal civil law, 25 U.S.C. § 2710(d)(1), components of IGRA prohibit Kalshi from engaging in gambling on sports on the Tribes' Indian lands.

### 2. Neither UIGEA nor *Iipay* support implied repeal of IGRA.

Alternatively, the District Court and Kalshi contend that UIGEA repeals IGRA by implication. ER-010–011. The District Court reached this conclusion by knitting together a patchwork of UIGEA provisions and isolated quotes from *Iipay*. The District Court's analysis does not meet the standard for finding a repeal by implication. "The rarity with which [the Court has] discovered implied repeals is due to the relatively stringent standard for such findings, namely, that there be an irreconcilable conflict between the two federal statutes at issue."[11] *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 142 (2001) (quoting *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 381 (1996)).[12]

As shown above, based on its plain language, UIGEA does not repeal IGRA. The District Court's conclusion that IGRA does not regulate class III internet gaming conducted on Indian lands, which would require the conclusion that UIGEA impliedly repealed IGRA, is also inconsistent with *Iipay*. ER-010. Unlike this litigation, *Iipay* involved: (1) class II gaming, which was beyond the regulatory reach

---

[11] See *Iipay*, 898 F.3d at 968 ("Here, there is no direct conflict between IGRA and the UIGEA and, thus, we give effect to the provisions of both statutes.").
[12] See *Reading Law* at 250 (discussing presumption against implied repeal).

of the compact and § 2710(d)(7)(A)(ii), *Iipay*, 2016 WL 10650810, at *8; (2) gaming conducted off Indian lands, which was beyond the scope of IGRA, *Iipay*, 898 F.3d at 967; and (3) a UIGEA claim by the State that was dispositive under the facts. In *Iipay*, this Court did not consider whether UIGEA impliedly repealed IGRA. Rather, this Court found no conflict between IGRA and UIGEA. *Iipay*, 898 F.3d at 968.

Moreover, although the Tribes disagree with this Court's conclusion that the definition of class II gaming in IGRA does not encompass internet gaming, *Iipay*, 898 F.3d at 964 n.6; Dkt. 31.1, at 32–33, the instant litigation involves sports betting, a class III game, 25 C.F.R. § 502.4(c). Class III gaming is defined as: "all forms of gaming that are not class I gaming or class II gaming," 25 U.S.C. § 2703(8), which easily encompasses internet gaming. Additionally, *Iipay*'s reliance on *Bay Mills* to demonstrate that UIGEA is not in conflict with IGRA, 898 F.3d at 967, illustrates that the analytic framework established in *Bay Mills* is sufficient to determine the situs of class III gaming activity in contradistinction to "off-site administrative authority." Thus, both UIGEA and *Iipay* are inapposite.

The dispositive issues, therefore, are: (1) whether the Tribes' compact/procedures authorize sports betting on Indian lands; (2) whether the lawful scope of the CEA prohibits sports betting; and, if so, (3) whether Kalshi subjected themselves to the Tribes' regulatory authority under IGRA by offering sports betting contracts on their Indian lands. UIGEA has no application.

15

### C. The CEA does not authorize sports betting on the Tribes' Indian lands.

The Tribes have already shown that the District Court erred, on one hand, in finding that it lacked jurisdiction to evaluate Kalshi's sports betting contracts because the CFTC has exclusive jurisdiction[13] while, on the other hand, presuming Kalshi's sports betting contracts are lawful CEA transactions exempt from UIGEA and finding the application of UIGEA dispositive. Dkt. 31.1, at 37–42.

Kalshi operates a derivatives exchange. Dkt. 43.1, at 1. Derivatives have long been criticized as gambling,[14] from the era of bucket shops[15] to the Congressional hearings leading to enactment of the Dodd-Frank Amendments to the CEA, establishing the "Special Rule."[16] "A derivative is a financial instrument that has value determined by the price of something else." Robert L. McDonald, *Derivatives*

---

[13] There has been a decades-long power struggle between the CFTC and the SEC. *See Board of Trade of the City of Chicago v. SEC*, 677 F.2d 1137 (7th Cir. 1982); *see generally* Gary E. Kalbaugh, *Derivatives Law and Regulation*, Ch. 2.B.4 (3d ed. 2019) (discussing the struggle that led to the "Shad-Johnson Accord); see also Dkt. 31.1, at 39–40.

[14] *See* Lynn A. Stout, *Uncertainty, Dangerous Optimism, and Speculation: An Inquiry into Some Limits of Democratic Governance*, 97 Cornell L. Rev. 1177, 1199 (2012) (stating "derivatives contracts have been used to wager on market phenomena for millennia."); Christopher L. Culp, *Risk Transfer: Derivatives in Theory and Practice* 26 (2004) ("Senator Arthur Capper, a sponsor of the Grain Futures Act regulating futures markets in 1921, referred to the Chicago Board of Trade as a 'gambling hell' and 'the world's greatest gambling house.'"); id. at 27 ("In the 1990s, politicians trained their sights on OTC derivatives like swaps following the widely publicized losses . . . . Representative Henry Gonzalez characterized swaps activity as a 'gambling orgy' in the business world. He criticized the very names of the products—'swaps, options, swaptions, futures, floors'—as nothing more than 'gambler's language.'").

[15] *See Bd. of Trade of City of Chicago v. Christie Grain & Stock Co.*, 198 U.S. 236, 246 (1905); *Gatewood v. State of N. Carolina*, 203 U.S. 531, 536 (1906).

[16] *See* 156 Cong. Rec. S5902-01, S5906; *N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, No. 2:25-CV-00978-APG-BNW, 2025 WL 2916151, at *10 (D. Nev. Oct. 14, 2025) ("*Crypto*").

*Markets* 2 (3d ed. 2013); Dkt. 43.1, at 6. The "value of [a derivative] is derived from the value of an underlying asset." Gary E. Kalbaugh, *Derivatives Law and Regulation* 8 (3d ed. 2019). Derivatives allocate future uncertainty in markets by transferring risk across market participants and facilitate price discovery in the face of future uncertainty. *See generally* McDonald, *Derivatives Markets* (3d ed. 2013).

The distinction between derivatives and gambling is that derivatives quintessentially *mitigate external risk* and the value of a derivative is proportionate to the risk mitigated, while gambling *manufactures risk internally* through a game of chance and the value reflects the probability (odds) of winning or losing. Gambling, thus, is antithetical to the primary economic, financial, and commercial purpose of derivatives: risk-mitigation. *See generally* Christopher L. Culp, *Risk Transfer: Derivatives in Theory and Practice* (2004).

In enacting the Dodd-Frank Amendments to the CEA, Congress sought to bring unregulated "swaps" within the regulation of the CEA[17] and, in so doing, enacted the "Special Rule," 7 U.S.C. § 7a-2(c)(5)(C), which can only be interpreted to authorize the CFTC to prohibit "gaming" contracts, because PAPSA, 28 U.S.C. §§ 3701–3704, generally prohibited sports gambling nationwide. In 2011, the CFTC exercised its authority in the Special Rule and promulgated 17 C.F.R. 40.11(a),

---

[17] *See generally* Kalbaugh, *Derivatives Law and Regulation*, Ch.2.E.2–3 (3d ed. 2019) (discussing the financial crisis of 2007–2009 and the subsequent Dodd-Frank Amendments).

which prohibited DCMs from listing event contracts/swaps related to "gaming." *See KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 3286282, at \*9 (D. Nev. Nov. 24, 2025). Significantly, Kalshi does not refute this—Kalshi does not address § 40.11(a) in its Answer, except to admit that 40.11(a) "generally bars DCMs from offering contracts involving 'gaming.'" Dkt. 43.1 at 50. Kalshi attempts to evade this "blanket" prohibition[18] by claiming that the CFTC has "discretion to permit such contracts on a case-by-case basis." *See* Dkt. 43.1 at 50. This evasive maneuver fails. Kalshi's admission that the CFTC generally prohibits listing contracts that relate to gaming ends the analysis. The prohibition is mandatory: "A registered entity **shall not list** for trading . . . [any] agreement, contract, transaction, or swap . . . that **involves**, **relates** to, or **references** . . . gaming . . . ." 17 C.F.R. § 40.11(a) (emphasis added). The burden to refrain from listing vests with the registered DCM, Kalshi, not with the CFTC.[19]

Contrary to Kalshi's suggestion that the CFTC may, notwithstanding § 40.11(a), "permit such [gaming] contracts on a case-by-case basis" pursuant to § 40.11(c), Dkt.43.1, at 50, Kalshi's interpretation runs afoul of the federal prohibition of sports gambling nationwide through PAPSA, and within Indian country, 18

---

[18] *Crypto*, 2025 WL 2916151, at \*10.

[19] Kalshi has, and always had, an adequate available remedy for seeking CFTC approval. *See* 17 C.F.R. § 40.3. The argument that Kalshi's contracts are lawful by way of § 40.2 self-certification unless the CFTC determines otherwise under § 40.11(c), thus, rewrites the Special Rule, 7 U.S.C. 7a-2(c)(5)(C) and § 40.11(a). *See, e.g.*, *Hendrick*, 2025 WL 3286282, at \*9.

U.S.C. § 1166, both of which were valid law in 2010 when Dodd-Frank was enacted. To the extent that there is any ambiguity in the Special Rule and the regulations, it is resolved by 156 Cong. Rec. S5902-01, S5906, and Congress's intent to "prevent the creation of futures and swaps markets that would allow citizens to profit from . . . gambling through futures markets." Congress specifically mentioned "the Super Bowl, the Kentucky Derby, and Masters Golf Tournament" as examples of impermissible sports gambling. *Id*. at S5907.

Kalshi attempts to exploit the use of "may determine" in § 7a-2(c)(5)(C) and § 40.11(c), but as the Ninth Circuit held in *Chicken Ranch*, "'may' can be limiting, meaning '*may only*.'" *Chicken Ranch*, 42 F.4th at 1034 (original emphasis). In other words, "the Commission may [only] determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve . . . gaming [or] similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." § 7a-2(c)(5)(C); § 40.11(a); *see, e.g.*, *Hendrick*, 2025 WL 3286282, at *9. Contrary to the District Court's observation, Kalshi has not discovered "a way around prohibitions on interstate gambling," Kalshi is simply violating the law. ER-014.

Kalshi also attempts to obscure the definition of event contracts by isolating the definition to 7 U.S.C. § 1a(47)(A)(ii), when § 1a(47)(A) generally provides that event contracts are limited by the traditional purposes of derivatives, namely,

19

external risk management and price discovery. Thus, attenuated commercial impacts on sports stadiums, hotels, restaurants, transportation providers, and retailers are not affected by the *outcome* of a sports event or contingencies within a sports event (such as whether a player exceeds *x* number of points), but, rather, by whether the sports event occurs or not, which is determined well in advance. Consumers, for example, book hotels in anticipation of sports events, not based on the outcome. *See Hendrick*, 2025 WL 3286282, at *6. Such downstream externalities depend on the occurrence of a sporting event, not the outcome.

In sum, Kalshi attempts to persuade the Court that the CEA and the CFTC can regulate sports gambling through a DCM, when that proposition is antithetical to the purpose of Dodd-Frank. If Kalshi is correct, then it is incumbent upon this Court to define the scope of the field of the CEA and IGRA. If the CEA contemplates nationwide sports betting on a DCM, then the Court must harmonize the CEA and IGRA and define the roles of the respective statutory regimes and regulatory roles of the CFTC and the Tribes, States, the Department of the Interior, and the National Indian Gaming Commission. If the CEA does not contemplate nationwide sports gambling on DCMs, then the Court must find that Kalshi has subjected itself to regulation pursuant to IGRA and the Tribes' Compact and Procedures, and must find that the Tribes have the authority to enjoin unauthorized class III gaming not conducted in conformance with their Compact, Procedures, and IGRA, under §

20

2710(d)(7)(A)(ii).

## II. THE TRIBES ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR LANHAM ACT CLAIM.

### A. Kalshi's Opposition relies on a characterization of its product not reflected in the advertisements.

Kalshi asserts (at 53-54, Dkt. 43.1) that its advertisements concerning the legality of its sports betting are a non-actionable statement of opinion. That response fails for a straightforward reason: it does not confront the plain language of the advertisements—that "Sports Betting [is] Legal in all 50 States on Kalshi." Instead, Kalshi reframes its product, when it is convenient to do so, as trading in "sports event contracts" on a DCM and argues that such activity is permissible under the CEA. But the advertisements do not say "sports event contract swaps legal in all 50 states on Kalshi, a designated contract market." The ads state that "sports betting" is legal in all 50 states on Kalshi. Kalshi cannot have it both ways.

Importantly, Kalshi has already told this Court in related litigation that it expressly rejects any equivalence between its products and "sports bets," explaining: "Nor does it follow from treating Kalshi's sports contracts as swaps that run of the mill sports bets must also be swaps." *KalshiEx, LLC v. Hendrick*, No. 25-7516, Appellant's Opening Br. at 61-62 (9th Cir. filed Dec. 26, 2025). With this, Kalshi stated that "The Commodity Futures Trading Commission has explained that derivatives such as swaps, unlike sports bets, are 'traded on organized markets and over the counter' . . . [b]ut 'consumer and commercial transactions' that 'are not

21

traded on an organized market or over-the-counter'—such as sports bets—are not."
*Id.* (citing 77 Fed. Reg. 48,208, 48,217, 48,247 (Aug. 13, 2012)). In other words, in briefing to this Court, Kalshi has taken the position that "sports bets" are categorically different from the exchange-traded instruments it offers. Kalshi cannot now tell this Court that "sports bets" are fundamentally distinct from its DCM-traded contracts, while simultaneously telling consumers that what it offers is "sports betting" that is legal in all 50 states.

To the extent Kalshi does address the "betting" aspect of its statement, it does so only indirectly and incorrectly. Dkt. 43.1, at 54. Kalshi suggests that "betting" can be understood in a loose or colloquial business sense, including in investment contexts. But the advertisements do not use "betting" in the abstract. It uses the full term "sports betting"—a term that refers to a specific, heavily regulated form of gambling activity. As recognized in *Murphy v. NCAA*, 584 U.S. 453, 486 (2018), "Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." With respect to Indian tribes, Congress has ensured that state gambling prohibitions apply with full force in Indian country by incorporating them into federal law. *See* 18 U.S.C. § 1166; *see also* Cal. Penal Code § 337a. Thus, conduct that qualifies as "sports betting" under state law is not uniformly lawful nationwide, and Kalshi cannot avoid that conclusion by recharacterizing its product as something else.

Kalshi's reliance on cases to demonstrate that "Plaintiffs cannot show bad faith," Dkt. 43.1, at 60, reflects the same departure from the language of the advertisements. Kalshi emphasizes that "multiple courts have agreed" with its interpretation of the CEA and asserts that there was ample basis for its good-faith belief in the legality of its offerings under that statute. In doing so, Kalshi again shifts the focus to CEA preemption and designated contract market trading authority, without grappling with the advertisement's description of its product as "sports betting." The cases Kalshi cites—*KalshiEX LLC v. CFTC*, No. 23-cv-3257, 2024 WL 4164694 (D.D.C. Sep. 12, 2024); *KalshiEX LLC v. Flaherty*, No. 25-cv-2152, 2025 WL 1218313 (D.N.J. Apr. 28, 2025); and *KalshiEX LLC v. Orgel*, No.3:25-cv-34, 2026WL 474869 (M.D. Tenn. Feb. 19, 2026)—address whether, and to what extent, state regulators may be preempted from applying state gambling laws to certain event contracts traded on a federally regulated exchange. Critically, they do not engage the separate question presented here: use of the term "sports betting."

And even if those cases are read to support Kalshi's position that its contracts fall within the CEA's regulatory scheme, they address only whether such contracts are permissible to trade on a DCM—and on this point, contrary to Kalshi's assertion that it has "never argued that the CEA prohibits actual 'gaming'-related contracts," Dkt 43.1, at 61, Kalshi has previously argued that "Congress did not want sports betting to be conducted on derivatives markets" and that "Congress sought to prevent

23

exchanges from facilitating casino-style or sports gambling." Appellee's Br. at 41, 45, *KalshiEX LLC v. Commodity Futures Trading Comm'n*, No. 23-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024), dismissed, No. 24-5205, 2025 WL 1349979 (D.C. Cir. May 7, 2025).

### B. The statement that "Sports Betting [Is] Legal in All 50 States On Kalshi" is a statement of fact, not opinion.

Kalshi notes that "statements concerning a product's legality are generally non-actionable statements of opinion" and that, "[a]bsent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact." Dkt. 43.1, at 53; *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999). But Kalshi's reliance on that language rests on a categorical error: it treats a rule about interpretive statements concerning unsettled law as if it governs all advertising claims of legality, regardless of context or content. The challenged statement in *Coastal Abstract* arose in a private business context and turned on a disputed interpretation of whether Coastal's activities fell within a specific provision of California's Financial Code. *Id.* at 729-30. This Court emphasized that, in that setting, the correct application of the statute "was not knowable" at the time, rendering the statement a non-actionable opinion

about unsettled law. *Id.*[20]

Unlike *Coastal Abstract*, the advertisements here do not present an interpretation of the CEA or regulatory authority; instead, they assert a concrete, product-defining fact: that "sports betting" is legal everywhere on Kalshi. This makes legality a key product attribute[21] and factual assertion, analogous to claims regarding a product's horsepower, *InSinkErator, LLC v. Joneca Co., Ltd. LLC*, 163 F.4th 608 (9th Cir. 2025), or whether "software qualifies as malware." *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 69 F.4th 665 (9th Cir. 2023). The inquiry should thus focus on whether the statement makes a "specific and measurable claim" that is "capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Coastal Abstract*, 173 F.3d at 731. Although the Ninth Circuit applied *Coastal Abstract* in *ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 612 (9th Cir. 2016), the advertisements

---

[20] Worth noting, the Supreme Court has addressed a case involving allegations that statements about illegality misrepresented a product's characteristics and a competitor's conduct. *See Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122-23 (2014) (discussing allegations that the defendant falsely represented that certain conduct involving the plaintiff's products was illegal, thereby misleading consumers and the market).

[21] Research and consumer survey data show that perceived legality of betting operations influences whether consumers choose to engage in betting activity. *See* Brandon Mastromartino *et al.*, *Perceived Legality and Online Sports Betting Behavior*, 41 *J. Gambling Stud.* 1703, 1717 (2025) ("Perceived legality also impacts future betting intentions, with participants who consider online sports betting to be legal more inclined to plan future betting activities."); *American Gaming Association*, New Study Finds Sports Bettors Abandoning Bookies for Legal Market, https://www.americangaming.org/new-study-finds-sports-bettors-abandoning-bookies-for-legal-market/ ("Bettors overwhelmingly prefer legal operators, with 74 percent saying it is important to only bet through legal providers.")

there claimed products were "legal" or "DSHEA-compliant," directly tethering the statements to a statutory interpretation not present here.

To the extent this Court applies the rule articulated in *Coastal Abstract* concerning statements purporting to interpret the meaning of a statute or regulation, and contrary to Kalshi's assertion that Plaintiffs do not identify any "clear and unambiguous ruling," Dkt. 43.1, at 54, *Murphy* made clear that sports gambling is a distinct category of activity subject to state-by-state regulation, and that, absent affirmative federal authorization, states retain authority to permit or prohibit it. That framework confirms that the legality of "sports betting" turns on state law, not on uncertain interpretive questions about federal commodities regulation.[22]

### C. Kalshi's reliance on "On Kalshi" does not save the advertisements.

Accepting, *arguendo*, Kalshi's claim that "on Kalshi" is an essential element of the statement, this reading only underscores the falsity of the advertisements. It communicates a legally impossible activity: sports betting on a designated contract market. By definition, a DCM is a venue for trading derivatives contracts under the CEA, not for offering or facilitating sports betting. *Crypto*, 2025 WL 2916151, at *10 (quoting 156 Cong. Rec. S5902-01, S5906 (July 15, 2010)) ("[t]he CFTC's decision to prohibit DCMs from listing gaming contracts is consistent with

---

[22] Any assertion that sports betting is legal in all 50 states is untenable as a matter of federal law as well. Congress has imposed a separate federal regime governing gambling in Indian country, under which unauthorized gambling activity is subject to federal criminal and civil enforcement. *See* 18 U.S.C. § 1166; 25 U.S.C. §§ 2701–2721.

congressional intent to prevent gambling through futures markets"). Kalshi cannot simultaneously rely on Kalshi's CFTC-regulated status and describe the activity in terms that place it outside that regulatory framework. This is especially clear given that Kalshi itself has previously told this Court that its products are not equivalent to "sports bets." *See* Appellant's Opening Br. at 61-62, *KalshiEx, LLC*, No. 25-7516.

## III.    THE DISTRICT COURT DID NOT ADDRESS THE REMAINING *WINTER* FACTORS.

Robinhood's discussion of the remaining *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) factors is misplaced because the District Court denied the motion on likelihood of success on the merits and did not reach irreparable harm, the balance of equities, or the public interest factors. Accordingly, those issues cannot serve as alternative grounds for affirmance where they were not addressed below, and Robinhood's reliance on them exceeds the scope of the District Court's ruling. Should the Court deem further consideration of the remaining *Winter* factors necessary, the Tribes respectfully request that the Court direct supplemental briefing before resolving those issues.

## CONCLUSION

For all the foregoing reasons, the Tribes respectfully request that the District Court's decision be reversed and remanded for further proceedings.

Dated: March 30, 2026          Respectfully Submitted,

By:    /s/ *Lester J. Marston*_____

LESTER J. MARSTON
California State Bar No. 081030
THE LAW OFFICES OF RAPPORT AND MARSTON
AN ASSOCIATION OF SOLE PRACTITIONERS
405 West Perkins Street
Ukiah, California 95482
Telephone: 707-462-6846
Facsimile: 707-462-4235
Email: ljmarston@rmlawoffice.net

*Attorney for Appellants*
*Blue Lake Rancheria, Chicken Ranch Rancheria Of*
*Me-Wuk Indians, And Picayune Rancheria Of The*
*Chukchansi Indians*

28

## CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party. This brief contains 6,997 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6). I certify that this brief complies with the word limit of Cir. R. 32-1.

Dated: March 30, 2026      Respectfully Submitted

By:    /s/ *Lester J. Marston*
       LESTER J. MARSTON
       California State Bar No. 081030
       THE LAW OFFICES OF RAPPORT AND MARSTON
       AN ASSOCIATION OF SOLE PRACTITIONERS
       405 West Perkins Street
       Ukiah, California 95482
       Telephone: 707-462-6846
       Facsimile: 707-462-4235
       Email: ljmarston@rmlawoffice.net

       *Attorney for Appellants*
       *Blue Lake Rancheria, Chicken Ranch Rancheria Of Me-Wuk Indians, And Picayune Rancheria Of The Chukchansi Indians*

## CERTIFICATE OF SERVICE

I am employed in the County of Mendocino, State of California. I am over the age of 18 years and not a party to the within action; my business address is that of Rapport & Marston, 405 West Perkins Street, Ukiah, California 95482.

I hereby certify that I electronically filed the foregoing document(s):

APPELLANTS' REPLY BRIEF

with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate Electronic Filing system on March 30, 2026, which generated and transmitted a notice of electronic filing to Appellate Electronic Filing system registrants.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct; executed on March 30, 2026, at Ukiah, California.

*/s/ Ericka Duncan*
ERICKA DUNCAN