**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| BLUE LAKE RANCHERIA; CHICKEN RANCH RANCHERIA OF ME-WUK INDIANS,<br><br>*Plaintiffs - Appellants*,<br><br>v.<br><br>KALSHI, INC.; KALSHIEX, LLC; ROBINHOOD MARKETS, INC.; ROBINHOOD DERIVATIVES, LLC,<br><br>*Defendants - Appellees*. | No. 25-7504<br><br>D.C. No. 3:25-cv-06162-JSC<br><br>OPINION |

Appeal from the United States District Court
for the Northern District of California
Jacqueline Scott Corley, District Judge, Presiding

Argued and Submitted July 10, 2026
San Francisco, California

Filed September 16, 2026

Before: Mary H. Murguia, Chief Judge, and M. Margaret McKeown and Richard A. Paez, Circuit Judges.

Opinion by Judge McKeown

# SUMMARY*

## Event Contracts / Preliminary Injunction

The panel affirmed in part and reversed in part the district court's order denying a motion for a preliminary injunction filed by two federally recognized tribes, Blue Lake Rancheria and Chicken Ranch Rancheria of Me-Wuk Indians, in their action under the Indian Gaming Regulatory Act ("IGRA") and the Lanham Act against Kalshi, Inc., and other defendants.

The tribes alleged that Kalshi's "event contracts," which pay out if the designated winner prevails in a sports event, were functionally sports bets, and that Kalshi, by offering these contracts on tribal lands, violated IGRA. IGRA allows a tribe to enjoin certain forms of gaming on Indian lands conducted in violation of a compact between a state and the tribe. The tribes also asserted a Lanham Act claim against Kalshi for advertising that "Sports Betting [Is] Legal in all 50 States on Kalshi."

Reversing the district court's denial of a preliminary injunction in part, the panel held that the tribes were likely to succeed in their claims that Kalshi's sports event contracts on tribal lands violated IGRA and the tribes' gaming ordinances. First, the tribes demonstrated that Kalshi's sports events contracts constituted class III gaming activities under IGRA, 25 U.S.C. § 2710(d)(7)(A)(ii). Second, the tribes demonstrated that the contracts were "located on Indian lands" because the users entered into the contracts

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

from tribal territory. Third, the tribes demonstrated that Kalshi was offering the contracts in violation of the tribes' secretarial procedures, which treat class III gaming as lawful only when tribally authorized and conducted through the tribal regulatory structure. Because the secretarial procedures in this case depended on and incorporated the tribes' ordinances, and Kalshi's sports event contracts were not authorized by those ordinances, Kalshi's contracts were also in violation of the compact between the tribes and the State of California.

The panel held that IGRA was not displaced by the Unlawful Internet Gambling Enforcement Act ("UIGEA"), which makes it illegal for a person engaged in the business of betting or wagering to knowingly accept financial payments from an individual engaged in unlawful internet gambling. UIGEA carves out from the definition of bet or wager any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under Commodity Exchange Act ("CEA"), such as Kalshi's event contracts. The panel held that the best reading of the two interrelated statutes is that IGRA provides a cause of action to enjoin class III gaming activities conducted improperly and at least in part on Indian lands, while UIGEA governs payments connected to unlawful internet gambling.

The panel also held that the CEA's "exclusive" jurisdiction did not extend to Kalshi's sports event contracts. The panel concluded that the CEA and IGRA address two different questions. The CEA gives the Commodity Futures Trading Commission jurisdiction over covered derivatives trading on designated contract markets, while IGRA governs class III gaming activity located on Indian lands.

The panel affirmed the district court's conclusion that a lay opinion about the contracts' legality could not support a Lanham Act claim.

Because the panel concluded that the tribes were likely to prevail on their claims under IGRA, it remanded as to that claim with instructions to reach the remaining factors for evaluating the tribes' motion for a preliminary injunction.

## COUNSEL

Lester J. Marston (argued), Nicholas Marston, and John Bursick, Rapport and Marston, Ukiah, California, for Plaintiffs-Appellants.

Antony L. Ryan (argued), Kevin J. Orsini, and Brittany L. Sukiennik, Cravath Swaine & Moore LLP, New York, New York; Grant R. Mainland (argued), Davis B. Campbell, and Karen Wong, Milbank LLP, New York, New York; William E. Havemann, Olivia S. Choe, and Joshua B. Sterling, Milbank LLP, Washington, D.C.; Dylan M. Silva and Christopher C. Wheeler, Farella Braun & Martel LLP, San Francisco, California; Mark R. Conrad, Conrad Metlitzky Kane LLP, San Francisco, California; Mark M. Rothrock, Lehotsky Cohn LLP, Raleigh, North Carolina; Mithun Mansinghani, Lehotsky Keller Cohn LLP, Oklahoma City, Oklahoma; for Defendants-Appellees.

Joseph H. Webster, Elizabeth A. Bower, and Jens W. Camp, Hobbs Straus Dean & Walker LLP, Washington, D.C.; Michael Hoenig, Yuhaaviatam of San Manuel Nation, Washington, D.C.; Scott Crowell, Crowell Law Office, Tribal Advocacy Group PLLC, Sedona, Arizona; for Amici Curiae Indian Gaming Association, National Congress of American Indians, California Nations Indian Gaming

Association, Arizona Indian Gaming Association, Minnesota Indian Gaming Association, Washington Indian Gaming Association, Oklahoma Indian Gaming Association, United South and Eastern Tribes Sovereignty Protection Fund, Native American Finance Officers Association, San Manuel Gaming and Hospitality Authority, and 15 Federally Recognized Tribes.

Kevin F. King, Thomas Brugato, Matthew J. Glover, Scott Garfing, and Eli Nachmany, Covington & Burling LLP, Washington, D.C., for Amicus Curiae American Gaming Association.

Louisa Castrucci, Alda Chan, Frances Cohen, and Joshua R. Edlin, Assistant Attorneys General; Gerard J. Cedrone, Deputy State Solicitor; Jared Rinehimer, Chief, Privacy & Responsible Technology Division; M. Patrick Moore, First Assistant Attorney General; Andrea J. Campbell, Massachusetts Attorney General; Office of the Massachusetts Attorney General, Boston, Massachusetts; Noel Fischer, Supervising Deputy Attorney General; Christine Williams, Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, Oakland, California;

Dave Yost, Ohio Attorney General, Office of the Ohio Attorney General, Columbus, Ohio; Matthew J. Platkin, New Jersey Attorney General, Office of the New Jersey Attorney General, Trenton, New Jersey; Steve Marshall, Alabama Attorney General, Office of the Alabama Attorney General, Montgomery, Alabama; Raúl R. Labrador, Idaho Attorney General, Office of the Idaho Attorney General, Boise, Idaho; Tim Griffin, Arkansas Attorney General, Office of the Arkansas Attorney General, Little Rock, Arkansas; Theodore E. Rokita, Indiana Attorney General,

Office of the Indiana Attorney General, Indianapolis, Indiana; Kristin K. Mayes, Arizona Attorney General, Office of the Arizona Attorney General, Phoenix, Arizona; Brian L. Schwalb, District of Columbia Attorney General, Office of the District of Columbia Attorney General, Washington, D.C.; Kathleen Jennings, Delaware Attorney General, Office of the Delaware Attorney General, Wilmington, Delaware; Kwame Raoul, Illinois Attorney General, Office of the Illinois Attorney General, Chicago, Illinois; Kris W. Kobach, Kansas Attorney General, Office of the Kansas Attorney General, Topeka, Kansas; Liz Murrill, Louisiana Attorney General, Office of the Louisiana Attorney General, Baton Rouge, Louisiana; Anthony G. Brown, Maryland Attorney General, Office of the Maryland Attorney General, Baltimore, Maryland; Keith Ellison, Minnesota Attorney General, Office of the Minnesota Attorney General, St. Paul, Minnesota; Brenna Bird, Iowa Attorney General; Office of the Iowa Attorney General, Des Moines, Iowa; William Tong, Connecticut Attorney General, Office of the Connecticut Attorney General, Hartford, Connecticut; Lynn Fitch, Mississippi Attorney General, Office of the Mississippi Attorney General, Jackson, Mississippi; Raúl Torrez, New Mexico Attorney General, Office of the New Mexico Attorney General, Santa Fe, New Mexico; Dan Rayfield, Oregon Attorney General, Office of the Oregon Attorney General, Salem, Oregon; Charity R. Clark, Vermont Attorney General, Office of the Vermont Attorney General, Montpelier, Vermont; Marty Jackley, South Dakota Attorney General, Office of the South Dakota Attorney General, Pierre, South Dakota; Jeff Jackson, North Carolina Attorney General, Office of the North Carolina Attorney General, Raleigh, North Carolina; Derek E. Brown, Utah Attorney General, Office of the Utah Attorney General, Salt

Lake City, Utah; Nicholas W. Brown, Washington Attorney General, Office of the Washington Attorney General, Olympia, Washington; Michael T. Hilgers, Nebraska Attorney General, Office of the Nebraska Attorney General, Lincoln, Nebraska; Aaron D. Ford, Nevada Attorney General; Office of the Nevada Attorney General, Las Vegas, Nevada; for Amici Curiae Massachusetts, California, 25 Other States, and the District of Columbia.

Tyler R. Green, Conor D. Woodfin, and Olivia C. Rogers, Consovoy McCarthy PLLC, Salt Lake City, Utah, for Amicus Curiae Paradigm Operations LP.

---

## OPINION

McKEOWN, Circuit Judge:

Say you live in California and want to wager whether the San Francisco Giants will win on Sunday. In California, where sports betting is illegal, you can't place your bet. Instead, you might try to buy an "event contract" keyed to that outcome in the now burgeoning national prediction markets. We must decide whether that transaction is illegal on tribal land where the state and the tribe have not sanctioned sports betting.

This interlocutory appeal centers on a suit brought by two federally recognized tribes, Blue Lake Rancheria ("Blue Lake") and Chicken Ranch Rancheria of Me-Wuk Indians

("Chicken Ranch") (together, "the Tribes"),[1] against Kalshi Inc., and KalshiEX LLC, (together, "Kalshi"), and against Robinhood Markets, Inc., and Robinhood Derivatives LLC (together, "Robinhood"). Kalshi operates a federally regulated derivatives exchange, and Robinhood acts as a retail distributor for Kalshi's products.

The contracts challenged here turn on the outcome of sports events. A customer picks one side of a binary outcome. The contract pays out if the designated winner—say, the San Francisco Giants—prevails, and expires worthless if it does not. Kalshi calls the transaction an "event contract." The Tribes say that these contracts are functionally sports bets and that Kalshi, by offering them on tribal lands, violates the Indian Gaming Regulatory Act ("IGRA"). IGRA allows a tribe to enjoin certain forms of gaming on Indian lands conducted in violation of a compact between the state and the tribe or procedures adopted by the Secretary of the Interior that stand in a compact's place. The tribes also assert a Lanham Act claim against Kalshi for advertising that "Sports Betting [Is] Legal in all 50 States on Kalshi."

Reasoning that Kalshi is not bound by any tribal compact or procedure, the district court denied the tribes' preliminary injunction motion. The court reasoned that the challenged transactions do not occur on Indian lands; that the Unlawful Internet Gambling Enforcement Act ("the UIGEA") controls Kalshi's conduct; and that the UIGEA does not govern Kalshi's event contracts because those contracts are regulated by the Commodity Exchange Act ("the CEA").

[1] A third tribe, Picayune Rancheria of the Chukchansi Indians, was dismissed without prejudice from this appeal after oral argument, pursuant to a joint stipulation between the parties. Dkt. Nos. 80, 83.

The court also rejected the Tribes' Lanham Act claim because it saw Kalshi's advertisement as a nonactionable opinion about legality.

We reverse the denial of the preliminary injunction because the Tribes are likely to succeed in their claims that Kalshi's event contracts on tribal lands violate IGRA and the Tribes' gaming ordinances. We affirm the district court's conclusion that a lay opinion about the contracts' legality cannot support a Lanham Act claim. We therefore affirm in part, reverse in part, and remand.

## Background

### I. IGRA's Exclusivity Regime

IGRA provides "a framework for regulating gaming on Indian lands." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 785 (2014). In so doing, the statute seeks "to strike a delicate balance between the sovereignty of states and federally recognized Native American tribes." *Pauma Band of Luiseno Mission Indians v. California*, 813 F.3d 1155, 1160 (9th Cir. 2015). That delicate balance ideally results from tribes and states negotiating rules about gaming on Indian lands with the imprimatur of the federal government. IGRA specifically confers upon "Indian tribes 'the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming.'" *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1031 (9th Cir. 2022) (quoting 25 U.S.C. § 2701(5)).

As relevant here, IGRA creates three classes of gaming. Class I gaming describes "social games solely for prizes of

minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations," 25 U.S.C. § 2703(6), and its regulation remains exclusively within the jurisdiction of the Indian tribes, *id.* § 2710(a)(1).

Class II gaming describes "the game of chance commonly known as bingo" and "card games that . . . are explicitly authorized by [state] law[]" or "not expressly prohibited by" it. *Id.* § 2703(7)(A). *Excluded* from Class II gaming are "banking card games" such as "baccarat, chemin de fer, or blackjack" and "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind." *Id.* § 2703(7)(B). Regulation of Class II gaming is left within tribal jurisdiction but subject to federal-state regulation as set forth in IGRA. *Id.* § 2710(a)(2).

The term "class III gaming" describes "all forms of gaming that are not class I gaming or class II gaming," *id.* § 2703(8). By way of example, "blackjack, baccarat, slot machines, and parimutuel horse-wagering" are class III games. *Chicken Ranch*, 42 F.4th at 1031.

Class III gaming is special. At the core of California's compacts with Indian tribes lies "the exclusive right to conduct . . . Las Vegas-style class III gaming, free from non-tribal competition." *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 723 (9th Cir. 2003) (quoting *In re Indian Gaming Related Cases* ("*Coyote Valley II*"), 331 F.3d 1094, 1104 (9th Cir. 2003)). IGRA specifically regulates Class III gaming "activity," *see e.g.*, 25 U.S.C § 2710(d)(3)(C)(i) (emphasis added), and the word "activity" "means just what it sounds like—the stuff involved in playing class III games." *Bay Mills*, 572 U.S. at 792. We have acknowledged that Class III gaming is

"lucrative," *Artichoke Joe's*, 353 F.3d at 723, and that it provides "a source of substantial revenue" for tribes, *Coyote Valley II*, 331 F.3d at 1097 (citation modified). Small wonder, then, that class III gaming has become "the lifeblood on which many tribes have come to rely." *Chicken Ranch*, 42 F.4th at 1032 (citation modified); *see also* 25 U.S.C. § 2702(1) ("The purpose of [IGRA] is to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments."); *San Manuel Indian Bingo & Casino v. NLRB*, 475 F.3d 1306, 1308 (D.C. Cir. 2007) ("As a result of [its] [c]asino . . . the [San Manuel Band of Serrano Mission Indians] can now boast full employment, complete medical coverage for all members, government funding for scholarships, improved housing, and significant infrastructure improvements to the reservation."). Because the Tribes' rancherias lie within the geographic boundaries of California, which permits class III gaming, they retain the exclusive authority to regulate class III gaming on their lands subject to IGRA's requirements.

## II. Compacts and Secretarial Procedures Under IGRA

Under IGRA, class III gaming on Indian lands must be "conducted" pursuant to "a Tribal-State compact," 25 U.S.C. § 2710(d)(3)(A)–(B), or "procedures" "prescribe[d]" by the Secretary of the Interior, *id.* § 2710(d)(7)(B)(vii). The purpose of those instruments is, in part, to "prescribe[] rules for operating gaming." *Bay Mills*, 572 U.S. at 785. Class III gaming activities are "lawful on Indian lands *only if*" they are "authorized by an ordinance or resolution" adopted by the host tribe, "located in a State that permits [class III] gaming," and "conducted in conformance with a Tribal-State compact." 25 U.S.C. § 2710(d)(1)(A)–(C) (emphasis

added). Among other things, IGRA permits the compact to "include provisions" that relate to "the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of [class III gaming] activity," *id.* § 2710(d)(3)(C)(i), and "remedies for breach of contract," *id.* § 2710(d)(3)(C)(v). Congress chose compacts as "the best mechanism to assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises." *Artichoke Joe's*, 353 F.3d at 726 (quoting S. Rep. No. 100–446, at 13 (1988)).

But Congress was also "clear-eyed that state involvement could turn decidedly uncooperative." *Chicken Ranch*, 42 F.4th at 1032. A system in which tribes depend on "state compact approval" could leave gaming—often the keystone of the tribal treasury—"at the potential mercy of the states, which could withhold approval . . . or insist upon onerous compact conditions." *Id.* Chicken Ranch and Blue Lake discovered the burdens of that system when their compact negotiations with California failed. *See Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 65 F.4th 1145, 1147 (9th Cir. 2023). But IGRA does not leave tribes without recourse in such a situation. Congress required states to "negotiate . . . in good faith," 25 U.S.C. § 2710(d)(3)(A), and built a meaningful backstop against interminable negotiations.

To effectuate this backstop, Congress specifically wrote into IGRA a series of remedial provisions, which take effect if a tribe sues in federal district court and the court finds that the state has failed to negotiate in good faith. Those remedial provisions require the court to "order the State and Indian tribe to conclude . . . a compact within a 60-day period." *Id.* § 2710(d)(7)(B)(iii) (footnote omitted). If the parties fail to

reach an agreement, they must "each submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact." *Id.* § 2710(d)(7)(B)(iv). That mediator must then "select from the two proposed compacts the one which best comports with" IGRA, other federal law, and the district court's findings and order. *Id.* If the state still does not consent to the compact, the "Secretary [of the Interior] shall prescribe, in consultation with the Indian tribe, procedures which are consistent with the proposed compact selected by the mediator," IGRA, and state law, and "under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction." *Id.* § 2710(d)(7)(B)(vii)(I)–(II). These procedures constitute "the final remedy for a state's refusal to negotiate" and are "functionally equivalent" to compacts. *Stand Up for California! v. U.S. Dep't of Interior*, 959 F.3d 1154, 1159–60 (9th Cir. 2020).

## III. The Tribes and Their Gaming Regimes

Blue Lake is the beneficial owner of the Blue Lake Rancheria, which consists of approximately 26 acres of trust and fee lands located within the exterior boundaries of the Blue Lake Reservation in Humboldt County, California. Chicken Ranch is the beneficial owner of the Chicken Ranch Rancheria, which consists of approximately 40 acres of trust and fee lands located within the exterior boundaries of the Rancheria in Tuolumne County, California.

Both Blue Lake and Chicken Ranch earlier conducted gaming activities on their rancherias[2] under a 1999 compact

[2] The term "rancheria" describes the "numerous small Indian reservations or communities in California, the lands for which were purchased by the Government (with Congressional authorization) for Indian use from time to time in the early years of the twentieth century—

with California that "gave Indian tribes in California the exclusive right to host" class III gaming. *Chicken Ranch*, 42 F.4th at 1029–30. The compact was set to expire at the end of 2020, but the Tribes and California agreed to extend it through 2023. *Id.* at 1030. The negotiations stalled because California "for years demanded" that the Tribes agree to "family law, environmental regulation, and tort law" provisions "unrelated to the operation gaming activities." *Id.* at 1029. The Tribes sued in federal district court, and on appeal we held that California had failed to negotiate successor compacts in good faith. *See id.* at 1049. Consistent with IGRA's remedial process, a court-appointed mediator selected the Tribes' "best and final" proposal for a compact, to which California declined to consent. *Id.* at 1030. IGRA then required the Secretary of the Interior to prescribe for each Tribe procedures that would function as the equivalent of a compact with the state. *See* 25 U.S.C. § 2710(d)(7)(B)(vi)–(vii).

The Tribes now conduct gaming pursuant to IGRA, those 2024 secretarial procedures,[3] and gaming ordinances

---

a program triggered by an inquiry (in 1905–06) into the landless, homeless or penurious state of many California Indians." *Big Lagoon Rancheria v. California*, 789 F.3d 947, 951 n.2 (9th Cir. 2015) (en banc), *as amended on denial of reh'g*, (July 8, 2015) (citation modified).

[3] *See* U.S. Dep't of the Interior, *Class III Gaming Secretarial Procedures for the Blue Lake Rancheria, California* 9 (Jan. 31, 2024), https://www.bia.gov/sites/default/files/dup/assets/as-ia/oig/pdf/508_compliant_2024.01.31_blue_lake_rancheria_secretarial_procedures.pdf; [https://perma.cc/YQV5-HN45]; U.S. Dep't of the Interior, *Class III Gaming Secretarial Procedures for the Chicken Ranch Rancheria of Me-Wuk Indians of California* 9 (Jan. 31, 2024), https://www.bia.gov/sites/default/files/dup/assets/as-ia/oig/pdf/508_compliant_2024.01.31_chicken_ranch_rancheria_secretarial_procedures.pdf; [https://perma.cc/L5U5-2AS6].

promulgated under the procedures. The Tribes take the position that Kalshi's event contracts amount to illegal class III gaming because no compact or secretarial procedure authorizes any nontribal entity to offer sports event contracts on their lands.

## IV. Kalshi and Its Gambit

KalshiEX LLC is a derivatives exchange licensed by the Commodity Futures Trading Commission ("the Commission"). The company operates as a designated contract market ("DCM") through which users take a position on the likelihood of future events by buying and selling derivatives that Kalshi styles as "event contracts." A derivative is a financial instrument whose value is determined by the price of something else. Gary E. Kalbaugh, *Derivatives Law and Regulation* 8 (3d ed. 2019). A swap is a type of derivative whose execution can depend "on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Picking up on the broad statutory definition of a "swap," Kalshi contends that its event contracts are swaps "based on the occurrence of real-world events such as elections and sports matches." The event contracts challenged in this appeal pay out based on the outcomes of sporting events.

Robinhood Markets, Inc., owns Robinhood Derivatives LLC, a Commission-registered futures commission merchant authorized to accept event contract orders from intermediary DCMs like Kalshi. Robinhood and Kalshi have partnered to allow users located nearly anywhere in the United States to enter into event contracts.

Case: 25-7504, 09/16/2026, DktEntry: 89.1, (16 of 38)



Sports betting is legal in many states, *see, e.g.*, Nev. Rev. Stat. §§ 463.245(2); 465.086, 465.092, but not in California, *see* Cal. Penal Code § 337a(a)(6). The following graphic illustrates the comparison between a sportsbook offering and Kalshi. The top half shows odds offered for an NFL game on a state-regulated online sportsbook in a state where sports betting is legal, such as in Nevada; the bottom half of the graphic shows odds offered on Kalshi for the same game. Both use the same format and nearly mirror each other. *See* Ben Blatt & Amy Fan, *Is Sports Betting Illegal in Your State? Not If You Call It a 'Prediction Market.'*, N.Y. Times (Oct. 5, 2025), [https://perma.cc/88XN-W2AX.]




Users can also create custom parlays, which Kalshi calls "combos," that stack multiple predictions on the same game.

For example, a person can wager that the San Francisco 49ers will win by more than 4.5 points, that the game's combined score will exceed 49.5 points, and that Brock Purdy will pass for over 200 yards. Trading data suggests that up to 90 percent of Kalshi's trading volume comes from sports. Dan Santaromita & Hannah Vanbiber, *Prediction Markets Are Coming to Sports in a Big Way,* N.Y. Times: The Athletic (Dec. 23, 2025), [https://perma.cc/4984-48Y5].

To understand the parties' arguments about the nature of Kalshi's contracts, it is helpful to survey how an entity becomes a DCM.

The Commodity Exchange Act permits entities like Kalshi to become DCMs by proving that they can comply with twenty-three "[c]ore principles" identified in the CEA and Commission regulations. *See* 7 U.S.C. § 7(d); 17 C.F.R. pt. 38. The Dodd-Frank Act added to the CEA a "[s]pecial rule" for the review and approval of event contracts. 7 U.S.C. § 7a-2(c)(5)(C). All authorized DCMs may either self-certify event contracts or can decide to request the Commission's preapproval for a given contract. *Id.* § 7a-2(c); 17 C.F.R. § 40.2(a) (self-certification requirements); 17 C.F.R. § 40.3 (preapproval rules). The Commission can prohibit event contracts that "involve . . . gaming" if it finds they "are contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i)(V). The self-certified contracts go forward unless the Commission steps in. *See id.* § 7a-2(c)(1).

The CEA provides the Commission with "exclusive jurisdiction" to regulate DCMs. *Id.* § 2(a)(1)(A). What "exclusive" means in this context is subject to much disagreement both among the litigants and in other proceedings. *See, e.g.*, *KalshiEX, LLC v. Assad*, --- F.4th ---, 2026 WL 2543846, at *15 (9th Cir. Aug. 28, 2026)

(Kalshi's "sports event contracts are likely not swaps under the CEA" and are thus not subject to the Commission's exclusive jurisdiction); *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 229 (3d Cir. 2026) (the CEA preempts state gaming regulations because Kalshi's event contracts are swaps subject to the Commission's exclusive jurisdiction); *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *3 (6th Cir. Apr. 24, 2026) (per curiam) (assuming without deciding that Kalshi's event contracts are swaps, but denying Kalshi's request for an injunction pending appeal against Ohio's gaming regulator because the question of the Commission's exclusive jurisdiction is "largely in equipoise (if not favoring Ohio)"); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 678 (D. Md. 2025) (the Commission's jurisdiction is exclusive to that of the SEC); *KalshiEX LLC v. Williams*, No. 25-cv-08846, 2026 WL 2017466, at *6–9 (S.D.N.Y. July 13, 2026) (assuming without deciding that Kalshi's event contracts are swaps, but holding that the Commission's exclusive jurisdiction over swap transactions does not preempt state gaming regulation). Notably, none of these cases involves event contracts on tribal lands.

Kalshi first filed a self-certification to trade sports event contracts on January 22, 2025. Those initial sports event contracts allowed buyers to predict the winner of a sport event related to American sports leagues, and took the form of a binary, "yes/no" event contract that posed the question: "Will <team> win <title>?" Commodity Futures Trading Comm'n, *Kalshi Notification Regarding the Initial Listing* (Jan. 22, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01222514045.pdf; [https://perma.cc/8J4A-Z8NH].

In this court, Kalshi studiously wraps its product in the language of derivatives. Its advertising is less coy. The

advertisement that the Tribes challenge in this appeal states that "Sports Betting [Is] Legal in all 50 States on Kalshi."




**Analysis**

In seeking a preliminary injunction, the Tribes must establish that (1) "[they are] likely to succeed on the merits"; (2) "[they are] likely to suffer irreparable harm"; (3) "that the balance of equities tips in [their] favor"; and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). We begin with the likelihood of success on the merits, which we have recognized as "the most important *Winter* factor." *Disney Enters. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (citation modified).

Reviewing de novo the "underlying issues of law" immanent in the district court's denial of the preliminary injunction, *Norbert v. City & County of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021) (citation modified), we conclude that the Tribes are likely to prevail on their IGRA claim.

## I. The Tribes' IGRA Claim

The sports event contracts challenged in this appeal likely violate the Tribes' gaming ordinances, which the Tribes were required to enact for their secretarially approved gaming regimes to take effect. Violation of an ordinance is tantamount to a violation of a Tribe's secretarial procedures.

This appeal concerns IGRA subsection 2710(d)(7)(A), which provides that:

> The United States district courts shall have jurisdiction over—
>
> > . . .
> >
> > (ii) any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under paragraph (3) that is in effect, and
> >
> > (iii) any cause of action initiated by the Secretary to enforce the procedures prescribed under subparagraph (B)(vii).

25 U.S.C. § 2710(d)(7)(A)(ii)–(iii).

While subsection 2710(d)(7)(A) speaks in jurisdictional terms, the provision does not impose a threshold

"jurisdictional requirement." The Supreme Court has explained that the "general federal-question statute, 28 U.S.C. § 1331, gives a district court subject matter jurisdiction to decide any claim alleging a violation of IGRA." *Bay Mills*, 572 U.S. at 788 n.2. The issue on which this appeal centers, then, is not our jurisdiction, but whether IGRA provides the Tribes with a cause of action against Kalshi. We conclude that it does.

We begin with the established proposition that, once implemented, secretarial procedures are "functionally equivalent" to compacts. *See Stand Up*, 959 F.3d at 1160; *accord Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 462, 469–70 (2d Cir. 2013) (analyzing *secretarial procedures* vis-à-vis *compact* topics listed in subsection 2710(d)(3)(C)(iii)). Although the Secretary is empowered to bring suit under subsection 2710(d)(7)(A)(iii) to "enforce" secretarial procedures, that provision does not circumscribe the Tribes' ability to sue to "enjoin a class III gaming activity" under subsection 2710(d)(7)(A)(ii). It is therefore hardly surprising that no court of appeals has adopted Kalshi's narrow view that only the Secretary of the Interior has a cause of action to enforce secretarial procedures.[4] Rather, subsection 2710(d)(7)(A)(iii) gives the

[4] Such an interpretation would reward a state that refuses to negotiate with a tribe by denying that tribe a cause of action where it would otherwise exist. As we explained in *Stand Up*, that interpretation "reads out of existence" the qualifying phrase "only if" in subsection 2710(d)(1) and makes a "nullity" out of 18 U.S.C. § 1166, which criminalizes "gambling activities on Indian lands who would have been subject to criminal liability by the state if the activities had occurred on state rather than Indian lands." 959 F.4th at 1160 (citation modified). Subsection 2710(d)(7)(A)(ii) thus confers upon tribes a cause of action to enjoin class III gaming activity in violation of implemented secretarial procedures.

Secretary an additional enforcement tool. It neither makes the Secretary the exclusive enforcer of the procedures that she prescribes, nor denies tribes that have no compact a cause of action that is available to the tribes that do.

Satisfied that the absence of a compact does not preclude a cause of action under subsection 2710(d)(7)(A)(ii) when valid secretarial procedures are "in effect," we turn to the provision's plain language.

To demonstrate a likelihood of success on the merits of their IGRA claim, the Tribes must demonstrate that Kalshi's sports event contracts constitute "class III gaming activit[ies]," that the contracts are "located on Indian lands," and that Kalshi is offering them "in violation of" the Tribes' secretarial procedures. 25 U.S.C. § 2710(d)(7)(A)(ii). We consider each element in turn.

### A. Kalshi's Sports Event Contracts Are Class III Gaming.

In our view, the challenged sports event contracts constitute "class III gaming activit[ies]." *Id.* § 2710(d)(7)(A)(ii). IGRA's residual definition of class III gaming as "all forms of gaming that are not class I gaming or class II gaming" sweeps broadly enough to include them. *Id.* § 2703(8). The National Indian Gaming Commission ("NIGC")[5] regulations implementing IGRA also provide that class III gaming includes "*[a]ny* sports betting and parimutuel wagering." 25 C.F.R. § 502.4(c) (emphasis added); *see also Maverick Gaming LLC v. United States*, 123

---

[5] The NIGC is a federal agency that IGRA created within the Department of the Interior, 28 U.S.C. § 2704, to "oversee[] the business of Indian gaming in order to ensure its lasting integrity." *Artichoke Joe's*, 353 F.3d at 716 n.6.

F.4th 960, 975 (9th Cir. 2024) (discussing "sports betting and other class III gaming"); *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1062 (D.C. Cir. 2023) ("Class III gaming . . . includes casino games, slot machines, and sports betting."). And we recently clarified "[t]he *substance* of the sports event contracts offered on Kalshi's DCM is sports gambling, regardless of whether Kalshi calls them swaps." *See Assad*, 2026 WL 2543846, at *10 (emphasis added). The analysis is functional. IGRA does not ask whether the operator labels the product a bet or an event contract, or something else. It asks what the activity looks like. This inquiry reflects the maxim that the words of a statute should carry "their ordinary meaning." *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (citation modified). And the ordinary meaning could not be plainer. *See Gaming*, Black's Law Dictionary (5th ed. 1979) ("An agreement between two or more persons to play together at a game of chance for a stake or wager which is to become the property of the winner, and to which all contribute."). Our conclusion is reinforced by the Department of Interior's compact review regulation, which defines gaming activity as "the conduct of class III gaming involving the three required elements of chance, consideration, and prize or reward." 25 C.F.R. § 293.2(d). These definitions direct attention to the act of play.

In practice, what Kalshi labels "sports event contracts" neatly track the activities described in IGRA and its implementing regulations. The similarities between a sports event contract, which even Kalshi calls "sports betting," and a traditional sports wager are overwhelming. *See Assad*, 2026 WL 2543846, at *10–11. The user pays consideration to take a position, which turns on the uncertain outcome of a sporting event, and the user then receives a reward if the

outcome occurs. Kalshi offers bets on point spreads, over/under game totals, and player propositions. It also permits users to combine these wagers into parlays.

Imagine a user standing on the floor of the Blue Lake Casino Hotel who downloads Kalshi and DraftKings, a classic online sports betting app. On Kalshi, she buys a $100 contract that pays if the San Francisco Giants win. On DraftKings, she wagers $100 on the same outcome. The bettor, the place, the stake, and the contingency remain the same. The only thing that changes is Kalshi's vocabulary.

Kalshi may reshuffle the cards, but it cannot change the hand: Its sports event contracts are class III gaming. Each entry into a sports event contract materially resembles a "roll of the dice and spin of the wheel," "gambling in the poker hall," *Bay Mills*, 572 U.S. at 792, or "parimutuel horse-wagering," *Artichoke Joe's*, 353 F.3d at 715—in short, an "act of placing a bet or wager," *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 967 (9th Cir. 2018). This is the "stuff" of sports betting. *Bay Mills*, 572 U.S. at 792.

### B. Kalshi's Sports Event Contracts Are Located on Indian Lands.

Kalshi's products are also "located on Indian lands" when a user enters into the event contract from tribal territory. 25 U.S.C. § 2710(d)(7)(A)(ii). IGRA does not require that the gaming activity take place exclusively on Indian lands in order to come within its ambit. In harmonizing IGRA with the UIGEA, we have explained that where "the act of placing a bet or wager" takes place in a state that prohibits a form of betting but an online gaming server is located on Indian lands, "the bets are not legal in the jurisdiction where they are *initiated*" and are thus illegal under the UIGEA. *Iipay*, 898 F.3d at 967. The same logic

works in reverse here. Kalshi may be headquartered in New York, and its back-end infrastructure may sit off Indian lands, but a Kalshi consumer can still enter an event contract on Indian lands if she purchases one while on a reservation. *See Bay Mills*, 572 U.S. at 792 (class III gaming "is what goes on in a casino" and not "the off-site licensing or operation of the games"). It follows that "at least some of the 'gaming activity'" challenged here occurs on Indian lands. *Ipay*, 898 F.3d at 967.[6]

### C. Kalshi's Sports Event Contracts Violate the Tribes' Secretarial Procedures.

The Tribes are likely to succeed on the merits of their IGRA claim because they have demonstrated a likelihood that Kalshi's activity on Indian lands is conducted in violation of their secretarial procedures. The statute establishes a "cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact entered into under paragraph (3) that is in effect." 25 U.S.C. § 2710(d)(7)(A)(ii). The object of "enjoin" in subsection

---

[6] Our reading is also consistent with IGRA's implementing regulations for internet gambling occurring on tribal land, such as those that govern a tribe's offering of internet gambling that is accessible on another tribe's lands. IGRA regulations provide that tribes have jurisdiction over internet gaming transactions where the bettor is located on another tribe's lands only if the other tribe has "lawfully consented." 25 C.F.R. § 293.26(c). The rule is similar in other areas of law: Interjurisdictional gaming is allowed only when the bet or wager is legal in both the originating and recipient locales. *See, e.g.*, 18 U.S.C. § 1084(a)–(b) (gambling using wire transmission is criminal offense unless gambling is legal in both state or foreign country where bet originated and was sent); 15 U.S.C. § 3002(3) (defining "interstate off-track wager" as "a legal wager" placed on outcome of a horserace "where lawful in each State involved").

2710(d)(7)(A)(ii) is not a party to a compact or procedure; it is “a class III gaming activity.” Congress limited who may “initiate” an action (tribes and states). *Id.* It also limited which activities may be “enjoin[ed]” (class III gaming activity). *Id.* But it did not limit which entities may be enjoined.

A nonparty’s violation of a gaming ordinance may constitute a violation of a secretarial procedure if that procedure makes compliance with an ordinance part of the terms under which class III gaming may take place. That is precisely the case here. The Chicken Ranch and Blue Lake secretarial procedures treat class III gaming as lawful only when tribally authorized and conducted through the tribal regulatory structure. Because the secretarial procedures in this case depend on and incorporate the Tribes’ ordinances, and Kalshi’s sports event contracts are not authorized by those ordinances, those contracts are also “in violation of” the compact and procedures. *Id.*

Our conclusion flows from IGRA, which requires a federally approved tribal ordinance for the compacted or secretarially approved gaming regime to take effect. If a tribe “proposes to engage in, or to authorize any person or entity to engage in, a class III gaming activity,” the tribal governing body must “adopt and submit to the Chairman [of the NIGC], an ordinance or resolution” that meets IGRA’s requirements. *Id.* § 2710(d)(2)(A). After the NIGC Chairman approves the ordinance and “publish[es] [it] in the Federal Register,” “class III gaming activity on the Indian lands of the Indian tribe [is] fully subject to the terms and conditions of the Tribal-State compact.” *Id.* § 2710(d)(2)(B)–(C). No ordinance means no compacted regime.

The secretarial procedures of Chicken Ranch and Blue Ranch support this conclusion. The procedures exist because, after a failure to negotiate a state-tribal compact, IGRA directed the Secretary of the Interior to prescribe rules "under which class III gaming may be conducted" on the Tribe's lands. *Id.* § 2710(d)(7)(B)(vii)(II). The procedures also describe themselves as the Secretary's "full and complete authorization . . . for the Tribe to conduct class III Gaming Activities on its Indian lands pursuant to IGRA." They further provide that the "Gaming Operation authorized under [them] shall be owned solely by the Tribe or any entity wholly owned or controlled by the Tribe," and that "[a]ll Gaming Activities conducted under th[e] Secretarial Procedures shall, at a minimum, comply . . . with a Gaming Ordinance duly adopted by the Tribe and approved in accordance with IGRA."

The Tribes' statutorily mandated gaming ordinances speak even more forcefully on the subject. The Chicken Ranch ordinance provides that "[a]ll gaming activities on the Rancheria (whether Class I, II, or III) are *prohibited except as expressly authorized* under [the ordinance]." Ord. No. 99-721-1 § 5 (1999) (Chicken Ranch Rancheria of Me-Wuk Indians Tribal Council), https://www.nigc.gov/?wpdmdl=9493&ind=9505; [https://perma.cc/67YY-F88S] *as amended*, Ord No. 99-721-01-A, https://www.nigc.gov/?wpdmdl=9494&ind=9506; [https://perma.cc/W4SA-DK94] (emphasis added). The Blue Lake ordinance contains an identical provision. Ord. No. 2000-___ § 5 (2001), https://www.nigc.gov/?wpdmdl=3428&ind=3430;

[https://perma.cc/3UUG-9JSG] (emphasis added).[7] These regulatory instruments establish a closed system in which class III gaming activity is barred unless tribally authorized and class III gaming not authorized by an ordinance violates the secretarial procedures. IGRA thus confers upon the Tribes a cause of action to enjoin Kalshi's sports event contracts on their lands.

We reject Kalshi's argument that the Tribes' "instruments *cannot* include provisions regulating third parties in light of IGRA's 'strict[]' limitations on what 'topics' a tribal-state compact can address." Regarding topics, IGRA simply provides that a compact or procedure "*may* include provisions relating to" several topics, including "any . . . subjects that are directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C) (emphasis added). In IGRA, "may" means "may only." *See Chicken Ranch*, 42 F.4th at 1035. That "limit on negotiation topics" likely represents a "barrier erected against state overreach": The limitation stops states from demanding "inappropriate concessions from tribes or us[ing] [c]ompacts as a subterfuge for imposing State jurisdiction on tribal lands." *Id.* at 1053 (Wardlaw, J., concurring) (citation modified).

Kalshi's argument is ultimately beside the point. Some topics may be off limits. But the permitted topics bear directly on IGRA's central concerns, because they include ordinances that relate to "the application of the . . . civil laws and regulations of the Indian tribe . . . that are directly

[7] We take judicial notice of both tribal ordinances as public legal enactments capable of accurate and ready determination from official sources. *See N. Cnty. Cmty. All., Inc. v. Salazar*, 573 F.3d 738, 746 n.1 (9th Cir. 2009).

related to, and necessary for, the licensing and regulation of [gaming] activity." 25 U.S.C. § 2710(d)(3)(C)(i). These procedures therefore may—and do—provide for the promulgation of ordinances that apply to nonparties.

At the heart of Kalshi's proposed interpretation of IGRA lies the revisionist view that "Tribal-State compact" means "contract." A contract establishes only the "rules . . . which will govern [the parties'] relationship," and in that sense, permits the parties to "create a mini-universe for themselves." *Erlich v. Menezes*, 21 Cal. 4th 543, 550 (1990) (citation modified). Kalshi reads subsection 2710(d)(7)(A)(ii) as a contract enforcement provision, but Congress chose not to limit IGRA actions to breach of contract claims. *See* 25 U.S.C. § 2710(d)(3)(C)(v) (one of seven topics that a compact may include is "remedies for breach of contract"). A compact certainly has contractual features, and the general rule that a contract cannot bind a nonparty would carry substantial force if the Tribes sought contractual relief from Kalshi. But the Tribes do not seek contractual relief. They seek an injunction against unlawful class III gaming activity that violates the secretarially approved regime on their lands.[8] The remedy sought here—

---

[8] Our decision in *Cabazon Band of Mission Indians v. Wilson* does not compel a contrary result. 124 F.3d 1050 (9th Cir. 1997). That case concerns the topics that a compact may cover, and not the persons to whom or entities to which the compact may apply. California argued in *Wilson* that the tribes violated their compacts by operating slot machines while their compacts only authorized simulcast horse racing. *Id.* at 1059. We rejected that theory because the slot machines were "not mentioned in the [c]ompacts" and so the tribes had not "breached the [c]ompacts." *Id.* at 1060. That decision addresses a state's effort to use compact silence to restrict a tribe's own authority to conduct class III gaming activity. In contrast, the Tribes in this case seek to stop unaffiliated nontribal actors from conducting class III gaming on tribal lands without

that the district court "enjoin" Kalshi's "class III gaming activity"—brings the Tribes' claim squarely within the ambit of IGRA's cause of action provision. *See* 25 U.S.C. § 2710(d)(7)(A)(ii); *cf. Comanche Nation v. Ware,* 174 F.4th 717, 728 (10th Cir. 2026) ("Nothing qualifies 'Indian tribe,' let alone something like 'that is party to the compact.' So under [subsection 2710(d)(7)(A)(ii)]'s plain language, it makes no difference *which* tribe brings suit, only that *some* tribe with standing brings suit.").

Kalshi's view would also put IGRA compacts and procedures in tension with parallel doctrines. An interstate compact, for instance, presents "the legislative means" by which "the age-old treaty making power of independent sovereign nations" has been "adapt[ed] to our Union of sovereign States." *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 104 (1938). Its provisions are "binding upon the citizens of each State." *Id.* at 106; *see also Texas v. New Mexico*, 602 U.S. 943, 949–50 (2024) (an interstate compact may be "contractual in nature," but it is "not just a contract" when federal law gives it legal effect (citation modified)). The same logic applies to IGRA compacts or procedures.

The upshot is that IGRA does not require that a compact or secretarial procedures name nonparties in order to apply to them. As to these parties, the district court's interpretation of subsection 2710(d)(7)(A)(ii) was legally erroneous and does not support the denial of the preliminary injunction.

---

tribal authorization, compact conformity, tribal regulatory approval, or any other form of IGRA-approved relationship. The alleged violation goes to the heart of the gaming regime: who may conduct class III gaming on the Tribes' lands, what tribal approvals must issue, and what controls govern gaming play.

## II. IGRA and the UIGEA

The UIGEA makes it illegal for a "person engaged in the business of betting or wagering" to knowingly to accept financial payments from an individual engaged "in unlawful Internet gambling." 31 U.S.C. § 5363. Unlawful internet gambling occurs when an individual places, receives, or transmits a "bet or wager" by using the Internet, and "where [the] bet or wager is unlawful under any applicable Federal or State law in the State or Tribal lands in which the bet or wager is initiated, received, or otherwise made." *Id.* § 5362(10)(A). The definition of "bet or wager" excludes "any transaction conducted on or subject to the rules of a registered entity or exempt board of trade under the Commodity Exchange Act" such as Kalshi's event contracts. *Id.* § 5362(1)(E)(ii).

This carveout frames Kalshi's main argument, which proceeds down an inferential chain: Kalshi lists its contracts on a Commission-designated exchange, 7 U.S.C.§ 2(e); 17 C.F.R. § 38.1, 38.3(a); the UIGEA excludes any transaction conducted on Commission-designated exchanges because those transactions are subject to the Commission's "exclusive jurisdiction," 7 U.S.C. § 2(a)(1)(A); the UIGEA displaces IGRA as to event contracts; therefore, in Kalshi's telling, if the Tribes "have any ability to challenge the C[ommission's] regulation of Kalshi—which is highly doubtful—[t]he proper vehicle to make such a challenge would be via an Administrative Procedure (APA) action against the C[ommission], not an IGRA lawsuit against Kalshi." Taken to its logical conclusion, this carveout would leave Kalshi's activity on Indian lands outside the federal courts' reach.

Kalshi's argument confers upon the UIGEA a displacing effect that Congress expressly denied it. The statute disavows any intent to "alter[], limit[], or extend[]" existing federal, state and tribal gaming regulations. 31 U.S.C. § 5361(b). It also specifically disavows any intent to "alter[], supersed[e], or otherwise affect[] the application of [IGRA]" in any civil "[p]roceedings" related to "Indian lands." *Id.* § 5365(b)(3)(A)–(B); *accord id.* § 5362(10)(B)(iii)(IV) (a wager does not constitute "unlawful Internet gambling" if it "does not violate any provision of [IGRA]"). We have also recognized that "the UIGEA definitions are not meant to 'alter[ ]' or 'limit[ ]' other laws." *Assad*, 2026 WL 2543846, at *9 n.4. Kalshi's explanation would thus delete a key aspect of the UIGEA, which preserves civil proceedings under IGRA. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute." (citation modified)).

The district court rejected the Tribes' claim that Section 5361(b) prevented application of the UIGEA because they had "not identified any Tribal-State compact provision regulating gambling which the UIGEA, as applied here, alters, limits, or extends." As we have explained, however, a carveout for Commission-regulated transactions from the definition of "bet or wager" would alter or limit the effects of the compact and procedures on the Tribes' land. The UIGEA thus curtails its own applicability.

Our decision in *California v. Iipay Nation of Santa Ysabel* supports this conclusion. In that case, a tribe argued that internet bingo, a class II game, was conducted on Indian lands because the servers and equipment were located on the reservation, even though California patrons placed wagers from outside tribal lands. *Iipay*, 898 F.3d at 961, 967. We

rejected that reasoning because "the act of placing a bet or wager" is equivalent to the act of "gambling in the poker hall." *Id.* at 966–67 (citation modified). That same principle favors the Tribes here. If a patron on Indian lands uses Kalshi to stake money on a sports outcome, the wagering act occurs on Indian lands, even if Kalshi's infrastructure operates elsewhere.

We thus reject the view that "IGRA . . . cover[s] Class III gaming activities that take place exclusively within Tribal lands," whereas the "UIGEA . . . appl[ies] to cover interstate (or state-to-Indian-lands and vice versa) gaming transactions via the internet." That reading cannot bear the weight that Kalshi places upon it. If Kalshi's sports event contracts are not "bets or wagers" for UIGEA purposes because they are on-DCM (as opposed to online) transactions, then the UIGEA may not apply to them. But that conclusion says nothing about whether the same contracts are "class III gaming activity" under IGRA when offered to users on Indian lands. IGRA applies to gaming that occurs at least partially on Indian lands, and UIGEA takes great pains to preserve IGRA's reach. The best reading of these two interrelated statutes is that IGRA provides a cause of action to enjoin class III gaming activities conducted improperly and at least in part on Indian lands, while UIGEA governs payments connected to unlawful internet gambling.

## III. IGRA and the CEA

The CEA's jurisdictional provision states:

> The Commission shall have exclusive jurisdiction . . . with respect to accounts, agreements . . . and transactions involving

> swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title . . . . Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

7 U.S.C. § 2(a)(1)(A).

We recently held in *KalshiEX v. Assad* that Kalshi's "sports event contracts are likely not swaps under the CEA." *See* 2026 WL 2543846 at *15. Because the CEA's exclusive jurisdiction only extends to certain "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery," 7 U.S.C. § 2(a)(1)(A), Kalshi's argument that we lack jurisdiction over the Tribes' IGRA claim fails at the outset. [9]

---

[9] We also "have the authority" interpret the CEA and evaluate its reach. *Assad*, 2026 WL 2543846, at *6; *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024) ("Congress expects courts to handle technical statutory questions."). The Tribes are "not challenging any determination by the C[ommission] about Kalshi's event contracts,"

We note that we would be compelled to reverse even if Kalshi's event contracts were categorized as swaps. In holding that the CEA preserves a private right of action, the Supreme Court has explained that this jurisdictional provision was "intended only to consolidate federal regulation of commodity futures trading in the Commission" and to "separate the functions of the Commission from those of the [SEC] and other regulatory agencies." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 386–87 (1982); *cf. CFTC v. Schor*, 478 U.S. 833, 848–55 (1986) (recognizing a waivable "personal right" to an Article III tribunal). The phrase "exclusive jurisdiction" is not a broad grant to the Commission of control over all commodities-related matters to the exclusion of all other federal laws.

The jurisdictional provision's own language confirms that its reach is limited. By its terms, "nothing" in Section 2 of the CEA "supersede[s] or limit[s]" federal courts' jurisdiction. 7 U.S.C. § 2(a)(1)(A). The provision juxtaposes the Commission with the SEC and "other regulatory authorities." *Id*. The phrase "other regulatory authorities" immediately follows the reference to "the Securities and Exchange Commission" and is best understood in relation to that term. The interpretive of canon of *ejusdem generis* counsels that general words like "other regulatory authorities" embrace only objects similar to the specific terms that precede them. *See Yates v. United States*, 574 U.S. 528, 545–46 (2015). In this context, the best reading of "exclusive" is a narrower one, describing jurisdiction exclusive of "all others, not just the SEC,"

---

but rather "pursuing enforcement of [IGRA] about what qualifies as" class III gaming. *Assad*, 2026 WL 2543846, at *6.

*Assad*, 2026 WL 2543846, at *7, but not jurisdiction exclusive of the federal courts or all federal law.

The CEA is also selective as to the application of other federal laws to products traded on a DCM. It "supersede[s] and preempt[s] the application of any *State or local law* that prohibits or regulates gaming." 7 U.S.C. § 16(e)(2) (emphasis added). It does not, however, "supersede or preempt" "the application of any Federal or State statute" to any transaction "that *is not* conducted on or subject to the rules of a registered entity or exempt board of trade." *Id.* § 16(e)(1)(B)(i) (emphasis added). True, Congress spoke clearly to supersede and preempt "state regulation of swaps that are 'traded or executed' on a DCM." *Assad*, 2026 WL 2543846, at *7. But it did not say clearly that the CEA displaces other federal statutes, much less IGRA's separate regulation of gambling on Indian lands—a subject on which Congress has spoken "repeatedly, deliberately, and specifically." *Id.* at *9 (citing 25 U.S.C. §§ 2701–2721). Because IGRA and the CEA are not "irreconcilable," we must harmonize them. *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 141–45 (2001).

In so doing, we conclude that the two statutes simply address two different questions. The CEA gives the Commission "exclusive" jurisdiction over covered derivatives trading on designated contract markets. IGRA governs class III gaming activity located on Indian lands. The former statute may determine when a contract can trade on a DCM. It does not determine whether the same transaction, when offered to users on Indian lands, satisfies IGRA's separate requirements. Kalshi's "exclusive jurisdiction" argument thus proves too much. We find it implausible that Congress took "a wrecking ball to all sports gambling regulations built up over decades by federal, state,

and tribal governments when it amended the CEA to add the definition of swap." *Assad*, 2026 WL 2543846, at *15. Section 2 of the CEA consolidates federal agency regulation of covered transactions in the Commission, but it does not create a roving exemption from every other federal statute that may apply to the same conduct for a different reason. For example, the fact that market activity is regulated by the SEC does not prevent application of the antitrust laws. Even where conduct lies in the heartland of an expert federal regulator's authority, another federal statute is displaced only when the two are "clearly incompatible." *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 275 (2007).

In short, the CEA may grant the Commission sole sway over its own field, but it neither negates IGRA nor bars federal courts from hearing a claim under it.

## IV. The Lanham Act[10]

To succeed on their Lanham Act claims, the Tribes must satisfy five elements, one of which is a "false or misleading representation of fact." 15 U.S.C. § 1125(a)(1). The district court correctly explained that the "Sports Betting Legal in all 50 States on Kalshi" advertisement was an inactionable "[s]tatement[] of opinion" about the legality of Kalshi's products. We have previously held that "[a]bsent a clear and

[10] We assume without deciding that the Tribes' interests "fall within the zone of interests protected by" the Lanham Act, and that they therefore have a cause of action under the Act. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (citation omitted); *see also Vericool World, LLC v. Igloo Prods. Corp.*, 175 F.4th 1045, 1052 n.2 (9th Cir. 2026) (the zone of interests inquiry, "sometimes referred to as 'Lanham Act standing,'" asks only "whether there is 'a cause of action under the statute'" and need not be resolved before "affirm[ing] summary judgment on the merits" (quoting *Lexmark*, 572 U.S. at 128)).

unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999). The legality of Kalshi's products remains unsettled, and that state of affairs forecloses a viable Lanham Act claim. *See, e.g.*, *Assad*, 2026 WL 2543846, at *15; *Flaherty*, 172 F.4th at 229; *Schuler*, 2026 WL 1295806, at *3; *Martin*, 793 F. Supp. 3d at 678; *Williams*, 2026 WL 2017466, at *6–9. We affirm the district court's refusal to enjoin Kalshi's advertisement.

## V. The Remaining Preliminary Injunction Factors

As we have reiterated time and again, likelihood of success on the merits is the most significant factor in evaluating a motion for preliminary injunction. Because the Tribes are likely to prevail on their claims under IGRA, we remand as to that claim with instructions "to reach the remaining *Winter* factors in the first instance." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 763 (9th Cir. 2022) (en banc) (citation omitted).

**AFFIRMED in part, REVERSED in part, and REMANDED.**[11]

The parties shall bear their own costs on appeal.

[11] Kalshi's motion to file a supplemental brief, Dkt. No. 85, is granted.